# EXHIBIT 10

Loan No: 198935

## ENVIRONMENTAL INDEMNITY AGREEMENT

This agreement is dated as of August 18, 2017, and is by ASHLAN & HAYES INVESTMENTS, LLC, a California limited liability company, GRANTOR FRESNO CLOVIS INVESTMENTS, LLC, a California limited liability company, and MARICOPA ORCHARDS, LLC, a California limited liability company (collectively, jointly and severally, "**Borrower**"), FARID ASSEMI, a married man, FARSHID ASSEMI, a married man, and DARIUS ASSEMI (a/k/a Dariush Assemi), a single man (together, jointly and severally, "**Guarantor**") (Borrower and Guarantor are collectively referred to herein as "**Indemnitor**"), in favor of METROPOLITAN LIFE INSURANCE COMPANY, a New York corporation, its successors and assigns ("**Lender**").

Indemnitee has agreed to make a loan (the "**Loan**") to Borrower, under the terms and conditions of the Promissory Note by Borrower in favor of Indemnitee dated as of the date of this agreement (the "**Note**"). The Loan is also evidenced by and made in connection with the Loan Agreement made by and among Borrower, Guarantor and Lender dated as of even date herewith (the "**Loan Agreement**").

As a condition to making the Loan, Indemnitee requires that Indemnitor enter into this agreement for the purpose of, without limitation, indemnifying and holding Indemnitee harmless from and against losses incurred by Indemnified Persons as a result of environmental matters relating to the real estate described on EXHIBIT A (the "**Mortgaged Land**").

To induce Indemnitee to make the Loan to Borrower, and in consideration thereof, Indemnitor agrees:

1.     <u>Representations. Covenants and Indemnification.</u>

<u>Representations.</u> To its actual knowledge, Indemnitor represents and warrants to Indemnitee that: (1) Indemnitor has complied and caused the Mortgaged Land to comply with all Environmental Laws, including but not limited to obtaining any necessary Environmental Permits, relating to the Mortgaged Land; (2) there are no existing, pending, or threatened Environmental Claims against Indemnitor relating to the Mortgaged Land; (3) neither Indemnitor nor to the knowledge of Indemnitor any agent, affiliate, tenant, or partner of Indemnitor has received any notices of and does not otherwise have any notice of an Environmental Claim regarding the Mortgaged Land nor any other action, proceeding or investigation by any Governmental Authority or third party under any Environmental Laws or Environmental Permits relating to the Mortgaged Land; (4) any environmental questionnaire, if any, prepared by Indemnitor and submitted to Indemnitee is true and accurate as of the date of this agreement; (5) the Mortgaged Land does not contain any facility that is subject to reporting under Section 312 of the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. 11022); (6) the Mortgaged Land is not listed on the Comprehensive Environmental Response, Compensation and Liability Information System (CERCLIS) in accordance with Section 116 of CERCLA (42 U.S.C. 9616); (7) no portion of the Mortgaged Land contains or is located within 2000 feet of a

Environmental Indemnity Agreement
Ashlan & Hayes et al.
Loan No. 198935
93359343.2 0053564-00303

significant disposal of hazardous waste within the meaning of California Health and Safety Code §25221 (the "**Code**") that could cause the Property to be classified as a hazardous waste property or border zone property under the Code; (8) other than the presence, use, storage and disposal of Hazardous Materials in quantities as necessary for Indemnitor's normal farming operations located on the Mortgaged Land, all of which Indemnitor covenants have and will be used, stored and disposed of in accordance with commercially reasonable farming practices and all applicable Environmental Laws, Indemnitor has no actual knowledge of the presence of any Hazardous Materials on the Mortgaged Land; (9) Indemnitor has no knowledge of any Release of Hazardous Materials on, under, from, or affecting the Mortgaged Land, other than the application of crop fertilizers and agricultural chemicals in accordance with Applicable Law and the manufacturer's label instructions; (10) except as disclosed to Indemnitee in writing, prior to the date of this agreement, Indemnitor has no knowledge of any underground storage tanks or landfills located on the Mortgaged Land; and (11) Indemnitor has provided Indemnitee with all environmental reports and site assessments in the custody or control of Indemnitor relating to the Mortgaged Land.

Covenants. Indemnitor covenants and agrees as follows: (1) Indemnitor shall keep the Mortgaged Land or cause the Mortgaged Land to be kept free of asbestos and asbestos-containing construction materials; (2) Indemnitor shall not use, transport, store, treat, generate, handle or dispose of, or in any manner deal with, and shall ensure that no occupant of the Mortgaged Land uses, transports, stores, treats, generates, handles or disposes of, or in any manner deals with, Hazardous Materials on, in, at, about, or from the Mortgaged Land, except in compliance with all applicable federal, state, and local laws, ordinances, rules and regulations, including Environmental Laws; (3) Indemnitor shall not cause and shall ensure that no occupant of the Mortgaged Land causes the Mortgaged Land to become subject to regulation as a hazardous waste treatment, storage, or disposal facility under Environmental Laws; (4) Indemnitor shall comply with, and ensure compliance by all occupants of the Mortgaged Land with, all Environmental Laws, and shall keep the Mortgaged Land free and clear of any liens imposed pursuant to any Environmental Laws; (5) Indemnitor shall immediately notify Indemnitee if Indemnitor receives any notice or advice from any Governmental Authority or any source whatsoever of any: (A) Release of Hazardous Materials, on, under, from, or affecting the Mortgaged Land, which could require remediation or reporting under Environmental Laws; (B) enforcement action or threat of enforcement action by any Governmental Authority with respect to Hazardous Materials in, on, under, from or affecting the Mortgaged Land or relating to Indemnitor's property, activities or operations generally; (C) Environmental Claim; (D) requirement of Indemnitor or any occupant of the Mortgaged Land to obtain an Environmental Permit other than permits required in the ordinary course of farming operations of the nature or manner occurring on the Mortgaged Land, provided that Indemnitor shall provide such permits promptly upon Indemnitee's request; or (E) requirement of Indemnitor or any occupant of the Mortgaged Land to obtain a permit or license with respect to exploration, mining, extraction, storage, transportation, processing or sale of coal, oil, gas or any other minerals on or under the Mortgaged Land; (6) promptly upon receipt, Indemnitor shall deliver to Indemnitee copies of all notices, orders, or other communications regarding any event described in clauses (5)(A) through (E) above; (7) except as specifically disclosed to Indemnitee in writing, prior to the date of this

Environmental Indemnity Agreement
Ashlan & Hayes et al.
Loan No. 198935
93359343.2 0053564-00303

2

agreement, Indemnitor shall not allow to exist on, under, or about the Mortgaged Land any underground storage tanks; and with respect to such underground storage tanks, previously disclosed to Indemnitee in writing, all such underground storage tanks shall be operated and maintained in accordance with all Environmental Laws; and (8) upon an Event of Default, then without any notice or further action Indemnitee may in its sole discretion enter the Mortgaged Land to perform or have performed investigation of the Mortgaged Land for the presence of Hazardous Materials. Such investigation may include but is not limited to the conduct of a Phase I and/or Phase II Environmental Report including any surface or subsurface sampling and analysis of soil, groundwater, sediment and/or surface water. Indemnitor shall cooperate fully with Indemnitee with respect to any such investigation by Indemnitee.

Environmental Report. If Indemnitee has received information indicating a reasonable possibility of the presence of Hazardous Materials on the Mortgaged Land in violation of Environmental Laws, Indemnitor shall provide at its sole cost and expense within 20 days after written request by Indemnitee, a Phase I Environmental Assessment from a qualified engineering firm or other qualified consultant acceptable to Indemnitee with respect to an investigation and audit of the Mortgaged Land as deemed necessary by the consultant to enable the consultant to report that there is no apparent or likely Hazardous Materials on the Mortgaged Land that violate Environmental Laws; and Indemnitor shall, if deemed reasonably necessary to further investigate suspected or likely contamination, provide Indemnitee with supplemental reports by acceptable qualified consultants of the analysis which may include surface and subsurface sampling and analysis of soil, sediment, surface water and/or groundwater from the Mortgaged Land, showing no Hazardous Materials present on the Mortgaged Land in violation Environmental Laws (any such audit, and any supplemental reports, an "**Environmental Report**"). If Indemnitor does not comply with the requirements of this Section within such 20 day period, or such additional time commercially reasonable as Indemnitee shall agree to in writing, or if Indemnitee is not reasonably satisfied with the results of any of the conclusions in the Environmental Report, then Indemnitee may perform or cause to be performed such additional investigations (including surface and subsurface testing of soil, groundwater, surface water and sediment) as Indemnitee deems appropriate. Indemnitor consents to Indemnitee entering the Mortgaged Land to the extent required to perform and to Indemnitee performing such additional investigations, without the need for further action.

Remedial Work. If any investigation, monitoring, containment, cleanup, removal, restoration or other remedial work of any kind or nature ("**Remedial Work**") is deemed by Indemnitee to be necessary pursuant to Environmental Laws or with respect to Environmental Claims, Indemnitor will within 30 days after written demand for performance thereof by Indemnitee (or such shorter period of time as required under Applicable Law), begin and thereafter complete, all such Remedial Work. All Remedial Work shall be approved in advance in writing by Indemnitee. All Costs related to such Remedial Work shall be paid by Indemnitor including Costs incurred by Indemnitee in connection with monitoring or review of such Remedial Work. If Indemnitor fails to promptly commence or fails to complete such Remedial Work, Indemnitee may, but shall not be required to, cause such Remedial Work to be performed and all Costs shall become an Environmental Claim hereunder. If there is an emergency, Indemnitor shall immediately commence the Remedial Work and thereafter give immediate notice to Indemnitee.

Environmental Indemnity Agreement
Ashlan & Hayes et al.
Loan No. 198935
93359343.2 0053564-00303

3

INDEMNITY. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW INDEMNITOR AGREES TO INDEMNIFY, DEFEND, PROTECT, AND HOLD HARMLESS INDEMNIFIED PERSONS (DEFINED BELOW) FROM AND AGAINST ANY AND ALL COSTS SUFFERED, IMPOSED ON, OR INCURRED BY INDEMNIFIED PERSONS OR ASSERTED AGAINST INDEMNIFIED PERSONS, WHICH DIRECTLY OR INDIRECTLY ARISE OUT OF OR RESULT FROM: (1) THE PRESENCE OR EXISTENCE OF HAZARDOUS MATERIALS AT, ON, ABOUT, UNDER, WITHIN, NEAR OR IN CONNECTION WITH THE MORTGAGED LAND; (2) THE INACCURACY OF ANY OF THE REPRESENTATIONS OF INDEMNITOR CONTAINED IN THIS AGREEMENT; (3) ANY ENVIRONMENTAL CLAIM; (4) ANY BREACH BY INDEMNITOR OF ANY OF ITS COVENANTS OR AGREEMENTS IN THIS AGREEMENT; AND (5) ANY CLAIM, DEMAND OR CAUSE OF ACTION, OR ANY ACTION OR OTHER PROCEEDING, WHETHER MERITORIOUS OR NOT, BROUGHT OR ASSERTED AGAINST INDEMNIFIED PERSONS WHICH RELATES TO, ARISES FROM OR IS BASED ON ANY OF THE MATTERS DESCRIBED IN CLAUSES (1) THROUGH (5) OF THIS SECTION, OR ANY ALLEGATION OF ANY SUCH MATTERS (collectively, the "**Indemnified Matters**"). The indemnification provided in this Section applies to and includes Costs due to Environmental Claims brought by or on behalf of employees of Indemnitor. This agreement does not limit any rights or remedies, including the right to contribution, which any Indemnified Person may have against Indemnitor or any other party under any federal, state or local laws.

2. Generale Terms and Conditions.

Payment on Demand; Interest. All amounts required to be paid by Indemnitor to Indemnified Persons under the terms of this agreement will be due and payable upon demand, and will bear interest from the date of any payment thereof by Indemnified Persons, until paid by Indemnitor, at a rate per annum equal to (1) if Indemnitee is the holder of the Note, the Default Interest Rate (as defined in the Note); and (2) if Indemnitee is no longer the holder of the Note, the lesser of (A) 16.000% per annum; or (B) the maximum rate then permitted under Applicable Law.

Unsecured Obligations. Notwithstanding any provision to the contrary in the Loan Documents, the Indemnity Obligations are not secured by any lien or security interest in real estate or personal property.

Environmental Claim Proceeding. Indemnitee may join and participate in, as a party if it so elects, any legal proceedings or actions initiated by Indemnitor or against Indemnitor or the Mortgaged Land, in connection with any Environmental Law. In connection with any Environmental Claim, Indemnified Persons may, but shall not be obligated to, employ their own legal counsel and consultants to investigate, prosecute, negotiate, or defend any such Environmental Claim or matter, and Indemnified Persons shall have the right to compromise or settle the same without showing actual liability therefor, and without the consent of Indemnitor. Provided, however, Indemnitor shall not, without the prior written consent of Indemnitee, in any circumstance in which this Agreement applies (1) settle or compromise any action, suit, proceeding, or claim or consent to the entry of any judgment that does not include as an unconditional term thereof the delivery by the claimant or plaintiff to Indemnitee of (A) a full and complete written release of Indemnified Persons (in form, scope and substance satisfactory

Environmental Indemnity Agreement
Ashlan & Hayes et al.
Loan No. 198935
93359343.2 0053564-00303

4

to Indemnitee) from all liability in respect of such action, suit or proceeding and (B) a dismissal with prejudice of such suit, action or proceeding; or (2) settle or compromise any action, suit, proceeding, or claim in any manner that may adversely affect Indemnified Persons as determined by Indemnitee. All Professional Fees and other expenses incurred by Indemnitee in connection with the exercise of its rights and remedies under this agreement will constitute an Environmental Claim.

INDEPENDENT OBLIGATIONS. THE RIGHTS OF INDEMNIFIED PERSONS ARE IN ADDITION TO ALL OTHER RIGHTS AND REMEDIES OF INDEMNIFIED PERSONS UNDER THE LOAN DOCUMENTS, OR ANY OTHER DOCUMENT OR INSTRUMENT NOW OR HEREAFTER EXECUTED BY INDEMNITOR, OR AT LAW OR IN EQUITY (INCLUDING ANY RIGHT OF REIMBURSEMENT OR CONTRIBUTION PURSUANT TO CERCLA). INDEMNIFIED PERSONS MAY BRING A SEPARATE ACTION, OR COMMENCE A SEPARATE REFERENCE OR ARBITRATION PROCEEDING AGAINST ANY INDEMNITOR WITHOUT FIRST PROCEEDING AGAINST ANY OTHER INDEMNITOR, IF ANY, ANY OTHER PERSON OR ANY SECURITY THAT INDEMNIFIED PERSONS MAY HOLD, AND WITHOUT PURSUING ANY OTHER REMEDY.

SURVIVAL OF OBLIGATIONS. SUBJECT TO THE PROVISIONS SET FORTH BELOW, THE RIGHTS OF INDEMNIFIED PERSONS UNDER THIS AGREEMENT WILL SURVIVE (1) THE PAYMENT IN FULL OF ALL INDEBTEDNESS (AS DEFINED IN THE LOAN AGREEMENT), (2) THE RELEASE OF THE MORTGAGED LAND FROM THE LIEN OF THE DEED OF TRUST (AS DEFINED IN THE LOAN AGREEMENT), (3) A FORECLOSURE TRANSFER, OR (4) ANY ASSIGNMENT OF ALL OR ANY OF INDEMNITEE'S RIGHTS UNDER THE LOAN DOCUMENTS. Notwithstanding any other provision of this agreement to the contrary, Indemnitor will not be liable to Indemnified Persons for Indemnified Matters, if such Indemnified Matters result directly and solely from (A) the gross negligence or willful misconduct of Indemnified Persons, or (B) other events or circumstances not first occurring or present until a time subsequent to the earlier of (X) the payment in full of all Indebtedness (as defined in the Loan Agreement) or (Y) a Foreclosure Transfer.

Revival and Reinstatement. If Indemnified Persons are required to pay, return or restore to Indemnitor or any other Person any amounts previously paid under the terms of this agreement because of any Insolvency Proceeding of Indemnitor or such other Person, any stop notice or any other reason, the obligations of Indemnitor shall be reinstated and revived and the rights of Indemnified Persons shall continue with regard to such amounts, all as though they had never been paid.

Notices. All requests, notices, approvals, consents, and other communications between Indemnitor and Indemnified Persons (individually and collectively, "**Notices**") under this agreement must be in writing and mailed or delivered, if to any Indemnitor, at 1306 W. Herndon Avenue, Suite 101, Fresno, California 93711, Attn: Legal Department; if to Indemnitee or any other Indemnified Person, at Metropolitan Life Insurance Company, Agricultural Investments, 10801 Mastin Blvd., Ste. 930, Overland Park, KS  66210, Attn: SSU Director, with a carbon

Environmental Indemnity Agreement
Ashlan & Hayes et al.
Loan No. 198935
93359343.2 0053564-00303

5

copy to Metropolitan Life Insurance Company, Agricultural Investments, 205 E River Park Circle, Ste. 430, Fresno, CA 93720, Attn: Director, WRO, or to the address designated by any party to this agreement in a notice to the other parties. All Notices will be deemed to be given or made upon the earlier to occur of: (1) actual receipt by the intended recipient; (2) if delivered by hand or by courier, upon delivery; or (3) if delivered by mail, four Business Days after deposit in the U.S. mail, properly addressed, postage prepaid; except that notices and other communications to Indemnitee will not be effective until actually received by Indemnitee.

<u>Defined Terms</u>. Except as otherwise expressly provided herein, capitalized terms used in this agreement will have the respective meanings assigned to such terms below

"**Affiliate**" of a Person other than an individual means another Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified. Unless otherwise specified, all references to an "Affiliate" or to "Affiliates" refer to any Affiliate or Affiliates, if any.

"**Applicable Law**" means all existing and future laws, orders, ordinances, rules and regulations of or by a Governmental Authority.

"**Costs**" shall mean all liabilities, losses, charges, costs, damages (including foreseeable and unforeseeable consequential damages), debts, reasonable expenses, claims, and Professional Fees of any kind or of any nature whatsoever. For the purposes of this definition, such losses, costs and damages shall include remedial, removal, response, abatement, cleanup, legal, investigative and monitoring costs and related costs, expenses, losses, damages, penalties, fees, fines, obligations, defenses, judgments, awards, actions, suits, proceedings, disbursements and amounts paid in settlement, of whatever kind or nature.

"**Drafting Conventions**" means the rules on interpretation specified in the section of this agreement captioned "Drafting Conventions."

"**Event of Default**" means an "Event of Default" as that term is defined in the Loan Agreement, and in addition, any default in the payment, performance or otherwise of any term, covenant, condition or obligation of Indemnitor under this agreement, which is not cured within any applicable cure or grace period as provided for in the Loan Agreement, if any.

"**Environmental Claim**" includes, but is not limited to, any claim, demand, action, cause of action, suit, loss, cost, damage, fine, penalty, expense, liability, judgment, proceeding, or injury, whether threatened, sought, brought, or imposed, that seeks to impose Costs, directly or indirectly related to the Mortgaged Land for (1) noise; (2) pollution or contamination of the air, surface water, ground water, drinking water, soil or soil vapor; (3) generation, handling, collection, treatment, management, storage, disposal or transportation of solid, gaseous, or liquid waste; (4) injection, withdrawal, generation, handling, collection, treatment, management, storage, disposal or transportation of process water, flowback water or fluids, produced water, wastewater, groundwater, surface water or stormwater; (5) the exposure to, presence or alleged Release of Hazardous Materials, on, under, from, or affecting the Mortgaged Land, whether or not known to Indemnitor, regardless of the source of such exposure, presence or Release, or except as expressly provided in this agreement, regardless of when such exposure, Release or

Environmental Indemnity Agreement
Ashlan & Hayes et al.
Loan No. 198935
93359343.2 0053564-00303

6

presence occurred; (6) the manufacture, processing, distribution in commerce, use, or storage of Hazardous Materials; (7) the exploration, mining, extraction, or processing of coal, oil, gas, or other minerals; (8) the drilling, installation, construction, maintenance, operation and existence of any wells on or under the Mortgaged Land; (9) injury to or death of any Person or Persons directly or indirectly connected with Hazardous Materials and directly or indirectly related to the Mortgaged Land; (10) destruction or contamination of any property directly or indirectly connected with Hazardous Materials and directly or indirectly related to the Mortgaged Land; (11) pollution, contamination, or degradation of the quality of drinking waters or public water supplies; (12) the removal of Hazardous Materials from the Mortgaged Land or the taking of necessary precautions to protect against the Release of Hazardous Materials on, under or from the Mortgaged Land; (13) compliance with all Environmental Laws and Environmental Permits and/or any asserted breach or violation of any Environmental Laws or Environmental Permits; (14) any restriction on use, ownership, occupation, or transferability of the Mortgaged Land as a result of Hazardous Materials; (15) the maintenance of a private or public nuisance, trespass, or the conducting of an abnormally dangerous activity on or near the Mortgaged Land, in each case arising from or in connection with Hazardous Materials; (16) any remedial, response, abatement, cleanup, investigative and monitoring work in connection with any Hazardous Materials or as required by any Environmental Laws; or (17) any and all fines or penalties directly or indirectly connected with Hazardous Materials and directly or indirectly related to the Mortgaged Land.

"**Environmental Law**" means all requirements of environmental or ecological laws or regulations or controls related to the Mortgaged Land, including all requirements imposed by any Applicable Law of any Governmental Authority or any private agreement (such as covenants, conditions and restrictions), which relate to (1) noise; (2) pollution or protection of the air, surface water, ground water, drinking water, soil or soil vapor; (3) solid, gaseous, or liquid waste generation, handling, collection, treatment, management, storage, disposal, or transportation; (4) exposure to Hazardous Materials; (5) regulation of the manufacture, processing, distribution and commerce, use, or storage of Hazardous Materials, (6) injection, withdrawal, generation, handling, collection, treatment, management, storage, disposal, or transportation of process water, flowback water or fluids, produced water, wastewater, groundwater, drinking water, surface water or stormwater; or (7) the exploration, mining, extraction, or processing of coal, oil, gas, or other minerals.

"**Environmental Permit**" means any permit, license, approval, or other authorization with respect to any activities, operations, or businesses conducted on, under or in relation to the Mortgaged Land obtained or required in connection with any Environmental Law.

"**Foreclosure Transfer**" means with respect to any Mortgaged Land, the transfer of title to that Mortgaged Land pursuant to judicial decree, the power of sale or other judicial or non-judicial action or proceeding to foreclose the interests of Indemnitee under the Loan Documents in the Mortgaged Land, or by deed in lieu of such foreclosure.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

Environmental Indemnity Agreement
Ashlan & Hayes et al.
Loan No. 198935
93359343.2 0053564-00303

7

"**Hazardous Materials**" means:   (1) those substances included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," or "solid waste" in the Comprehensive Environmental Response Compensation and Liability Act of 1980 (42 U.S.C. § 9601 *et seq.*) ("**CERCLA**"), as amended by Superfund Amendments and Reauthorization Act of 1986 (Pub. L. 99-499 100 Stat. 1613) ("**SARA**"), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 *et seq.*) ("**RCRA**"), and the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 *et seq.*, and those substances included in the definitions of "hazardous air pollutant" under the federal Clean Air Act (42 U.S.C. Section 701, *et seq.*), or "extremely hazardous substance" or "toxic chemical' under the Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001, *et seq.*), and in the regulations promulgated pursuant to said laws, all as amended; (2) those substances listed in the U.S. Department of Transportation Table (49 CFR 172.101 and amendments thereto) or by the Environmental Protection Agency (or any successor agency) as hazardous substances (40 CFR Part 302 and amendments thereto); (3) any material, waste or substance which is or are: (A) petroleum, (B) asbestos, (C) polychlorinated biphenyls, (D) designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* (33 U.S.C. § 1321) or listed pursuant to Section 307 of the Clean Water Act (33 U.S.C. § 1317); (E) designated as a "pollutant" pursuant to Section 502(6) of the Clean Water Act (33 U.S.C. § 1362(6); (F) flammable explosives; or (G) radioactive materials; and (4) such other substances, materials and wastes which are or become classified or regulated as hazardous or toxic under Applicable Law or by any Governmental Authority, including mold, radon, radionuclides, heavy metals or other potentially naturally-occurring minerals or substances.

"**Indemnified Persons**" means Indemnitee, Indemnitee's Subsidiaries and Affiliates and all of their officers, directors, agents, employees, servants, attorneys, and representatives.

"**Indemnity Obligations**" means the indebtedness, liabilities and obligations of Indemnitor to Indemnified Persons under the terms of this agreement.

"**Insolvency Proceeding**" means the insolvency of a Person, the appointment of a receiver of any part of a Person's property, an assignment by a Person for the benefit of creditors, or the commencement of any proceeding under the Federal Bankruptcy Code or any other bankruptcy or insolvency law, by or against a Person.

"**Legal Fees**" means all counsel, attorney, paralegal and law clerk fees and disbursements including, but not limited to fees and disbursements at the pre-trial, trial, appellate, discretionary review, or any other level.

"**Loan Documents**" shall have the meaning provided in the Loan Agreement, provided that notwithstanding anything to the contrary in the Loan Documents as defined therein, the term Loan Documents does not include this agreement.

"**Person**" means an individual, a corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or other business entity, or a government or any agency or political subdivision thereof.

Environmental Indemnity Agreement
Ashlan & Hayes et al.
Loan No. 198935
93359343.2 0053564-00303

8

"**Professional Fees**" means: Legal Fees; and all other fees and disbursements of environmental engineers and other third party consultants or professionals associated with the enforcement of Indemnitee's rights and remedies under this agreement.

"**Release**" means any discharging, disposing, emitting, leaking, pumping, pouring, emptying, injecting, escaping, leaching, dumping or spilling (including the abandonment or discarding of barrels, containers and other closed receptacles) into ambient air, surface water, ground water, soil, or soil vapor.

"**Subsidiary**" of a Person which is anything other than an individual means a business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly by that Person. Unless otherwise specified, all references to a "Subsidiary" or to "Subsidiaries" refer to any Subsidiary or Subsidiaries, if any.

<u>Drafting Conventions</u>.  Evidence of the occurrence or non-occurrence of any event, or the existence or non-existence of any circumstance to be delivered to Indemnitee must be in a form satisfactory to Indemnitee; and any report or document to be received by Indemnitee must be in form and content satisfactory to Indemnitee.  Wherever:  (1) Indemnitee exercises any right given to it to approve or disapprove; (2) any arrangement or term is to be satisfactory to Indemnitee; or (3) any other decision or determination is to be made by Indemnitee, then except as may be otherwise expressly and specifically provided therein, the decision to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory, and all other decisions and determinations made by Indemnitee, will be in the sole discretion of Indemnitee.  The words "**include**," "**includes**," and "**including**" are to be read as if they were followed by the phrase "without limitation"; headings and captions are provided for convenience only and do not affect the meaning of the text which follows; and the definitions in this agreement apply equally to both singular and plural forms of the terms defined.

<u>General</u>.  This agreement may be executed in counterparts, each of which will be an original and all of which together are deemed one and the same agreement.  Indemnitee may make an optically imaged reproduction of this agreement and, at its election, destroy the original or originals.  Indemnitor consents to the destruction of the original or originals and agrees that a copy of the optically imaged reproduction of this agreement will be the equivalent of and for all purposes constitute an "original" document.  No provision or waiver in this agreement shall be construed as limiting the generality of any other provision or waiver contained in this agreement.  Each party to this agreement has participated in negotiating and drafting this agreement, so if an ambiguity or a question of intent or interpretation arises, this agreement is to be construed as if the parties had drafted it jointly, as opposed to being construed against a party because it was responsible for drafting one or more provisions of this agreement.  This agreement will inure to the benefit of and shall be binding upon the parties and their respective successors and assigns; provided, that Indemnitor shall not assign its rights or obligations hereunder without Indemnitee's consent.  Indemnitee may transfer all or any portion of its rights under this agreement to any other Person to whom Indemnitee assigns its rights under the Loan Documents; provided, however, that Indemnitee is under no obligation to make such assignment upon the

Environmental Indemnity Agreement
Ashlan & Hayes et al.
Loan No. 198935
93359343.2 0053564-00303

9

assignment of its rights under the Loan Documents. All rights and remedies under this agreement and the Loan Documents are cumulative, and the exercise of any one or more of them does not constitute an election of remedies. Any provision of this agreement which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this agreement or affecting the validity or enforceability of that provision in any other jurisdiction. This agreement may not be amended, changed, modified, altered or terminated without the prior written consent of Indemnitor. This agreement: (1) represents the sum of the understandings and agreements between Indemnitee and Indemnitor related to the Mortgaged Land concerning the subject of an unsecured environmental indemnity agreement separate from and in addition to the indebtedness, liabilities and obligations of Indemnitor under the Loan Documents (a "**Separate Environmental Indemnity**"); (2) replaces any prior agreements between Indemnitee and Indemnitor concerning the subject of a Separate Environmental Indemnity; and (3) is intended by Indemnitee and Indemnitor as the final, complete and exclusive statement of the terms agreed to by them with respect to a Separate Environmental Indemnity.

Governing Law/Jurisdiction and Venue. This agreement shall be governed exclusively by the laws of the State of California without regard or reference to its conflict of laws principles. INDEMNITOR AND INDEMNITEE IRREVOCABLY AGREES THAT ALL ACTIONS, PROCEEDINGS OR COUNTERCLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY LOAN DOCUMENT WILL BE LITIGATED IN THE DISTRICT COURT IN AND FOR THE COUNTY IN WHICH THE MORTGAGED LAND IS LOCATED, OR THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CALIFORNIA IN WHICH SUCH COUNTY IS LOCATED. INDEMNITOR AND INDEMNITEE IRREVOCABLY CONSENTS TO SERVICE, JURISDICTION, AND VENUE OF THOSE COURTS FOR ALL SUCH ACTIONS, PROCEEDINGS AND COUNTERCLAIMS AND WAIVES ANY OTHER VENUE TO WHICH IT MIGHT BE ENTITLED BY VIRTUE OF DOMICILE, HABITUAL RESIDENCE OR OTHERWISE.

Joint and Several Obligations. If Indemnitor consists of more than one Person, each Indemnitor (1) acknowledges that this agreement is the independent and several obligation of each Indemnitor and may be enforced against each Indemnitor separately, whether or not enforcement of any right or remedy hereunder has been sought against any other Indemnitor; and (2) agrees that its liability under this agreement shall be absolute, unconditional, continuing and irrevocable. INDEMNITOR WAIVES ANY REQUIREMENT THAT INDEMNITEE EXHAUST ANY RIGHT, POWER OR REMEDY AND PROCEED AGAINST ANY OTHER INDEMNITOR UNDER THIS AGREEMENT OR AGAINST ANY OTHER PERSON UNDER ANY AGREEMENT OF, OR SECURITY FOR, ANY OF THE INDEMNITY OBLIGATIONS.

Obligations of Married Persons. Any Indemnitor who is a married Person signs this agreement on his or her own behalf and on behalf of Indemnitor's marital community, if any and agrees that recourse may be had against community assets, if any, and against Indemnitor's separate property for the satisfaction of all Indemnity Obligations.

Successive Actions. To the extent permitted by Applicable Law, separate and successive actions may be brought hereunder to enforce any of the provisions of this agreement. No action

hereunder shall prevent a subsequent action, and Indemnitor hereby waives and covenants not to assert any defense in the nature of splitting of causes of action or merger of judgments.

Waiver. Indemnitor: (1) waives any right or claim of right to cause a marshaling of the assets of Indemnitor or to cause Indemnified Persons to proceed against any of the security for the Loan before proceeding under this agreement against Indemnitor; and (2) waives and relinquishes all rights and remedies accorded by Applicable Law to indemnitors or guarantors, except any rights of subrogation that Indemnitor may have; provided that the indemnity provided for hereunder shall neither be contingent upon the existence of any such rights of subrogation nor subject to any claims or defenses whatsoever that may be asserted in connection with the enforcement or attempted enforcement of such subrogation rights, including any claim that such subrogation rights were abrogated by any acts or omissions of Indemnified Persons.

Waiver of Right of Contribution. If Indemnitor is comprised of more than one Person, each such Person agrees that it will have no right of contribution (including any right of contribution under CERCLA) or subrogation against any other Person comprising Indemnitor under this agreement unless and until all Indemnity Obligations have been satisfied. Each such Person further agrees that, to the extent that the waiver of its rights of subrogation and contribution in this agreement is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation or contribution that Person may have will be junior and subordinate to the rights of Indemnitee against Indemnitor under this agreement.

**WAIVER OF TRIAL BY JURY. INDEMNITOR BY EXECUTION AND DELIVERY OF THIS AGREEMENT TO INDEMNITEE, AND INDEMNITEE, BY ACCEPTANCE OF THIS AGREEMENT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, (A) COVENANT AND AGREE NOT TO ELECT A TRIAL BY JURY IN ANY ACTION OR PROCEEDING FOR THE RESOLUTION OF ANY CONTROVERSY OR CLAIM THAT ARISES OUT OF OR RELATES TO: (1) THIS AGREEMENT; OR (2) ANY INDEMNITY OBLIGATION, WHETHER ARISING IN CONTRACT, TORT OR BY STATUTE (INDIVIDUALLY AND COLLECTIVELY, A "CONTROVERSY OR CLAIM"); AND, (B) WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY CONTROVERSY OR CLAIM TO THE EXTENT SUCH RIGHT EXISTS NOW OR IN THE FUTURE. THE PROVISIONS OF THIS SECTION ARE GIVEN KNOWINGLY AND VOLUNTARILY; AND ARE A MATERIAL INDUCEMENT FOR INDEMNITEE ENTERING INTO THE NOTE AND OTHER LOAN DOCUMENTS.**

Environmental Indemnity Agreement
Ashlan & Hayes et al.
Loan No. 198935
93359343.2 0053564-00303

11

Indemnitor has executed this agreement effective as of the day and year first written above.

**INDEMNITOR**

BORROWERS:

ASHLAN & HAYES INVESTMENTS, LLC,
a California limited liability company

By: _____
Kevin Assemi, Manager

By: _____
Neema Assemi, Manager

By: _____
Darius Assemi, Manager

*[Signatures continue on following page]*

Environmental Indemnity Agreement
Ashlan & Hayes et al.
Loan No. 198935
93359343.2 0053564-00303

12

GRANTOR FRESNO CLOVIS INVESTMENTS, LLC
a California limited liability company

By: _____

Neema Assemi, Sole Trustee of The Farid Assemi 2010
Grantor Trust dated December 30, 2010, Member

By: _____

Kevin Assemi, Sole Trustee of The Farshid and Sonia
Assemi 2010 Grantor Trust dated December 30, 2010,
Member

*[Signatures continue on following page]*

Environmental Indemnity Agreement
Ashlan & Hayes et al.
Loan No. 198935
93359343.2 0053564-00303

13

MARICOPA ORCHARDS, LLC,
a California limited liability company

By: _____
      Farid Assemi, General Manager

By: _____
      Farshid Assemi, General Manager

By: _____
      Darius Assemi, General Manager

*[Signatures continue on following page]*

Environmental Indemnity Agreement
Ashlan & Hayes et al.
Loan No. 198935
93359343.2 0053564-00303

14

GUARANTOR:

_____
FARID ASSEMI

_____
FARSHID ASSEMI

_____
DARIUS ASSEMI

Environmental Indemnity Agreement
Ashlan & Hayes et al.
Loan No. 198935
93359343.2 0053564-00303

SPOUSAL CONSENT

The undersigned, as the spouse of FARID ASSEMI, hereby signs and consents to this "Agreement" for the purpose of binding and consenting to the commitment of the marital community property of FARID ASSEMI and the undersigned as assets available for satisfaction of obligations under the Agreement, and for the purpose of acknowledging and agreeing that (i) no consent of the undersigned shall be required for any future modification of the Agreement or the obligations undertaken thereunder, and (ii) any community property of FARID ASSEMI and the undersigned which shall hereafter be transmuted into separate property of the undersigned shall be available for satisfaction of obligations under the Agreement.

By: _____
     Cheryl Assemi

SPOUSAL CONSENT

The undersigned, as the spouse of FARSHID ASSEMI, hereby signs and consents to this "Agreement" for the purpose of binding and consenting to the commitment of the marital community property of FARSHID ASSEMI and the undersigned as assets available for satisfaction of obligations under the Agreement, and for the purpose of acknowledging and agreeing that (i) no consent of the undersigned shall be required for any future modification of the Agreement or the obligations undertaken thereunder, and (ii) any community property of FARSHID ASSEMI and the undersigned which shall hereafter be transmuted into separate property of the undersigned shall be available for satisfaction of obligations under the Agreement.

By: _Sonia Rosemary Assemi_

Sonia Rosemary Assemi

Environmental Indemnity Agreement
Ashlan & Hayes et al.
Loan No. 198935
93359343.2 0053564-00303

17

## EXHIBIT A

ENVIRONMENTAL INDEMNITY AGREEMENT
Loan No: 198935
**Legal Description**

The land is situated in the unincorporated area of the County of Kern, State of California, and is described as follows:

TRACT I:

PARCEL ONE:

The West half of the Southwest quarter of Section 34, Township 32 South, Range 25 East, Mount Diablo Meridian, in the unincorporated area of the County of Kern, State of California, as per the Official Plat thereof.

APN: 220-130-32-00-5

PARCEL TWO:

The South half of the Northwest quarter and the Southwest quarter of the Northeast quarter of Section 26, Township 32 South, Range 25 East, Mount Diablo Meridian, in the unincorporated area of the County of Kern, State of California, as per the Official Plat thereof.

APN: 220-130-30-00-9

PARCEL THREE:

The Southeast quarter of the Northeast quarter of Section 26, Township 32 South, Range 25 East, Mount Diablo Meridian, in the unincorporated area of the County of Kern, State of California, as per the Official Plat thereof.

EXCEPTING THEREFROM 10% of all oil, gas, other hydrocarbon substances and minerals within or underlying said land as by B.P. Oil Corporation, a corporation by Deed recorded November 21, 1973 in Book 4813, Page 1567 of Official Records.

APN: 220-130-05-00-7

TRACT II:

PARCEL ONE:

The Northeast quarter of Section 34, Township 32 South, Range 25 East, Mount Diablo Meridian, according to the Official Plat of said land approved by the Surveyor General, on June 1, 1855.

Environmental Indemnity Agreement
Ashlan & Hayes et al.
Loan No. 198935
93359343.2 0053564-00303

Exhibit A – 1

EXCEPTING THEREFROM 1/4 of all oil, gas and minerals rights as reserved in Deed from Pauline F. Crane, Administratrix of the Estate of Abigail Briggs Fowler, deceased, recorded July 3, 1952 in Book 1959, Page 228 of Official Records.

APN: 220-130-24-00-2

PARCEL TWO:

The Northeast quarter of the Southeast quarter of Section 34, Township 32 South, Range 25 East, Mount Diablo Meridian, in the unincorporated area of the County of Kern, State of California, according to the Official Plat thereof.

APN: 220-130-17-00-2

TRACT III:

The Southeast quarter (SE 1/4) of the Northeast quarter (NE 1/4) of Section 33, Township 12 North, Range 22 West, San Bernardino Base and Meridian.

APN: 295-160-05-00-2

EXCEPTING AND RESERVING unto the Grantor herein in all the above described property all oil, gas, petroleum and other hydrocarbons, precious minerals, industrial minerals, hard rock minerals, gravel, geothermal resources, water byproducts associated with extraction of minerals including the right to inject water, produced from said land only, to the oil-bearing strata underlying said land not previously excepted or reserved of record. (Mineral Reservation)

Mineral Reservation shall be subject to the following: (i) Grantor shall have no right to drill and/or use any water supply well on said land; (ii) Grantor shall have no right to use open pits or sumps on the surface of said land or to inject water or chemicals into the oil-bearing strata from sources other than from activities conducted on said land; (iii) any oil wells and other infrastructure will be located on the perimeter of said land; and (iv) Grantor acknowledges that Grantee (or its successor(s), assign(s), tenant(s) or subtenant(s)) are not, in any way, waiving any claim for damages Grantee may suffer to said land or improvements as a result of Grantor's or Grantor's lessee's or licensee's mineral exploration activities conducted on said land.

TRACT IV:

The East 1/2 of the South 1/2 of Section 26, Township 32 South, Range 25 East, Mount Diablo Base and Meridian, in the unincorporated area of the County of Kern, State of California, according to the Official Plat thereof.

Excepting therefrom all oil, gas, other hydrocarbon substances and minerals of any kind or character, in, on, or thereunder, as reserved in previous Deeds of record.

APN: 220-130-35-00-4

Loan No: 198935

## ENVIRONMENTAL INDEMNITY AGREEMENT

This Agreement is dated as of August ⏗, 2019, and is by GRANTOR FRESNO CLOVIS INVESTMENTS, LLC, a California limited liability company, ASHLAN & HAYES INVESTMENTS, LLC, a California Limited liability company, and MARICOPA ORCHARDS, LLC, a California limited liability company (collectively, jointly and severally, "**Borrower**"), FARID ASSEMI, a married man, FARSHID ASSEMI, a married man, and DARIUS ASSEMI (a/k/a Dariush Assemi), a single man (together, jointly and severally, "**Guarantor**"), and 104 PARTNERS, LLC, a California limited liability company ("**Trustor**") (Borrower, Trustor and Guarantor are collectively referred to herein as "**Indemnitor**"), in favor of METROPOLITAN LIFE INSURANCE COMPANY, a New York corporation, its successors and assigns ("**Indemnitee**").

Indemnitee has made a loan (the "**Loan**") to Borrower, under the terms and conditions of the Promissory Note by Borrower in favor of Indemnitee dated as of August 18, 2017 (the "**Note**"). The Loan is also evidenced by and made in connection with the Loan Agreement made by and among Borrower, Guarantor and Indemnitee dated as of August 18, 2017 (the "**Loan Agreement**").

Borrower has requested that Indemnitee consent to the exchange of a parcel encumbered by the Deed of Trust (the "**Release Parcel**") for another parcel of real property for which title to the leasehold estate and improvements is vested in Trustor (the "**Additional Parcel**") (such release and exchange, the "**Parcel Exchange**"). The Additional Parcel is described on <u>Exhibit A</u> attached hereto, and will be encumbered as collateral for the Loan by a Deed of Trust, Security Agreement, Assignment of Rents and Leases and Fixture Filing dated as of even date herewith granted by Rachel Marie White, an unmarried woman, as to the fee estate and Trustor, as to the Improvements and leasehold estate, collectively as trustor (the "**Deed of Trust**"). As part of the Parcel Exchange transaction, Trustor has, or will concurrently herewith, assume the obligations under the Loan jointly and severally with the Borrower.

As a condition to consenting to the Parcel Exchange, Indemnitee requires Indemnitor to indemnify and hold harmless Indemnitee from any Environmental Claim, any requirements of Environmental Law, and any violation of any Environmental Permit, and all Costs (as the foregoing terms are defined below) relating to the Additional Parcel. Indemnitee would not consent to the Parcel Exchange without this Agreement and Indemnitor acknowledges and understands that this Agreement is a material inducement for Indemnitee's consent to the Parcel Exchange. This Agreement is not intended to be, nor shall it be, secured or limited by the Deed of Trust in any manner whatsoever and is not intended to secure payment of the Note but rather is an independent obligation of Indemnitor. It shall be understood that any and all rights and remedies contained herein shall be in addition to and not in derogation of any rights or remedies contained in the Deed of Trust or in any related loan documents.

To induce Indemnitee to agree to the Parcel Exchange, and in consideration thereof, Indemnitor agrees:

1.      <u>Representations. Covenants and Indemnification.</u>

<u>Representations.</u>  To its actual knowledge, Indemnitor represents and warrants to Indemnitee that: (1) Indemnitor has complied and caused the Additional Parcel (herein, the "**Mortgaged Land**") to comply with all Environmental Laws, including but not limited to obtaining any necessary Environmental Permits, relating to the Mortgaged Land; (2) there are no existing, pending, or threatened

1

Environmental Claims against Indemnitor relating to the Mortgaged Land; (3) neither Indemnitor nor to the knowledge of Indemnitor any agent, affiliate, tenant, or partner of Indemnitor has received any notices of and does not otherwise have any notice of an Environmental Claim regarding the Mortgaged Land nor any other action, proceeding or investigation by any Governmental Authority or third party under any Environmental Laws or Environmental Permits relating to the Mortgaged Land; (4) any environmental questionnaire, if any, prepared by Indemnitor and submitted to Indemnitee is true and accurate as of the date of this agreement; (5) the Mortgaged Land does not contain any facility that is subject to reporting under Section 312 of the Emergency Planning and Community Right-to-Know Act of 1986 (42 U.S.C. 11022); (6) the Mortgaged Land is not listed on the Comprehensive Environmental Response, Compensation and Liability Information System (CERCLIS) in accordance with Section 116 of CERCLA (42 U.S.C. 9616); (7) no portion of the Mortgaged Land contains or is located within 2000 feet of a significant disposal of hazardous waste within the meaning of California Health and Safety Code §25221 (the "**Code**") that could cause the Property to be classified as a hazardous waste property or border zone property under the Code; (8) other than the presence, use, storage and disposal of Hazardous Materials in quantities as necessary for Indemnitor's normal farming operations located on the Mortgaged Land, all of which Indemnitor covenants have and will be used, stored and disposed of in accordance with commercially reasonable farming practices and all applicable Environmental Laws, Indemnitor has no actual knowledge of the presence of any Hazardous Materials on the Mortgaged Land; (9) Indemnitor has no knowledge of any Release of Hazardous Materials on, under, from, or affecting the Mortgaged Land, other than the application of crop fertilizers and agricultural chemicals in accordance with Applicable Law and the manufacturer's label instructions; (10) except as disclosed to Indemnitee in writing, prior to the date of this agreement, Indemnitor has no knowledge of any underground storage tanks or landfills located on the Mortgaged Land; and (11) Indemnitor has provided Indemnitee with all environmental reports and site assessments in the custody or control of Indemnitor relating to the Mortgaged Land.

<u>Covenants</u>.  Indemnitor covenants and agrees as follows:  (1) Indemnitor shall keep the Mortgaged Land or cause the Mortgaged Land to be kept free of asbestos and asbestos-containing construction materials; (2) Indemnitor shall not use, transport, store, treat, generate, handle or dispose of, or in any manner deal with, and shall ensure that no occupant of the Mortgaged Land uses, transports, stores, treats, generates, handles or disposes of, or in any manner deals with, Hazardous Materials on, in, at, about, or from the Mortgaged Land, except in compliance with all applicable federal, state, and local laws, ordinances, rules and regulations, including Environmental Laws; (3) Indemnitor shall not cause and shall ensure that no occupant of the Mortgaged Land causes the Mortgaged Land to become subject to regulation as a hazardous waste treatment, storage, or disposal facility under Environmental Laws; (4) Indemnitor shall comply with, and ensure compliance by all occupants of the Mortgaged Land with, all Environmental Laws, and shall keep the Mortgaged Land free and clear of any liens imposed pursuant to any Environmental Laws; (5) Indemnitor shall immediately notify Indemnitee if Indemnitor receives any notice or advice from any Governmental Authority or any source whatsoever of any: (A) Release of Hazardous Materials, on, under, from, or affecting the Mortgaged Land, which could require remediation or reporting under Environmental Laws; (B) enforcement action or threat of enforcement action by any Governmental Authority with respect to Hazardous Materials in, on, under, from or affecting the Mortgaged Land or relating to Indemnitor's property, activities or operations generally; (C) Environmental Claim; (D) requirement of Indemnitor or any occupant of the Mortgaged Land to obtain an Environmental Permit other than permits required in the ordinary course of farming operations of the nature or manner occurring on the Mortgaged Land, provided that Indemnitor shall provide such

2

permits promptly upon Indemnitee's request; or (E) requirement of Indemnitor or any occupant of the Mortgaged Land to obtain a permit or license with respect to exploration, mining, extraction, storage, transportation, processing or sale of coal, oil, gas or any other minerals on or under the Mortgaged Land; (6) promptly upon receipt, Indemnitor shall deliver to Indemnitee copies of all notices, orders, or other communications regarding any event described in clauses (5)(A) through (E) above; (7) except as specifically disclosed to Indemnitee in writing, prior to the date of this agreement, Indemnitor shall not allow to exist on, under, or about the Mortgaged Land any underground storage tanks; and with respect to such underground storage tanks, previously disclosed to Indemnitee in writing, all such underground storage tanks shall be operated and maintained in accordance with all Environmental Laws; and (8) upon an Event of Default, then without any notice or further action Indemnitee may in its sole discretion enter the Mortgaged Land to perform or have performed investigation of the Mortgaged Land for the presence of Hazardous Materials. Such investigation may include but is not limited to the conduct of a Phase I and/or Phase II Environmental Report including any surface or subsurface sampling and analysis of soil, groundwater, sediment and/or surface water. Indemnitor shall cooperate fully with Indemnitee with respect to any such investigation by Indemnitee.

Environmental Report. If Indemnitee has received information indicating a reasonable possibility of the presence of Hazardous Materials on the Mortgaged Land in violation of Environmental Laws, Indemnitor shall provide at its sole cost and expense within 20 days after written request by Indemnitee, a Phase I Environmental Assessment from a qualified engineering firm or other qualified consultant acceptable to Indemnitee with respect to an investigation and audit of the Mortgaged Land as deemed necessary by the consultant to enable the consultant to report that there is no apparent or likely Hazardous Materials on the Mortgaged Land that violate Environmental Laws; and Indemnitor shall, if deemed reasonably necessary to further investigate suspected or likely contamination, provide Indemnitee with supplemental reports by acceptable qualified consultants of the analysis which may include surface and subsurface sampling and analysis of soil, sediment, surface water and/or groundwater from the Mortgaged Land, showing no Hazardous Materials present on the Mortgaged Land in violation Environmental Laws (any such audit, and any supplemental reports, an **"Environmental Report"**). If Indemnitor does not comply with the requirements of this Section within such 20 day period, or such additional time commercially reasonable as Indemnitee shall agree to in writing, or if Indemnitee is not reasonably satisfied with the results of any of the conclusions in the Environmental Report, then Indemnitee may perform or cause to be performed such additional investigations (including surface and subsurface testing of soil, groundwater, surface water and sediment) as Indemnitee deems appropriate. Indemnitor consents to Indemnitee entering the Mortgaged Land to the extent required to perform and to Indemnitee performing such additional investigations, without the need for further action.

Remedial Work. If any investigation, monitoring, containment, cleanup, removal, restoration or other remedial work of any kind or nature (**"Remedial Work"**) is deemed by Indemnitee to be necessary pursuant to Environmental Laws or with respect to Environmental Claims, Indemnitor will within 30 days after written demand for performance thereof by Indemnitee (or such shorter period of time as required under Applicable Law), begin and thereafter complete, all such Remedial Work. All Remedial Work shall be approved in advance in writing by Indemnitee. All Costs related to such Remedial Work shall be paid by Indemnitor including Costs incurred by Indemnitee in connection with monitoring or review of such Remedial Work. If Indemnitor fails to promptly commence or fails to complete such Remedial Work, Indemnitee may, but shall not be required to, cause such Remedial Work to be

3

performed and all Costs shall become an Environmental Claim hereunder. If there is an emergency, Indemnitor shall immediately commence the Remedial Work and thereafter give immediate notice to Indemnitee.

<u>INDEMNITY</u>. TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW INDEMNITOR AGREES TO INDEMNIFY, DEFEND, PROTECT, AND HOLD HARMLESS INDEMNIFIED PERSONS (DEFINED BELOW) FROM AND AGAINST ANY AND ALL COSTS SUFFERED, IMPOSED ON, OR INCURRED BY INDEMNIFIED PERSONS OR ASSERTED AGAINST INDEMNIFIED PERSONS, WHICH DIRECTLY OR INDIRECTLY ARISE OUT OF OR RESULT FROM: (1) THE PRESENCE OR EXISTENCE OF HAZARDOUS MATERIALS AT, ON, ABOUT, UNDER, WITHIN, NEAR OR IN CONNECTION WITH THE MORTGAGED LAND; (2) THE INACCURACY OF ANY OF THE REPRESENTATIONS OF INDEMNITOR CONTAINED IN THIS AGREEMENT; (3) ANY ENVIRONMENTAL CLAIM; (4) ANY BREACH BY INDEMNITOR OF ANY OF ITS COVENANTS OR AGREEMENTS IN THIS AGREEMENT; AND (5) ANY CLAIM, DEMAND OR CAUSE OF ACTION, OR ANY ACTION OR OTHER PROCEEDING, WHETHER MERITORIOUS OR NOT, BROUGHT OR ASSERTED AGAINST INDEMNIFIED PERSONS WHICH RELATES TO, ARISES FROM OR IS BASED ON ANY OF THE MATTERS DESCRIBED IN CLAUSES (1) THROUGH (5) OF THIS SECTION, OR ANY ALLEGATION OF ANY SUCH MATTERS (collectively, the "**Indemnified Matters**"). The indemnification provided in this Section applies to and includes Costs due to Environmental Claims brought by or on behalf of employees of Indemnitor. This agreement does not limit any rights or remedies, including the right to contribution, which any Indemnified Person may have against Indemnitor or any other party under any federal, state or local laws.

2.   <u>General Terms and Conditions</u>.

<u>Payment on Demand; Interest</u>. All amounts required to be paid by Indemnitor to Indemnified Persons under the terms of this agreement will be due and payable upon demand, and will bear interest from the date of any payment thereof by Indemnified Persons, until paid by Indemnitor, at a rate per annum equal to (1) if Indemnitee is the holder of the Note, the Default Interest Rate (as defined in the Note); and (2) if Indemnitee is no longer the holder of the Note, the lesser of (A) 16.000% per annum; or (B) the maximum rate then permitted under Applicable Law.

<u>Unsecured Obligations</u>. Notwithstanding any provision to the contrary in the Loan Documents, the Indemnity Obligations are not secured by any lien or security interest in real estate or personal property.

<u>Environmental Claim Proceeding</u>. Indemnitee may join and participate in, as a party if it so elects, any legal proceedings or actions initiated by Indemnitor or against Indemnitor or the Mortgaged Land, in connection with any Environmental Law. In connection with any Environmental Claim, Indemnified Persons may, but shall not be obligated to, employ their own legal counsel and consultants to investigate, prosecute, negotiate, or defend any such Environmental Claim or matter, and Indemnified Persons shall have the right to compromise or settle the same without showing actual liability therefor, and without the consent of Indemnitor. Provided, however, Indemnitor shall not, without the prior written consent of Indemnitee, in any circumstance in which this Agreement applies (1) settle or compromise any action, suit, proceeding, or claim or consent to the entry of any judgment that does not include as an unconditional term thereof the delivery by the claimant or plaintiff to Indemnitee of (A) a full and complete written release of Indemnified Persons (in form, scope and substance satisfactory to Indemnitee) from all liability in respect of such action, suit or proceeding and (B) a dismissal with

4

prejudice of such suit, action or proceeding; or (2) settle or compromise any action, suit, proceeding, or claim in any manner that may adversely affect Indemnified Persons as determined by Indemnitee. All Professional Fees and other expenses incurred by Indemnitee in connection with the exercise of its rights and remedies under this agreement will constitute an Environmental Claim.

INDEPENDENT OBLIGATIONS.   THE RIGHTS OF INDEMNIFIED PERSONS ARE IN ADDITION TO ALL OTHER RIGHTS AND REMEDIES OF INDEMNIFIED PERSONS UNDER THE LOAN DOCUMENTS, OR ANY OTHER DOCUMENT OR INSTRUMENT NOW OR HEREAFTER EXECUTED BY INDEMNITOR, OR AT LAW OR IN EQUITY (INCLUDING ANY RIGHT OF REIMBURSEMENT OR CONTRIBUTION PURSUANT TO CERCLA). INDEMNIFIED PERSONS MAY BRING A SEPARATE ACTION, OR COMMENCE A SEPARATE REFERENCE OR ARBITRATION PROCEEDING AGAINST ANY INDEMNITOR WITHOUT FIRST PROCEEDING AGAINST ANY OTHER INDEMNITOR, IF ANY, ANY OTHER PERSON OR ANY SECURITY THAT INDEMNIFIED PERSONS MAY HOLD, AND WITHOUT PURSUING ANY OTHER REMEDY.

SURVIVAL OF OBLIGATIONS.   SUBJECT TO THE PROVISIONS SET FORTH BELOW, THE RIGHTS OF INDEMNIFIED PERSONS UNDER THIS AGREEMENT WILL SURVIVE (1) THE PAYMENT IN FULL OF ALL INDEBTEDNESS (AS DEFINED IN THE LOAN AGREEMENT), (2) THE RELEASE OF THE MORTGAGED LAND FROM THE LIEN OF THE DEED OF TRUST (AS DEFINED IN THE LOAN AGREEMENT), (3) A FORECLOSURE TRANSFER, OR (4) ANY ASSIGNMENT OF ALL OR ANY OF INDEMNITEE'S RIGHTS UNDER THE LOAN DOCUMENTS. Notwithstanding any other provision of this agreement to the contrary, Indemnitor will not be liable to Indemnified Persons for Indemnified Matters, if such Indemnified Matters result directly and solely from (A) the gross negligence or willful misconduct of Indemnified Persons, or (B) other events or circumstances not first occurring or present until a time subsequent to the earlier of (X) the payment in full of all Indebtedness (as defined in the Loan Agreement) or (Y) a Foreclosure Transfer.

Revival and Reinstatement.  If Indemnified Persons are required to pay, return or restore to Indemnitor or any other Person any amounts previously paid under the terms of this agreement because of any Insolvency Proceeding of Indemnitor or such other Person, any stop notice or any other reason, the obligations of Indemnitor shall be reinstated and revived and the rights of Indemnified Persons shall continue with regard to such amounts, all as though they had never been paid.

Notices.  All requests, notices, approvals, consents, and other communications between Indemnitor and Indemnified Persons (individually and collectively, "**Notices**") under this agreement must be in writing and mailed or delivered, if to any Indemnitor, at 1306 W. Herndon Avenue, Suite 101, Fresno, California 93711, Attn: Legal Department; if to Indemnitee or any other Indemnified Person, at Metropolitan Life Insurance Company, Agricultural Investments, 10801 Mastin Blvd., Ste. 700, Overland Park, KS 66210, Attn: Director, with a carbon copy to Metropolitan Life Insurance Company, Agricultural Investments, 205 E River Park Circle, Ste. 430, Fresno, CA 93720, Attn: Director, WRO, or to the address designated by any party to this agreement in a notice to the other parties. All Notices will be deemed to be given or made upon the earlier to occur of: (1) actual receipt by the intended recipient; (2) if delivered by hand or by courier, upon delivery; or (3) if delivered by mail, four Business Days after deposit in the U.S. mail, properly addressed, postage prepaid; except that notices and other communications to Indemnitee will not be effective until actually received by Indemnitee.

5

<u>Defined Terms</u>.  Except as otherwise expressly provided herein, capitalized terms used in this agreement will have the respective meanings assigned to such terms below

"**Affiliate**" of a Person other than an individual means another Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified.  Unless otherwise specified, all references to an "Affiliate" or to "Affiliates" refer to any Affiliate or Affiliates, if any.

"**Applicable Law**" means all existing and future laws, orders, ordinances, rules and regulations of or by a Governmental Authority.

"**Costs**" shall mean all liabilities, losses, charges, costs, damages (including foreseeable and unforeseeable consequential damages), debts, reasonable expenses, claims, and Professional Fees of any kind or of any nature whatsoever.  For the purposes of this definition, such losses, costs and damages shall include remedial, removal, response, abatement, cleanup, legal, investigative and monitoring costs and related costs, expenses, losses, damages, penalties, fees, fines, obligations, defenses, judgments, awards, actions, suits, proceedings, disbursements and amounts paid in settlement, of whatever kind or nature.

"**Drafting Conventions**" means the rules on interpretation specified in the section of this agreement captioned "Drafting Conventions."

"**Event of Default**" means an "Event of Default" as that term is defined in the Loan Agreement, and in addition, any default in the payment, performance or otherwise of any term, covenant, condition or obligation of Indemnitor under this agreement, which is not cured within any applicable cure or grace period as provided for in the Loan Agreement, if any.

"**Environmental Claim**" includes, but is not limited to, any claim, demand, action, cause of action, suit, loss, cost, damage, fine, penalty, expense, liability, judgment, proceeding, or injury, whether threatened, sought, brought, or imposed, that seeks to impose Costs, directly or indirectly related to the Mortgaged Land for (1) noise; (2) pollution or contamination of the air, surface water, ground water, drinking water, soil or soil vapor; (3) generation, handling, collection, treatment, management, storage, disposal or transportation of solid, gaseous, or liquid waste; (4) injection, withdrawal, generation, handling, collection, treatment, management, storage, disposal or transportation of process water, flowback water or fluids, produced water, wastewater, groundwater, surface water or stormwater; (5) the exposure to, presence or alleged Release of Hazardous Materials, on, under, from, or affecting the Mortgaged Land, whether or not known to Indemnitor, regardless of the source of such exposure, presence or Release, or except as expressly provided in this agreement, regardless of when such exposure, Release or presence occurred; (6) the manufacture, processing, distribution in commerce, use, or storage of Hazardous Materials; (7) the exploration, mining, extraction, or processing of coal, oil, gas, or other minerals; (8) the drilling, installation, construction, maintenance, operation and existence of any wells on or under the Mortgaged Land; (9) injury to or death of any Person or Persons directly or indirectly connected with Hazardous Materials and directly or indirectly related to the Mortgaged Land; (10) destruction or contamination of any property directly or indirectly connected with Hazardous Materials and directly or indirectly related to the Mortgaged Land; (11) pollution, contamination, or degradation of the quality of drinking waters or public water supplies; (12) the removal of Hazardous Materials from the Mortgaged Land or the taking of necessary precautions to protect against the Release of Hazardous Materials on, under or from the Mortgaged Land; (13) compliance with all Environmental Laws and Environmental Permits and/or any asserted breach or violation of any Environmental Laws or Environmental Permits;

6

(14) any restriction on use, ownership, occupation, or transferability of the Mortgaged Land as a result of Hazardous Materials; (15) the maintenance of a private or public nuisance, trespass, or the conducting of an abnormally dangerous activity on or near the Mortgaged Land, in each case arising from or in connection with Hazardous Materials; (16) any remedial, response, abatement, cleanup, investigative and monitoring work in connection with any Hazardous Materials or as required by any Environmental Laws; or (17) any and all fines or penalties directly or indirectly connected with Hazardous Materials and directly or indirectly related to the Mortgaged Land.

"**Environmental Law**" means all requirements of environmental or ecological laws or regulations or controls related to the Mortgaged Land, including all requirements imposed by any Applicable Law of any Governmental Authority or any private agreement (such as covenants, conditions and restrictions), which relate to (1) noise; (2) pollution or protection of the air, surface water, ground water, drinking water, soil or soil vapor; (3) solid, gaseous, or liquid waste generation, handling, collection, treatment, management, storage, disposal, or transportation; (4) exposure to Hazardous Materials; (5) regulation of the manufacture, processing, distribution and commerce, use, or storage of Hazardous Materials, (6) injection, withdrawal, generation, handling, collection, treatment, management, storage, disposal, or transportation of process water, flowback water or fluids, produced water, wastewater, groundwater, drinking water, surface water or stormwater; or (7) the exploration, mining, extraction, or processing of coal, oil, gas, or other minerals.

"**Environmental Permit**" means any permit, license, approval, or other authorization with respect to any activities, operations, or businesses conducted on, under or in relation to the Mortgaged Land obtained or required in connection with any Environmental Law.

"**Foreclosure Transfer**" means with respect to any Mortgaged Land, the transfer of title to that Mortgaged Land pursuant to judicial decree, the power of sale or other judicial or non-judicial action or proceeding to foreclose the interests of Indemnitee under the Loan Documents in the Mortgaged Land, or by deed in lieu of such foreclosure.

"**Governmental Authority**" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"**Hazardous Materials**" means:  (1) those substances included within the definitions of "hazardous substances," "hazardous materials," "toxic substances," or "solid waste" in the Comprehensive Environmental Response Compensation and Liability Act of 1980 (42 U.S.C. § 9601 *et seq.*) ("**CERCLA**"), as amended by Superfund Amendments and Reauthorization Act of 1986 (Pub. L. 99-499 100 Stat. 1613) ("**SARA**"), the Resource Conservation and Recovery Act of 1976 (42 U.S.C. § 6901 *et seq.*) ("**RCRA**"), and the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 *et seq.*, and those substances included in the definitions of "hazardous air pollutant" under the federal Clean Air Act (42 U.S.C. Section 701, *et seq.*), or "extremely hazardous substance" or "toxic chemical' under the Emergency Planning and Community Right-to-Know Act (42 U.S.C. § 11001, *et seq.*), and in the regulations promulgated pursuant to said laws, all as amended; (2) those substances listed in the U.S. Department of Transportation Table (49 CFR 172.101 and amendments thereto) or by the Environmental Protection Agency (or any successor agency) as hazardous substances (40 CFR Part 302 and amendments thereto); (3) any material, waste or substance which is or are: (A) petroleum, (B) asbestos, (C) polychlorinated biphenyls, (D) designated as a "hazardous substance" pursuant to

7

Section 311 of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* (33 U.S.C. § 1321) or listed pursuant to Section 307 of the Clean Water Act (33 U.S.C. § 1317); (E) designated as a "pollutant" pursuant to Section 502(6) of the Clean Water Act (33 U.S.C. § 1362(6); (F) flammable explosives; or (G) radioactive materials; and (4) such other substances, materials and wastes which are or become classified or regulated as hazardous or toxic under Applicable Law or by any Governmental Authority, including mold, radon, radionuclides, heavy metals or other potentially naturally-occurring minerals or substances.

"**Indemnified Persons**" means Indemnitee, Indemnitee's Subsidiaries and Affiliates and all of their officers, directors, agents, employees, servants, attorneys, and representatives.

"**Indemnity Obligations**" means the indebtedness, liabilities and obligations of Indemnitor to Indemnified Persons under the terms of this agreement.

"**Insolvency Proceeding**" means the insolvency of a Person, the appointment of a receiver of any part of a Person's property, an assignment by a Person for the benefit of creditors, or the commencement of any proceeding under the Federal Bankruptcy Code or any other bankruptcy or insolvency law, by or against a Person.

"**Legal Fees**" means all counsel, attorney, paralegal and law clerk fees and disbursements including, but not limited to fees and disbursements at the pre-trial, trial, appellate, discretionary review, or any other level.

"**Loan Documents**" shall have the meaning provided in the Loan Agreement, provided that notwithstanding anything to the contrary in the Loan Documents as defined therein, the term Loan Documents does not include this agreement.

"**Person**" means an individual, a corporation, limited liability company, partnership, joint venture, association, joint-stock company, trust, unincorporated organization, or other business entity, or a government or any agency or political subdivision thereof.

"**Professional Fees**" means:  Legal Fees; and all other fees and disbursements of environmental engineers and other third party consultants or professionals associated with the enforcement of Indemnitee's rights and remedies under this agreement.

"**Release**" means any discharging, disposing, emitting, leaking, pumping, pouring, emptying, injecting, escaping, leaching, dumping or spilling (including the abandonment or discarding of barrels, containers and other closed receptacles) into ambient air, surface water, ground water, soil, or soil vapor.

"**Subsidiary**" of a Person which is anything other than an individual means a business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly by that Person.  Unless otherwise specified, all references to a "Subsidiary" or to "Subsidiaries" refer to any Subsidiary or Subsidiaries, if any.

Drafting Conventions.  Evidence of the occurrence or non-occurrence of any event, or the existence or non-existence of any circumstance to be delivered to Indemnitee must be in a form satisfactory to Indemnitee; and any report or document to be received by Indemnitee must be in form and content satisfactory to Indemnitee.  Wherever:  (1) Indemnitee exercises any right given to it to approve or disapprove; (2) any arrangement or term is to be satisfactory to Indemnitee; or (3) any other decision or determination is to be made by Indemnitee, then except as may be otherwise expressly and specifically

Environmental Indemnity Agreement
Ashlan & Hayes et al.
Loan No. 198935
102908920.1 0053564-00390.001

provided therein, the decision to approve or disapprove, all decisions that arrangements or terms are satisfactory or not satisfactory, and all other decisions and determinations made by Indemnitee, will be in the sole discretion of Indemnitee. The words **"include," "includes,"** and **"including"** are to be read as if they were followed by the phrase "without limitation"; headings and captions are provided for convenience only and do not affect the meaning of the text which follows; and the definitions in this agreement apply equally to both singular and plural forms of the terms defined.

General. This agreement may be executed in counterparts, each of which will be an original and all of which together are deemed one and the same agreement. Indemnitee may make an optically imaged reproduction of this agreement and, at its election, destroy the original or originals. Indemnitor consents to the destruction of the original or originals and agrees that a copy of the optically imaged reproduction of this agreement will be the equivalent of and for all purposes constitute an "original" document. No provision or waiver in this agreement shall be construed as limiting the generality of any other provision or waiver contained in this agreement. Each party to this agreement has participated in negotiating and drafting this agreement, so if an ambiguity or a question of intent or interpretation arises, this agreement is to be construed as if the parties had drafted it jointly, as opposed to being construed against a party because it was responsible for drafting one or more provisions of this agreement. This agreement will inure to the benefit of and shall be binding upon the parties and their respective successors and assigns; provided, that Indemnitor shall not assign its rights or obligations hereunder without Indemnitee's consent. Indemnitee may transfer all or any portion of its rights under this agreement to any other Person to whom Indemnitee assigns its rights under the Loan Documents; provided, however, that Indemnitee is under no obligation to make such assignment upon the assignment of its rights under the Loan Documents. All rights and remedies under this agreement and the Loan Documents are cumulative, and the exercise of any one or more of them does not constitute an election of remedies. Any provision of this agreement which is prohibited or unenforceable in any jurisdiction shall, as to that jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions of this agreement or affecting the validity or enforceability of that provision in any other jurisdiction. This agreement may not be amended, changed, modified, altered or terminated without the prior written consent of Indemnitor. This agreement: (1) represents the sum of the understandings and agreements between Indemnitee and Indemnitor related to the Mortgaged Land concerning the subject of an unsecured environmental indemnity agreement separate from and in addition to the indebtedness, liabilities and obligations of Indemnitor under the Loan Documents (a **"Separate Environmental Indemnity"**); (2) replaces any prior agreements between Indemnitee and Indemnitor concerning the subject of a Separate Environmental Indemnity; and (3) is intended by Indemnitee and Indemnitor as the final, complete and exclusive statement of the terms agreed to by them with respect to a Separate Environmental Indemnity.

Governing Law/Jurisdiction and Venue. This agreement shall be governed exclusively by the laws of the State of California without regard or reference to its conflict of laws principles. INDEMNITOR AND INDEMNITEE IRREVOCABLY AGREES THAT ALL ACTIONS, PROCEEDINGS OR COUNTERCLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY LOAN DOCUMENT WILL BE LITIGATED IN THE DISTRICT COURT IN AND FOR THE COUNTY IN WHICH THE MORTGAGED LAND IS LOCATED, OR THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF CALIFORNIA IN WHICH SUCH COUNTY IS LOCATED. INDEMNITOR AND INDEMNITEE IRREVOCABLY CONSENTS TO SERVICE, JURISDICTION, AND VENUE OF THOSE COURTS FOR ALL SUCH ACTIONS, PROCEEDINGS AND

9

COUNTERCLAIMS AND WAIVES ANY OTHER VENUE TO WHICH IT MIGHT BE ENTITLED BY VIRTUE OF DOMICILE, HABITUAL RESIDENCE OR OTHERWISE.

<u>Joint and Several Obligations</u>.   If Indemnitor consists of more than one Person, each Indemnitor (1) acknowledges that this agreement is the independent and several obligation of each Indemnitor and may be enforced against each Indemnitor separately, whether or not enforcement of any right or remedy hereunder has been sought against any other Indemnitor; and (2) agrees that its liability under this agreement shall be absolute, unconditional, continuing and irrevocable.  INDEMNITOR WAIVES ANY REQUIREMENT THAT INDEMNITEE EXHAUST ANY RIGHT, POWER OR REMEDY AND PROCEED AGAINST ANY OTHER INDEMNITOR UNDER THIS AGREEMENT OR AGAINST ANY OTHER PERSON UNDER ANY AGREEMENT OF, OR SECURITY FOR, ANY OF THE INDEMNITY OBLIGATIONS.

<u>Obligations of Married Persons</u>.  Any Indemnitor who is a married Person signs this agreement on his or her own behalf and on behalf of Indemnitor's marital community, if any and agrees that recourse may be had against community assets, if any, and against Indemnitor's separate property for the satisfaction of all Indemnity Obligations.

<u>Successive Actions</u>.  To the extent permitted by Applicable Law, separate and successive actions may be brought hereunder to enforce any of the provisions of this agreement.  No action hereunder shall prevent a subsequent action, and Indemnitor hereby waives and covenants not to assert any defense in the nature of splitting of causes of action or merger of judgments.

<u>Waiver</u>.  Indemnitor:  (1) waives any right or claim of right to cause a marshaling of the assets of Indemnitor or to cause Indemnified Persons to proceed against any of the security for the Loan before proceeding under this agreement against Indemnitor; and (2) waives and relinquishes all rights and remedies accorded by Applicable Law to indemnitors or guarantors, except any rights of subrogation that Indemnitor may have; provided that the indemnity provided for hereunder shall neither be contingent upon the existence of any such rights of subrogation nor subject to any claims or defenses whatsoever that may be asserted in connection with the enforcement or attempted enforcement of such subrogation rights, including any claim that such subrogation rights were abrogated by any acts or omissions of Indemnified Persons.

<u>Waiver of Right of Contribution</u>.  If Indemnitor is comprised of more than one Person, each such Person agrees that it will have no right of contribution (including any right of contribution under CERCLA) or subrogation against any other Person comprising Indemnitor under this agreement unless and until all Indemnity Obligations have been satisfied.  Each such Person further agrees that, to the extent that the waiver of its rights of subrogation and contribution in this agreement is found by a court of competent jurisdiction to be void or voidable for any reason, any rights of subrogation or contribution that Person may have will be junior and subordinate to the rights of Indemnitee against Indemnitor under this agreement.

**<u>WAIVER OF TRIAL BY JURY</u>.  INDEMNITOR BY EXECUTION AND DELIVERY OF THIS AGREEMENT TO INDEMNITEE, AND INDEMNITEE, BY ACCEPTANCE OF THIS AGREEMENT, TO THE EXTENT PERMITTED BY APPLICABLE LAW, (A) COVENANT AND AGREE NOT TO ELECT A TRIAL BY JURY IN ANY ACTION OR PROCEEDING FOR THE RESOLUTION OF ANY CONTROVERSY OR CLAIM THAT ARISES OUT OF OR RELATES TO: (1) THIS AGREEMENT; OR (2) ANY INDEMNITY OBLIGATION, WHETHER ARISING IN CONTRACT, TORT OR BY STATUTE (INDIVIDUALLY AND**

Environmental Indemnity Agreement
Ashlan & Hayes et al.
Loan No. 198935
102908920.1 0053346-00390.001

COLLECTIVELY, A "CONTROVERSY OR CLAIM"); AND, (B) WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY CONTROVERSY OR CLAIM TO THE EXTENT SUCH RIGHT EXISTS NOW OR IN THE FUTURE.  THE PROVISIONS OF THIS SECTION ARE GIVEN KNOWINGLY AND VOLUNTARILY; AND ARE A MATERIAL INDUCEMENT FOR INDEMNITEE ENTERING INTO THE NOTE AND OTHER LOAN DOCUMENTS.

Indemnitor has executed this agreement effective as of the day and year first written above.

**INDEMNITOR**

BORROWERS:

ASHLAN & HAYES INVESTMENTS, LLC,
a California limited liability company

By: _____
Kevin Assemi, Manager

By: _____
Neema Assemi, Manager

By: _____
Darius Assemi, Manager

11

GRANTOR FRESNO CLOVIS INVESTMENTS, LLC
a California limited liability company

By: _____

Neema Assemi, Sole Trustee of The Farid Assemi 2010
Grantor Trust dated December 30, 2010, Member

By: _____

Kevin Assemi, Sole Trustee of The Farshid and Sonia
Assemi 2010 Grantor Trust dated December 30, 2010,
Member

*[Signatures continue on following page]*

12

MARICOPA ORCHARDS, LLC,
a California limited liability company

By: _____

Farid Assemi, General Manager

By: _____

Farshid Assemi, General Manager

By: _____

Darius Assemi, General Manager

*[Signatures continue on following page]*

13

Environmental Indemnity Agreement
Ashlan & Hayes et al.
Loan No. 198935
102908920.1 0053564-00390.001

TRUSTOR:

104 PARTNERS, LLC
a California limited liability company

By: _____

Farid Assemi, Trustee of the Amended and
Restated Farid Assemi Revocable Trust,
Its Member/General Manager

By: _____

Farshid Assemi, Trustee of the Amended
and Restated Farshid Assemi and Sonia
Rosemary Assemi Revocable Trust
Its Member/General Manager

By: _____

Sonia Rosemary Assemi, Trustee of the
Amended and Restated Farshid Assemi and
Sonia Rosemary Assemi Revocable Trust
Its Member/General Manager

By: _____

Darius Assemi, Trustee of the Amended and
Restated Darius Assemi Revocable Trust
Its Member/General Manager

14

GUARANTOR:

_____
FARID ASSEMI

_____
FARSHID ASSEMI

_____
DARIUS ASSEMI

15

## SPOUSAL CONSENT

The undersigned, as the spouse of FARID ASSEMI, hereby signs and consents to this "Agreement" for the purpose of binding and consenting to the commitment of the marital community property of FARID ASSEMI and the undersigned as assets available for satisfaction of obligations under the Agreement, and for the purpose of acknowledging and agreeing that (i) no consent of the undersigned shall be required for any future modification of the Agreement or the obligations undertaken thereunder, and (ii) any community property of FARID ASSEMI and the undersigned which shall hereafter be transmuted into separate property of the undersigned shall be available for satisfaction of obligations under the Agreement.

By: _____
Cheryl Assemi

SPOUSAL CONSENT

The undersigned, as the spouse of FARSHID ASSEMI, hereby signs and consents to this "Agreement" for the purpose of binding and consenting to the commitment of the marital community property of FARSHID ASSEMI and the undersigned as assets available for satisfaction of obligations under the Agreement, and for the purpose of acknowledging and agreeing that (i) no consent of the undersigned shall be required for any future modification of the Agreement or the obligations undertaken thereunder, and (ii) any community property of FARSHID ASSEMI and the undersigned which shall hereafter be transmuted into separate property of the undersigned shall be available for satisfaction of obligations under the Agreement.

By: _Sonia Rosemary Assemi_____
Sonia Rosemary Assemi

17

## EXHIBIT A

ENVIRONMENTAL INDEMNITY AGREEMENT
Loan No:  198935
**Legal Description**

The land is situated in the unincorporated area of the County of Fresno, State of California, and is described as follows:

FEE PARCEL 1: (APN: 038-141-59S)

THE WEST 1,344.4 FEET OF THE SOUTHWEST QUARTER OF SECTION 15, TOWNSHIP 16 SOUTH, RANGE 14 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM THAT PORTION DESCRIBED AS FOLLOWS:

BEGINNING AT THE SOUTHWEST CORNER OF SAID SECTION 15; THENCE, (1) NORTHERLY, ALONG THE WEST BOUNDARY OF SAID SECTION 15, A DISTANCE OF 50 FEET; THENCE, (2) SOUTH 87° 34' 31" EAST, A DISTANCE OF 535.37 FEET; THENCE, (3) SOUTHEASTERLY ALONG THE ARC OF A TANGENT CURVE, CONCAVE TO THE NORTHEAST (HAVING A 37,950 FOOT RADIUS, A RADIUS POINT WHICH BEARS NORTH 02° 25' 29" EAST AND A CENTRAL ANGLE OF 01° 13' 10") A DISTANCE OF 807.70 FEET; THENCE, (4) SOUTH 88° 47' 41" EAST, PARALLEL WITH AND 30 FEET NORTH OF THE SOUTH BOUNDARY OF THE SAID SOUTHWEST QUARTER, TO A POINT ON THE EAST BOUNDARY OF THE SAID SOUTHWEST QUARTER; THENCE, (5) SOUTHERLY ALONG SAID EAST BOUNDARY, A DISTANCE OF 30 FEET TO THE SOUTH QUARTER CORNER OF SAID SECTION 15; THENCE, (6) NORTH 88° 47' 41" WEST, ALONG SAID SOUTH BOUNDARY OF THE SOUTHWEST QUARTER, A DISTANCE OF 2646.07 FEET TO THE POINT OF BEGINNING.

SAID LEGAL DESCRIPTION IS MADE PURSUANT TO THAT CERTAIN CERTIFICATE OF COMPLIANCE, PLA 05-13(A), RECORDED MAY 11, 2007 AS <u>INSTRUMENT NO. 2007-0093874</u> OF OFFICIAL RECORDS OF FRESNO COUNTY.

EXCEPTING AND RESERVING, HOWEVER, TO THE UNITED STATES ALL THE COAL AND OTHER MINERALS IN THE LANDS SO ENTERED AND PATENTED, TOGETHER WITH THE RIGHT TO PROSPECT FOR, MINE AND REMOVE THE SAME PURSUANT TO THE PROVISIONS AND LIMITATIONS OF THE ACT OF DECEMBER 29, 1916 (39 STAT. 862).

ALSO EXCEPTING THEREFROM ANY AND ALL OIL, GAS AND OTHER HYDROCARBON SUBSTANCES AND MINERAL THEREIN AND THEREUNDER AS PREVIOUSLY RESERVED OR GRANTED OF RECORD.

EASEMENT PARCEL 1:

A NON-EXCLUSIVE EASEMENT FOR AN EXISTING PIPELINE TO TRANSPORT IRRIGATION WATER TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS AS GRANTED TO R. TODD HENRY AND LINDA J. HENRY, AS TRUSTEES OF THE TODD AND LINDA HENRY REVOCABLE

Exhibit A – 1

TRUST AND GARY G. ROBINSON AND KAREN E. ROBINSON, AS TRUSTEES OF THE GARY G. ROBINSON AND KAREN E. ROBINSON 2004 TRUST BY INSTRUMENT RECORDED JUNE 15, 2005 AS DOCUMENT NO. 2005-0132006 OF OFFICIAL RECORDS OVER AND ACROSS THE FOLLOWING DESCRIBED PARCELS "A" AND "B".

PARCEL A: (APN: 038-071-46S)

THE WEST 30 FEET OF THE FOLLOWING DESCRIBED PARCEL:

ALL THAT PORTION OF LOTS 21 TO 29, INCLUSIVE, IN SECTION 10, TOWNSHIP 16 SOUTH, RANGE 14 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE MAP OF PART OF CALIFORNIA LAND INVESTMENT COMPANY'S TRACT NO. 1, RECORDED MAY 8, 1912 IN BOOK 7, PAGE 49 OF RECORD OF SURVEYS, FRESNO COUNTY RECORDS, LYING SOUTHWESTERLY OF THE SAN LUIS CANAL.

EXCEPT THEREFROM THE FOLLOWING DESCRIBED PROPERTY:

BEGINNING AT A POINT IN THE WEST BOUNDARY OF SAID SECTION 10, DISTANT THEREALONG SOUTH 0° 56' WEST 2092.6 FEET FROM THE NORTHWEST CORNER OF SAID SECTION 10; THENCE ALONG SAID WEST BOUNDARY NORTH 0° 56' EAST 644.8 FEET; THENCE LEAVING SAID WEST BOUNDARY SOUTH 57° 36' EAST 35.2 FEET TO A POINT IN THE EAST BOUNDARY OF THAT CERTAIN 30-FOOT WIDE STRIP OF LAND OFFERED FOR PUBLIC DEDICATION ACCORDING TO SAID MAP; THENCE CONTINUING SOUTH 57° 36' EAST 194.8 FEET; THENCE CONTINUING SOUTH 57° 36' EAST 345.5 FEET; THENCE SOUTH 51° 54' EAST 201.0 FEET; THENCE SOUTH 57° 36' EAST 2300.9 FEET TO A POINT IN THE WEST BOUNDARY OF THAT CERTAIN 60-FOOT WIDE STRIP OF LAND OFFERED FOR DEDICATION ACCORDING TO SAID MAP; THENCE CONTINUING SOUTH 57° 36' EAST 70.4 FEET TO A POINT IN THE EAST BOUNDARY OF SAID 60-FOOT WIDE STRIP OF LAND; THENCE CONTINUING SOUTH 57° 36' EAST 93.3 FEET; THENCE SOUTH 67° 05' EAST 143.2 FEET; THENCE SOUTH 74° 07' EAST 141.9 FEET; THENCE SOUTH 79° 37' EAST 2266.6 FEET TO A POINT IN THE WEST BOUNDARY OF THAT CERTAIN 30-FOOT WIDE STRIP OF LAND OFFERED FOR PUBLIC DEDICATION ACCORDING TO SAID MAP; THENCE CONTINUING SOUTH 79° 37' EAST 30.4 FEET TO A POINT IN THE EAST BOUNDARY OF SAID SECTION 10; DISTANT THEREALONG NORTH 0° 55' EAST 1700.5 FEET FROM THE SOUTHEAST CORNER OF SAID SECTION 10; THENCE ALONG SAID EAST BOUNDARY SOUTH 0° 55' WEST 547.5 FEET; THENCE LEAVING SAID EAST BOUNDARY NORTH 79° 37' WEST 30.4 FEET TO A POINT IN THE WEST BOUNDARY OF LAST SAID 30 FOOT WIDE STRIP OF LAND; THENCE CONTINUING NORTH 79° 37' WEST 2356.8 FEET; THENCE NORTH 74° 06' WEST 245.5 FEET; THENCE NORTH 63° 06' WEST 26.0 FEET TO A POINT IN THE EAST BOUNDARY OF AFORESAID 60-FOOT WIDE STRIP OF LAND; THENCE CONTINUING NORTH 63° 06' WEST 66.8 FEET TO A POINT IN THE WEST BOUNDARY OF SAID 60-FOOT WIDE STRIP OF LAND; THENCE CONTINUING NORTH 63° 06' WEST 152.7 FEET; THENCE NORTH 57° 36' WEST 2868.2 FEET TO A POINT IN THE EAST BOUNDARY OF FIRST SAID 30-FOOT WIDE STRIP OF LAND; THENCE CONTINUING NORTH 57° 36' WEST 35.2 FEET TO THE POINT OF BEGINNING.

PARCEL B: (APN: 038-141-01S)

Exhibit A – 2

THE WEST 30 FEET OF THE NORTHWEST QUARTER OF SECTION 15, TOWNSHIP 16 SOUTH, RANGE 14 EAST, MOUNT DIABLO BASE AND MERIDIAN.

EASEMENT PARCEL 2: (APN: 038-060-28S)

A NON-EXCLUSIVE EASEMENT FOR WELL SITE AND POWER POLES AND ASSOCIATED POWER LINES, PIPELINES AND OTHER NECESSARY FIXTURES AS GRANTED TO FARID ASSEMI, ET AL, BY INSTRUMENT RECORDED JUNE 29, 2005 AS DOCUMENT NO. 2005-0144187 OF OFFICIAL RECORDS OVER AND ACROSS THE FOLLOWING PROPERTY:

A 50 BY 50 FOOT SQUARE AROUND THE EXISTING IRRIGATION WELL LOCATED IN THE NORTHEAST CORNER OF THE NORTHEAST QUARTER OF SECTION 7, TOWNSHIP 16 SOUTH, RANGE 14 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EASEMENT PARCEL 3: (APN: 038-130-05S)

A NON-EXCLUSIVE EASEMENT FOR WELL SITE AND POWER POLES AND ASSOCIATED POWER LINES, PIPELINES AND OTHER NECESSARY FIXTURES AS GRANTED TO FARID ASSEMI, ET AL, BY INSTRUMENT RECORDED JUNE 29, 2005 AS DOCUMENT NO. 2005-0144188 OF OFFICIAL RECORDS OVER AND ACROSS THE FOLLOWING DESCRIBED PROPERTY:

A 50 BY 50 FOOT SQUARE AROUND THE EXISTING IRRIGATION WELL LOCATED IN THE NORTHEAST CORNER OF THE NORTH HALF OF THE NORTHEAST QUARTER OF SECTION 17, TOWNSHIP 16 SOUTH, RANGE 14 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EASEMENT PARCEL 6: (APN: 038-060-77S)

A NON-EXCLUSIVE EASEMENT FOR IRRIGATION PIPELINE TOGETHER WITH INGRESS AND EGRESS, AS GRANTED TO R. TODD HENRY AND LINDA J. HENRY, AS TRUSTEES OF THE TODD AND LINDA HENRY REVOCABLE TRUST AND GARY G. ROBINSON AND KAREN E. ROBINSON, AS TRUSTEES OF THE GARY G. ROBINSON AND KAREN E. ROBINSON 2004 TRUST, BY INSTRUMENT RECORDED JUNE 29, 2005 AS DOCUMENT NO. 2005-0144194 OF OFFICIAL RECORDS OVER AND ACROSS THE SOUTH 20 FEET OF THE EAST 20 FEET OF LOTS 5 TO 12, INCLUSIVE, IN SECTION 8, TOWNSHIP 16 SOUTH, RANGE 14 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE MAP OF PART OF CALIFORNIA LAND INVESTMENT CO'S TRACT NO. 1, ACCORDING TO THE MAP THEREOF RECORDED IN BOOK 7, PAGE 49 OF RECORDS OF SURVEYS, FRESNO COUNTY RECORDS.

EASEMENT PARCEL 7:

A NON-EXCLUSIVE EASEMENT FOR AN IRRIGATION PIPELINE TOGETHER WITH THE RIGHT OF INGRESS AND EGRESS, AS GRANTED TO R. TODD HENRY AND LINDA J. HENRY, AS TRUSTEES OF THE TODD AND LINDA HENRY REVOCABLE TRUST AND GARY G. ROBINSON AND KAREN E. ROBINSON, AS TRUSTEES OF THE GARY G. ROBINSON AND KAREN E. ROBINSON 2004 TRUST BY INSTRUMENT RECORDED JUNE 29, 2005 AS DOCUMENT NO.

Environmental Indemnity Agreement
Ashlan & Hayes et al.
Loan No. 198935
102908920.1 0053564-00390.001

Exhibit A – 3

20050144195 OF OFFICIAL RECORDS OVER AND ACROSS THE FOLLOWING DESCRIBED PARCELS "A" AND "B":

PARCEL A: (APN: 038-060-28S)

THE EAST 30 FEET OF THE NORTHEAST QUARTER OF SECTION 7, TOWNSHIP 16 SOUTH, RANGE 14 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT THEREOF.

PARCEL B: (APN: 038-130-02)

THE NORTH 30 FEET OF THE EAST 30 FEET OF THE NORTHEAST QUARTER OF SECTION 18, TOWNSHIP 16 SOUTH, RANGE 14 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EASEMENT PARCEL 8:

A NON-EXCLUSIVE EASEMENT FOR AN IRRIGATION PIPELINE WITH THE RIGHT OF INGRESS AND EGRESS AS GRANTED TO R. TODD HENRY AND LINDA J. HENRY, AS TRUSTEES OF THE TODD AND LINDA HENRY REVOCABLE TRUST AND GARY G. ROBINSON AND KAREN E. ROBINSON, AS TRUSTEES OF THE GARY G. ROBINSON AND KAREN E. ROBINSON 2004 TRUST BY INSTRUMENT RECORDED JUNE 29, 2005 AS DOCUMENT NO. 2005-0144196 OF OFFICIAL RECORDS OVER AND ACROSS THE FOLLOWING DESCRIBED PARCELS "A, B, C, D AND E":

PARCEL A: (APN: 038-130-04S)

THE NORTH 30 FEET OF THE NORTHWEST QUARTER OF SECTION 17, TOWNSHIP 16 SOUTH, RANGE 14 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT THEREOF.

PARCEL B: (APN: 038-130-05S)

THE NORTH 30 FEET OF THE NORTH HALF OF THE NORTHEAST QUARTER OF SECTION 17, TOWNSHIP 16 SOUTH, RANGE 14 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT THEREOF.

PARCEL C: (APN: 038-060-31S)

THE EAST 30 FEET OF THE FOLLOWING DESCRIBED PARCEL:

BEGINNING AT THE SOUTHEAST CORNER OF SECTION 7, TOWNSHIP 16 SOUTH, RANGE 14 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT THEREOF; THENCE WEST ALONG THE SOUTH LINE OF SAID SECTION, A DISTANCE OF 96 RODS; THENCE AT RIGHT ANGLES NORTH 53 1/3 RODS; THENCE AT RIGHT ANGLES EAST, 96 RODS

**Exhibit A – 4**

TO THE EAST LINE OF SAID SECTION; THENCE SOUTH ALONG SAID EAST LINE TO THE PLACE OF BEGINNING.

PARCEL D: (APN: 038-060-30S)

THE EAST 30 FEET OF THE FOLLOWING DESCRIBED PARCEL:

THAT PORTION OF THE SOUTHEAST QUARTER OF SECTION 7, TOWNSHIP 16 SOUTH, RANGE 14 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE EAST LINE OF SAID SECTION 7, DISTANT THEREON 53 1/2 RODS SOUTH OF THE NORTHEAST CORNER OF THE SOUTHEAST QUARTER OF SAID SECTION 7; THENCE WEST PARALLEL WITH THE NORTH LINE OF THE SOUTHEAST QUARTER OF SAID

SECTION 7, A DISTANCE OF 96 RODS; THENCE SOUTH PARALLEL WITH THE EAST LINE OF SAID SECTION A DISTANCE OF 53 1/3 RODS; THENCE EAST PARALLEL WITH THE NORTH LINE OF SAID SOUTHEAST QUARTER, A DISTANCE OF 96 RODS TO A POINT ON THE EAST LINE OF SAID SECTION 7; THENCE NORTH ALONG SAID EAST LINE A DISTANCE OF 53 1/3 RODS TO THE POINT OF BEGINNING.

PARCEL E: (APN: 038-060-29S)

THE EAST 30 FEET OF THE FOLLOWING DESCRIBED PARCEL:

THAT CERTAIN PORTION OF THE SOUTHEAST QUARTER OF SECTION 7, TOWNSHIP 16 SOUTH, RANGE 14 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT THEREOF, DESCRIBED AS FOLLOWS:

BEGINNING AT THE NORTHEAST CORNER OF THE SOUTHEAST QUARTER OF SAID SECTION 7, RUNNING THENCE WEST ALONG THE NORTH LINE OF SAID QUARTER SECTION A DISTANCE OF 96 RODS; THENCE AT RIGHT ANGLES SOUTH A DISTANCE OF 53 1/3 RODS; THENCE AT RIGHT ANGLES EAST A DISTANCE OF 96 RODS TO THE EAST LINE OF SAID SECTION; THENCE NORTH LONG SAID EAST LINE OF SAID SECTION TO THE POINT OF BEGINNING.

EASEMENT PARCEL 9: (APN: 038-060-92S)

AN EASEMENT FOR A FILTER STATION SITE AS CREATED UNDER THAT CERTAIN INSTRUMENT RECORDED SEPTEMBER 27, 2010, INSTRUMENT NO. 2010-126979 OF OFFICIAL RECORDS, OVER THE FOLLOWING DESCRIBED PROPERTY:

BEGINNING AT THE SOUTHEAST CORNER OF THE SOUTHEAST QUARTER OF SECTION 9, TOWNSHIP 16 SOUTH, RANGE 14 EAST, MOUNT DIABLO BASE AND MERIDIAN, ACCORDING TO THE OFFICIAL PLAT THEREOF; THENCE WEST PARALLEL TO THE SOUTH BORDER OF SAID SECTION 9 ALONG THE MIDDLE OF THE RIGHT OF WAY OF WEST MOUNTAIN VIEW AVENUE, A DISTANCE OF 11 FEET; THENCE NORTH PARALLEL TO THE EAST BOUNDARY OF THE SOUTHEAST QUARTER OF SAID SECTION 9, A DISTANCE OF 25 AND 1/2 FEET, WHICH IS THE

Exhibit A – 5

POINT OF BEGINNING; THENCE NORTH PARALLEL WITH SAID EASTERLY LINE OF THE SOUTHEAST QUARTER OF SAID SECTION 9, A DISTANCE OF 54 FEET; THENCE WEST PARALLEL WITH SAID MIDDLE OF RIGHT OF WAY OF WEST MOUNTAIN VIEW AVENUE, A DISTANCE OF 84 FEET; THENCE SOUTH PARALLEL WITH SAID EASTERLY LINE OF THE SOUTHEAST QUARTER OF SAID SECTION 9, A DISTANCE OF 54 FEET; THENCE EAST PARALLEL WITH SAID MIDDLE OF RIGHT OF WAY OF WEST MOUNTAIN VIEW AVENUE, A DISTANCE OF 84 FEET TO THE POINT OF BEGINNING.

Environmental Indemnity Agreement
Ashlan & Hayes et al.
Loan No. 198935
102908920.1 0053564-00390.001

Exhibit A – 6