1  ZEV SHECHTMAN (BAR NO. 266280)
   Zev.Shechtman@saul.com
2  CAROL CHOW (BAR NO. 169299)
   carol.chow@saul.com
3  RYAN COY (BAR NO. 324939)
   ryan.coy@saul.com
4  SAUL EWING LLP
   1888 Century Park East, Suite 1500
5  Los Angeles, California 90067
   Telephone:  (310) 255-6100
6  Facsimile:  (310) 255-6200

7  Attorneys for Phillip Christensen, as Receiver

8                **UNITED STATES DISTRICT COURT**

9        **EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION**

10

11  METROPOLITAN LIFE INSURANCE            Lead Case No. 1:24-cv-01261-KES-SAB
    COMPANY, a New York corporation,
12                                          Consolidated with Case Nos:
                   Plaintiff,               1:24-cv-01226; 1:24-cv-01230; 1:24-cv-
13                                          01231; 1:24-cv-01232; 1:24-cv-01233; 1:24-
          vs.                               cv-01235; and 1:24-cv-01241
14
    ACDF, LLC, a California limited liability    **RECEIVER'S NOTICE OF MOTION AND**
15  company, et al.,                             **MOTION FOR ENTRY OF ORDER**
                                                 **APPROVING SALE OF REAL**
16                 Defendants.                   **PROPERTY AND FOR RELATED**
                                                 **RELIEF; MEMORANDUM OF POINTS**
17  ┌─────────────────────────────────────┐      **AND AUTHORITIES AND**
                                                 **DECLARATIONS OF PHILLIP**
18  ☐  Affects All Cases                         **CHRISTENSEN AND SULLIVAN GROSZ**
    ☒  Affects Metropolitan Life Ins. Co. v.     **IN SUPPORT THEREOF**
19     ACDF, LLC, et al., 1:24-cv-01261
    ☐  Affects Metropolitan Life Ins. Co. v.     Hearing:
20     FNF Farms, LLC, et al., 1:24-cv-01226     Date:   April 21, 2025
                                                 Time:   1:30 p.m.
21  ☐  Affects Metropolitan Life Ins. Co. v. C   Place:  Robert E. Coyle U.S. Courthouse
       & A Farms, LLC, et al., 1:24-cv-01230             2500 Tulare Street
22  ☐  Affects Metropolitan Life Ins. Co. v.             Courtroom 6, 7th Floor
       Maricopa Orchards, LLC, et al., 1:24-             Fresno, CA 93721
23     cv-01231
    ☐  Affects Brighthouse Life Ins. Co. v.
24     Kamm South, LLC, et al., 1:24-cv-
25     01232
    ☐  Affects Brighthouse Life Ins. Co. v.
26     Manning Avenue Pistachios, LLC, et
       al., 1:24-cv-01233 Case No. 1:24-cv-
27     01233
    └─────────────────────────────────────┘
28

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

55265379.2 392865-00009

☐ Affects Brighthouse Life Ins. Co. v.
   ACDF, LLC, et al., 1:24-cv-01235
☐ Affects MetLife Real Estate Lending,
   LLC v. Panoche Pistachios, LLC, et
   al., 1:24-cv-01241

**NOTICE IS GIVEN that on April 21, 2025, at 1:30 p.m., in Courtroom 6 of the Robert E. Coyle U.S. Courthouse, 2500 Tulare Street, 7th Floor, Fresno, California, 93721**, Phillip Christensen, Receiver of the above referenced estates (the "Receiver" or "Seller"), will and hereby does move (the "Motion" and "Sale Hearing") the Court for an order:

1.    Approving the sale by the Receiver of certain real property (the "Subject Property") described herein to the Buyer defined immediately below, for $6,000,000.00, subject to higher and better bids (the "Purchase Price");

2.    Approving the below Bidding Procedures;

3.    Authorizing the Receiver to pay real estate brokers' commissions and other costs in connection with the sale;

4.    Finding that the sale satisfies 28 U.S.C. §§ 2001 and 2002;

5.    Finding that notice of the Motion is adequate and proper;

6.    Authorizing the Receiver to execute documents and take such other and further action as is necessary to close the sale; and

7.    Providing such other and further relief as the Court deems just and proper.

The Motion is based upon this Notice of Motion and Motion, the Memorandum of Points and Authorities, the Declarations of Phillip Christensen and Sullivan Grosz, all of which are attached to the Motion, the papers and pleadings in the Receivership case, and such other evidence that may be presented at the hearing.

In support of the Motion, the Receiver hereby provides the following additional information:

1.    The Buyer is E & C Farms, LLC, a California limited liability company or

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1   permitted assignee (the "Buyer").

2       2.      The Subject Property consists of cherry farmland and improvements thereon

3   located in Kern County, and bearing Kern County Assessor's Parcel Numbers 220-130-05-00-7,

4   220-130-17-00-2, 220-130-24-00-2, 220-130-30-00-9, and 220-130-35-00-4, as more particularly

5   described in **Exhibit A** to the proposed order attached hereto as **Exhibit 1**.[1]

6       3.      The terms and conditions of the sale are that the Land and Improvements

7   are as stated in the PSA attached hereto as **Exhibit 2**, subject to the terms hereof.  The sale is "as

8   is," "where is," "with all faults," with no warranty or recourse whatsoever, except to the extent

9   expressly and unambiguously stated in the PSA. The sale is subject to Court approval.

10      4.      The proposed sale is subject to overbids and, by way of this Motion, the

11  Receiver is requesting that the Court approve the following bidding procedures (the "Bidding

12  Procedures"):[2]

13          a.      Listing.  The Receiver has listed the Subject Property with his real

14  estate broker, Pearson Realty (the "Broker") on the terms set forth in the listing agreement at

15  **Exhibit 3** hereto.

16          b.      Publication of Sale. The Broker has been listing the Subject Property

17  for sale in the Fresno Business Journal since March 7, 2025 consistent with 28 U.S.C. § 2002.

18  The Broker will update the newspaper publication to add the Sale Hearing date, time, and place.

19  The Auction and Sale Hearing of the Subject Property will occur after not less than four

20  consecutive weeks of such publication, as required by 28 U.S.C. § 2002.

21          c.      Auction and Sale Hearing.  If more than one bidder becomes

22  qualified to bid for the purchase of the Subject Property, an auction will be held at the Sale

23  Hearing described above (the "Auction").  At the conclusion of the Auction, the Receiver will

24  seek confirmation of the sale to the successful bidder and entry of the proposed order.  If there are

25

26  _____

[1] This estate also has property in Fresno County, which is not a part of the proposed transaction.

27  [2] The procedures are consistent with those which are the subject of a pending motion for approval

28  of sale procedures (ECF No. 101), modified as necessary and appropriate for a single sale.

1  no qualified overbidders, then the Receiver will request entry of the order approving the sale at the

2  Sale Hearing without holding an Auction.

3          d.    <u>Qualification to Bid</u>.  To submit a qualified bid, a prospective

4  purchaser must submit its bid in writing, so that it is received by the Receiver, through the

5  undersigned counsel, at least two business days before the Sale Hearing.  Such bid must clearly

6  include the following terms or information (a "Qualified Bid" and a "Qualified Bidder"):

7          i.    <u>Deposit</u>. A deposit of 5% of the purchase price which must

8  be delivered to the Receiver with the Qualified Bid (the "Deposit").  The Receiver will hold the

9  Deposit in trust or escrow pending approval of the Court.  The Deposit shall be nonrefundable

10  unless:

11          (1)    Another bidder is the successful bidder at auction and

12  the Qualified Bidder does not wish to be deemed a backup bidder; or

13          (2)    The Court does not approve the sale through no fault

14  of the Qualified Bidder.

15          ii.    <u>Contingencies</u>. There shall be no outstanding contingencies

16  other than the approval of the Court.

17          iii.    <u>No Liability of Receiver</u>.  The Qualified Bid shall

18  acknowledge and accept that the Receiver shall have no liability under any circumstances, and the

19  Qualified Bidder's only possible remedy in the event of alleged breach by Receiver is return of its

20  Deposit.

21          iv.    <u>Good Faith</u>. The Qualified Bidder must submit a declaration

22  signed under penalty of perjury disclosing any connections such bidder has to the Receiver, the

23  Broker, any owner, borrower, or insider thereof, any creditor, or other interested party, and that it

24  has not, and will not, collude with any other potential purchasers or anyone else with respect to the

25  sale.

26          v.    <u>Ability to Close</u>. A Qualified Bid must be accompanied by

27  evidence of the bidder's financial ability to close unconditionally in form and substance

28  satisfactory to the Receiver.

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

vi.     <u>Purchase and Sale Agreement</u>.  The Qualified Bid shall accept all of the same terms as the PSA attached as **Exhibit 2** hereto, except as to purchase price.

vii.     <u>Minimum Overbid and Bidding Increments</u>.  The minimum overbid amount is $6,250,000, and bidding, if any, shall proceed in increments of not less than $10,000. The Receiver holds discretion in accepting or rejecting all overbids, including the form and support required for any overbid.

5.     <u>Stalking Horse Terms</u>.

a.     <u>Breakup Fee</u>. The Receiver requests approval of the breakup fee of $120,000, which is equal to 2% of the initial bid amount of $6,000,0000, as set forth in the PSA, to be paid to the Buyer, as the Stalking Horse Bidder, which will be paid if, and only if, an overbidder other than the Stalking Horse Bidder is the successful purchaser of the Subject Property after Auction, Court approval, after closing of such sale.

6.     <u>Closing</u>.  Escrow shall close no later than 21 calendar days after the entry of an order approving the sale.

7.     <u>Broker's Commission</u>.  The Receiver seeks authority from the Court to pay commissions of the broker(s) through escrow at the rates described in the listing agreement, at **Exhibit 3**, which are summarized below.

8.     <u>Liens</u>.  The sale will only be free and clear of liens that are consensually removed from the Property through escrow.  All other rights, claims, interests or encumbrances running with the land shall remain.  A title report is attached as **Exhibit 4**.  The debt secured by the Subject Property is owed to Metropolitan Life Insurance Company ("MetLife" or "Plaintiff"). MetLife will release its lien in consideration of payment of the net sale proceeds from closing up to the amount of MetLife's secured claim.

9.     <u>Time to File Opposition</u>.  Pursuant to Local Rule 230, any opposition to the Motion must be filed and served not later than 14 days before the date of the Sale Hearing.  The

1  failure to file an opposition may be construed by the Court as non-opposition to the Motion, and a

2  party who fails to timely file an opposition is not entitled to be heard at the Sale Hearing.

3

4  DATED: March 17, 2025              SAUL EWING LLP

5

6                                    By:

7                                        ZEV SHECHTMAN
                                         Attorneys for Phillip Christensen, as Receiver
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

3

## I.

4

## INTRODUCTION

5    The Receiver prays for the Court's approval of the sale of the Subject Property to E & C

6    Farms, LLC, a California limited liability company or permitted assignee ("Buyer"), for

7    $6,000,000.00 (the "Purchase Price"). The proposed sale complies with 28 U.S.C. §§ 2001 and

8    2002 and other applicable law and is in the best interests of this Receivership estate and all parties

9    in interest. The Court should approve this Motion.

10

11    ## II.

12    ## FACTUAL STATEMENT

13    A.    ## Receivership Background

14    The Plaintiffs[3] filed the eight Receivership Cases between October 9 and October 16,

15    2024. After briefing and hearings on the appointment of the Receiver, any objections to the terms

16    of the Receiver's appointment were resolved, and the Court entered agreed orders in the eight

17    cases appointing the Receiver (the "Appointment Orders").

18    On December 10, 2024, the Plaintiffs filed an unopposed motion to consolidate the eight

19    receivership actions for administrative purposes. Case No. 24-01261 ("Lead Case"), ECF No. 53.

20    On December 12, 2024, the Court entered its order consolidating the cases for administrative

21    purposes, allowing parties to file papers relating to the administration of the eight Receivership

22    Cases in the Lead Case. On January 8, 2025, the Court entered an order granting the Plaintiffs'

23    unopposed motion to continue the receivership. Lead Case, ECF No. 80.

24

25

26

27

28

[3] The "Plaintiffs" are Metropolitan Life Insurance Company, Metropolitan Real Estate Lending, LLC, and Brighthouse Life Insurance Company.

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**B.**    **The Sale Procedures Motion**

Plaintiffs filed each of the eight Receivership Cases with respect to distinct loans extended to the subject defendants secured by distinct real property collateral. Accordingly, each of the Appointment Orders appointed the Receiver with respect to different properties. Those Appointment Orders can be located in the following locations on the dockets of the Receivership Cases.

| Action | Date | ECF No. |
|---|---|---|
| Metlife v. ACDF, LLC, et al, 1:24-cv-01261 ("Lead Case") | 11/7/2024 | 45 |
| Metlife v. C & A Farms, LLC et al, 1:24-cv-01230 | 11/7/2024 | 39 |
| Metlife v. FNF Farms, LLC et al, 1:24-cv-01226 | 11/18/2024 | 18 |
| Metlife v. Maricopa Orchards, LLC et al, 1:24-cv-01231 | 11/18/2024 | 17 |
| Brighthouse Life v. Kamm South, LLC et al, 1:24-cv-01232 | 11/25/2024 | 20 |
| Brighthouse Life v. Manning Avenue Pistachios, LLC et al, 1:24-cv-01233 | 12/3/2024 | 22 |
| Brighthouse Life v. ACDF, LLC, et al., 1:24-cv-01235 | 11/22/2024 | 22 |
| MetLife Real Estate v. Panoche Pistachios, LLC et al, 1:24-cv-01241 | 11/18/2024 | 18 |

The Appointment Orders authorize the Receiver to sell the properties subject to Court approval. See, e.g., Lead Case ECF No. 45 at ¶ 7. On February 19, 2025, the Receiver filed a motion to approve sale procedures that would apply to all of the receivership properties (the "Sale Procedures Motion"). See ECF No. 101. A hearing on the Sale Procedures Motion was originally set for March 10, 2025. The Court continued the hearing *sua sponte* to March 17, 2025, and again to March 31, 2025, with instructions to give notice of the Sale Procedures Motion to additional parties. See Minute Orders at ECF Nos. 112, 120.

**C.**    **The Sale of the Subject Property**

The Receiver has listed several properties, including the Subject Property, which is comprised of five parcels of cherry farmland, which are the property of the estate pending in the lead case, No. 1:24-cv-01261. The Receiver has received the Buyer's offer to purchase the

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Subject Property.  Following negotiations, the Receiver and the Buyer entered into an agreement for the Receiver to sell the Subject Property for the Purchase Price of $6,000,000.00, subject to Court approval and overbids per the PSA, a copy of which is attached hereto as **Exhibit 2**.  The Buyer desires to close as quickly as possible so that it can harvest the 2025 cherry crop, which requires harvesting in April of 2025.  Indeed, to ensure proper harvesting, the Buyer required that the Receiver enter into the 2025 Grower/Shipper Agreement with Buyer which contracts the crop to be delivered to the Buyer.  See Exhibit D to the PSA, at **Exhibit 2**.

The PSA is the highest and best offer the Receiver has received to date. The Receiver originally procured the Buyer without use of the Broker.  However, to assist with the proper marketing of the Subject Property to potential overbidders, and with the logistics of the sale and closing, the Receiver has listed the Subject Property with the Broker for a reduced commission. The Broker will continue to market the Subject Property pending the hearing on the Motion.

The proposed sale of the Land and Improvements are "as is," "where is," "with all faults," with no warranty or recourse whatsoever, subject only to overbid and Court approval and limited additional commercial terms set forth in the PSA. The proposed sale was reached via arms-length negotiations.

The Receiver determined to file this Motion while the Sale Procedures Motion is pending to avoid any delay to the sale of the Subject Property while the Court is considering general procedures that will apply to various other properties that are not yet in escrow and not yet the subject of a time sensitive transaction.

### III.

### AUTHORITIES

28 U.S.C. § 2001 governs sales of real property by receivers in federal court.  It provides that:

> (a)    Any realty or interest therein sold under any order or decree of any court of the United States shall be sold as a whole or in separate parcels at public sale at the courthouse of the county, parish, or city in which the greater part of the property is located, or upon the premises or some parcel thereof located therein, as the court directs. Such sale shall be upon such terms and conditions as the court directs.

1

> Property in the possession of a receiver or receivers appointed by one or more district courts shall be sold at public sale in the district wherein any such receiver was first appointed, at the courthouse of the county, parish, or city situated therein in which the greater part of the property in such district is located, or on the premises or some parcel thereof located in such county, parish, or city, as such court directs, unless the court orders the sale of the property or one or more parcels thereof in one or more ancillary districts.

2

3

4

5   28 U.S.C. § 2001.

6     28 U.S.C. § 2002 requires notice of the sale, as follows:

7

> A public sale of realty or interest therein under any order, judgment or decree of any court of the United States shall not be made without notice published once a week for at least four weeks prior to the sale in at least one newspaper regularly issued and of general circulation in the county, state, or judicial district of the United States wherein the realty is situated.

8

9

10   28 U.S.C. § 2002.

11     These statutory sections authorize the court to set the terms and conditions for a judicial

12   sale.  The district holds broad discretion in its oversight of a receiver.  *S.E.C. v. Hardy*, 803 F.2d

13   1034, 1037 (9th Cir. 1986) ("a court overseeing a receivership is accorded wide discretionary

14   powers in light of the concern for orderly administration") (internal quotations omitted).  The

15   court's discretion extends to establishing reasonable procedures for the conduct of a sale overseen

16   by the court.  *United States v. Branch Coal Corp.*, 390 F.2d 7, 10 (3d Cir. 1968) ("There can be no

17   doubt that Congress has authorized the federal judiciary to use sound discretion in setting the

18   terms and conditions for judicial sales.") (cited approvingly by *In re Crown Corp.*, 679 F.2d 774,

19   777 (9th Cir. 1982)).  Thus, the court has the discretion to approve appropriate sale procedures that

20   comply with the applicable statute.  *Cf. SEC v. Priv. Equity Mgmt. Grp., LLC*, No. CV 09-2901

21   PSG (EX), 2009 WL 10676006, at *4 (C.D. Cal. Nov. 20, 2009) (denying waiver of the

22   requirements of 28 U.S.C. § 2001).  Approval of a breakup fee is appropriate when it is reasonable

23   and benefits the estate by incentivizing a stalking horse bidder to submit an offer subject to

24   overbid.  *Matter of Bouchard Transportation Co., Inc.*, 74 F.4th 743, 756 (5th Cir. 2023)

25   (affirming approval of breakup fee of up to 3% of purchase price).

26

27

28

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

# IV.

## RELIEF REQUESTED

**A.      Proposed Treatment of Liens and Other Interests**

The Receiver intends to sell the Subject Property free and clear only of liens and claims that will be removed consensually.  Specifically, the senior secured lender, MetLife, will be paid the net sale proceeds (after costs of sale) through escrow and consents to the sale and will release its lien in the ordinary course of escrow.  There are no other known liens, interests or encumbrances, other than those that run with the land.

A copy of the preliminary title report is attached hereto as **Exhibit 4**.  All parties listed on the title report, to the extent addresses are available, are being served with a copy of the complete Motion.

**B.      Proposed Bidding Procedures**

The Bidding Procedures are set forth in detail in the above Notice of Motion, and are incorporated herein by this reference.  The Receiver believes that such procedures are reasonable and appropriate to create a competitive and fair bidding process to maximize the value of the estate.  These Bidding Procedures are consistent with the Sale Procedures Motion which is pending before the Court, while modified to be tailored to this transaction.  The Receiver  requests that the Court approve all of the Bidding Procedures above.  In particular, the Receiver requests approval of the breakup fee of 2% of the Purchase Price, as a reasonable exercise of the Receiver's business judgment in the best interests of the estate, as it incentivizes the Buyer's participation in this sale subject to potential overbidding.

**C.      Payment of Commissions to Real Estate Brokers and Sale Costs through Escrow**

The Receiver respectfully requests that the Court approve the commissions described in the Listing Agreement at **Exhibit 3** hereto and summarized as follows:

If the successful overbidder is not the original Buyer, the commission shall be 4% if the buyer is not represented by the Broker, and 3.75% if the buyer is represented by the Broker. However, a 1% discount shall apply if the original Buyer closes the transaction, meaning that the commission shall be 3.00%.

Further, the Receiver should be authorized to pay all reasonable, customary, or otherwise appropriate costs arising through escrow in the exercise of the Receiver's business judgment.

V.

**CONCLUSION**

This Motion complies with the requirements of 28 U.S.C. §§ 2001 and 2002 by conducting a public sale with appropriate published notice. A commercially reasonable marketing process has been conducted to maximize value of the Subject Property. A ready, willing, and able Buyer is ready to move forward with the sale, and it should be approved.

Based upon the foregoing, the Receiver respectfully requests that the Court enter the order in the form of Exhibit 1 hereto:

1. Granting the Motion in its entirety;

2. Approving the Bidding Procedures;

3. Approving the sale by the Receiver of the Subject Property for $6,000,000.00, subject to higher and better bids;

4. Authorizing the Receiver to pay real estate brokers' commissions and other costs in connection with the sale;

5. Finding that the sale satisfies 28 U.S.C. §§ 2001 and 2002;

6. Finding that notice of the Motion is adequate and proper;

7. Authorizing the Receiver to execute documents and take such other and further action as is necessary to close the sale; and

8. Providing such other and further relief as the Court deems just and proper.

DATED: March 17, 2025

SAUL EWING LLP

By: ______________________
ZEV SHECHTMAN
Attorneys for Phillip Christensen, as Receiver

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

# **DECLARATION OF PHILLIP CHRISTENSEN**

I, Phillip Christensen, declare as follows:

1.     I am the Receiver in the above-entitled action.  I have personal knowledge of the facts set forth in this Declaration and, if called as a witness, could and would competently testify to such facts under oath.

2.     I make this declaration in support of my above *Motion for Entry of Order Approving Sale of Real Property and for Related Relief* (the "Motion").  Defined terms are the same as in the Motion.  I have reviewed and approve of the Motion.

3.     Attached as **Exhibit 1** is a copy of the proposed order approving the Motion.

4.     Attached as **Exhibit 2** is a copy of the Purchase and Sale Agreement with the buyer (the "PSA").

5.     Attached as **Exhibit 3** is a copy of my listing agreement for the Subject Property with Pearson Reality.

6.     Attached as **Exhibit 4** is a copy of the preliminary title report recently obtained from Chicago title.

7.     I have determined in my business judgment that it is appropriate to sell the Subject Property on the terms described in the above Motion.  The Buyer has requested to close expeditiously out of concern for the cherry harvest commencing in April, and I am committed to seeking an expeditious closing in a manner consistent with the rules of the Court and other applicable law.

8.     I believe in my business judgment that it is necessary to incentivize a buyer to serve as a stalking horse bidder, meaning that the buyer will voluntarily allow itself to be overbid, by providing a breakup fee in the event of successful overbidding.  Accordingly, I request approval of the 2% breakup fee described in the PSA.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

1    Executed on this 17th day of March, 2025, at Fresno, California.

2

3    _____

4    Phillip Christensen

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

55265379.2 392865-00009                                    14

1

**<u>DECLARATION OF SULLIVAN GROSZ</u>**

2      I, SULLIVAN GROSZ, declare as follows:

3      1.      I am President at Pearson Realty, the Broker for the Receiver. I have personal

4   knowledge of the facts set forth in this Declaration and, if called as a witness, could and would

5   competently testify to such facts under oath.

6      2.      I make this declaration in support of the above Motion.  Defined terms are the same

7   as in the Motion.

8      3.      Attached as **Exhibit 3** is a copy of the Listing Agreement engaging my firm to sell

9   the Subject Property.

10      4.      Phillip Christensen, as Receiver, retained me to list, market and aid the Receiver in

11   selling the Receiver's right, title, and interest in the Subject Property.

12      5.      The Receiver procured the original Buyer independently, and the Listing

13   Agreement discounts my firm's commission by 1% unless my firm obtains an overbidder.

14      6.      On or about February 21, 2025, I listed the Subject Property on the Multiple Listing

15   Service.

16      7.      The original listing price for the Subject Property was $6,250,000.

17      8.      I have been advertising the listing in the Fresno Business Journal since March 7,

18   2025.  Today, I added the information regarding the date, time, and place of this sale to that

19   publication.

20      9.      Through the MLS and other online sources, information about the opportunity

21   remains available to a large audience of brokers and potential buyers.

22      10.      Based upon my experience on the sales of farmland in the region, my research into

23   current market conditions, and the marketing history, and knowledge regarding the Subject

24   Property, I believed that the proposed sale of $6,000,000 to the Buyer, subject to overbidding, is in

25   the range of the current fair market value of the Land and Improvements.

26      11.      Such offer remains subject to overbid. Accordingly, Pearson will continue its

27   marketing efforts as to the Subject Property until the sale closes.

28

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1    I declare under penalty of perjury under the laws of the United States of America that the

2  foregoing is true and correct.

3    Executed on this 17th day of March, 2025, at Fresno, California.

4

5    *Sullivan Grosz*
   _____

6    SULLIVAN GROSZ

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

# EXHIBIT 1

1  ZEV SHECHTMAN (BAR NO. 266280)
   Zev.Shechtman@saul.com
2  CAROL CHOW (BAR NO. 169299)
   carol.chow@saul.com
3  RYAN COY (BAR NO. 324939)
   ryan.coy@saul.com
4  SAUL EWING LLP
   1888 Century Park East, Suite 1500
5  Los Angeles, California 90067
   Telephone:  (310) 255-6100
6  Facsimile:  (310) 255-6200

7  Attorneys for Phillip Christensen, as Receiver

8              UNITED STATES DISTRICT COURT

9       EASTERN DISTRICT OF CALIFORNIA, FRESNO DIVISION

10

11  METROPOLITAN LIFE INSURANCE           Lead Case No. 1:24-cv-01261-KES-SAB
    COMPANY, a New York corporation,
12                                        Consolidated with Case Nos:
              Plaintiff,                  1:24-cv-01226; 1:24-cv-01230; 1:24-cv-
13                                        01231; 1:24-cv-01232; 1:24-cv-01233; 1:24-
        vs.                               cv-01235; and 1:24-cv-01241
14
    ACDF, LLC, a California limited liability   **[PROPOSED] ORDER GRANTING**
15  company, et al.,                      **RECEIVER'S MOTION FOR ENTRY OF**
                                          **ORDER APPROVING SALE OF REAL**
16              Defendants.               **PROPERTY AND FOR RELATED**
                                          **RELIEF**
17
    ☐  Affects All Cases                  Hearing:
18  ☒  Affects Metropolitan Life Ins. Co. v.   Date:    April 21, 2025
       ACDF, LLC, et al., 1:24-cv-01261   Time:    1:30 p.m.
19  ☐  Affects Metropolitan Life Ins. Co. v.   Place:  Robert E. Coyle U.S. Courthouse
       FNF Farms, LLC, et al., 1:24-cv-01226        2500 Tulare Street
20  ☐  Affects Metropolitan Life Ins. Co. v. C        Courtroom 6, 7th Floor
       & A Farms, LLC, et al., 1:24-cv-01230         Fresno, CA 93721
21  ☐  Affects Metropolitan Life Ins. Co. v.
22     Maricopa Orchards, LLC, et al., 1:24-
       cv-01231
23  ☐  Affects Brighthouse Life Ins. Co. v.
24     Kamm South, LLC, et al., 1:24-cv-
       01232
25  ☐  Affects Brighthouse Life Ins. Co. v.
26     Manning Avenue Pistachios, LLC, et
       al., 1:24-cv-01233 Case No. 1:24-cv-
27     01233
28

**Exhibit 1**
**17**

☐ Affects Brighthouse Life Ins. Co. v.
   ACDF, LLC, et al., 1:24-cv-01235
☐ Affects MetLife Real Estate Lending,
   LLC v. Panoche Pistachios, LLC, et
   al., 1:24-cv-01241

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

The Court having held a hearing on April 21, 2025, at 1:30 p.m., at the above-captioned Courthouse, the Honorable Kirk E. Sherriff, United States District Judge, presiding, on the *Motion for Entry of Order Approving Sale of Real Property and for Related Relief* (ECF No. ___) (the "Motion"), filed by Motion Phillip Christensen, Receiver of the above-referenced estate (the "Receiver" or "Seller");[1] having read and considered the Motion, any opposition, and reply with respect thereto; having heard the oral arguments of counsel at the hearing; having read the Purchase and Sale Agreement ("PSA") and other evidence in support of the Motion; having called for higher and better bids at the Sale Hearing; good cause appearing therefor; it is hereby ORDERED THAT:

1.    The Motion is granted in its entirety.  Without limiting the generality of the foregoing, it is further

ORDERED THAT:

2.    The sale by the Receiver of the real property described in Exhibit A hereto (the "Subject Property"), to the Buyer, [_____], for the Purchase Price of $[_____], is approved.  The Deposit of $[_____] shall be credited to the Purchase Price and the balance must be paid at closing.

[3.    _____ is confirmed as a backup buyer of the Subject Property, and the Receiver shall retain such party's deposit until the closing of the sale to the Buyer or default of the Buyer.  If the Buyer defaults, the Receiver shall close the sale to the backup buyer.]

[4.    The breakup fee of $120,000 is approved (if the sale is to a successful overbidder).]

---

[1] Unless otherwise indicated, defined terms are the same as in the Motion.

55271905.1 392865-00009                    2
[PROPOSED] ORDER GRANTING RECEIVER'S MOTION FOR
ENTRY OF ORDER AUTHORIZING SALE OF REAL PROPERTY

Exhibit 1
18

5.      The closing must occur no later than 21 days after entry hereof, and may occur immediately after entry hereof.

6.      The Bidding Procedures described in the Motion are approved.

7.      The Receiver is authorized to pay real estate brokers' commissions and other costs in connection with the sale, as described in the Motion.

8.      The Court finds that the sale satisfies 28 U.S.C. §§ 2001 and 2002.

9.      The notice of the Motion is adequate and proper.

10.     The sale is "AS-IS" and "WHERE-IS" "WITH ALL FAULTS" and "WITHOUT REPRESENTATIONS OR WARRANTIES" except to the extent expressly and unambiguously stated in the PSA.

11.     The Buyer's only remedy if the sale is not consummated through no fault of Buyer is a return of the Deposit. If the sale is not consummated due to an act or omission by Buyer, then Buyer shall forfeit the Deposit.

12.     The Receiver is authorized to execute documents and take such other and further action as is necessary to close the sale.

13.     This Court shall retain exclusive jurisdiction over the subject matter hereof.


IT IS SO ORDERED.

Dated: April __, 2025

_____
UNITED STATES DISTRICT JUDGE

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

55271905.1 392865-00009                                   3

[PROPOSED] ORDER GRANTING RECEIVER'S MOTION FOR
ENTRY OF ORDER AUTHORIZING SALE OF REAL PROPERTY

Exhibit 1
19

**EXHIBIT "A"**
Legal Description

<u>**For APN/Parcel ID(s):**  220-130-17, 220-130-24, 220-130-05, 220-130-30 and 220-130-35</u>

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA IN COUNTY OF KERN, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

**PARCEL 1: <u>APN 220-130-30</u>**

THE SOUTH HALF OF THE NORTHWEST QUARTER AND THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 26, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER THE OFFICIAL PLAT THEREOF.

**PARCEL 2: <u>APN 220-130-05</u>**

THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 26, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM AN UNDIVIDED 10% INTEREST OF ALL OIL, GAS, OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND AS BY B.P. OIL CORPORATION, A CORPORATION BY DEED RECORDED NOVEMBER 21, 1973, IN <u>BOOK 4813, PAGE 1567</u>, AS <u>DOCUMENT NO. 36460 OF OFFICIAL RECORDS</u>.

**PARCEL 3: <u>APN 220-130-24</u>**

THE NORTHEAST QUARTER OF SECTION 34, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND APPROVED BY THE SURVEYOR GENERAL ON JUNE 1, 1855.

EXCEPTING THEREFROM AN UNDIVIDED 1/4 INTEREST OF ALL OIL, GAS AND MINERAL RIGHTS AS RESERVED IN DEED FROM PAULINE F. CRANE ADMINISTRATIX OF THE ESTATE OF ABIGAIL BRIGGS FOWLER, DECEASED, RECORDED JULY 3, 1952, IN <u>BOOK 1959, PAGE 228</u>, AS <u>DOCUMENT NO. 30914 OF OFFICIAL RECORDS</u>.

**PARCEL 4: <u>APN 220-130-17</u>**

THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 34, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND APPROVED BY THE SURVEYOR GENERAL ON JUNE 1, 1855.

**PARCEL 5: <u>APN 220-130-35</u>**

THE EAST HALF OF THE SOUTH HALF OF SECTION 26, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL OIL, GAS, OTHER HYDROCARBONS SUBSTANCES AND MINERALS OF ANY KIND OR CHARACTER, IN, ON OR THEREUNDER, AS RESERVED IN PREVIOUS DEEDS OF RECORD.

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

1

ORDER GRANTING RECEIVER'S MOTION FOR
ENTRY OF ORDER AUTHORIZING SALE OF REAL PROPERTY

Exhibit 1
20

# EXHIBIT 2

## PURCHASE AND SALE AGREEMENT

This PURCHASE AND SALE AGREEMENT (this "<u>Agreement</u>") is made as of March 6, 2025 (the "<u>Effective Date</u>"), by and between (i) **PHILLIP CHRISTENSEN**, as Receiver ("<u>Seller</u>"), as seller, and (ii) **E & C Farms, LLC, a California limited liability company** or permitted assignee ("<u>Purchaser</u>"), as purchaser.

## <u>WITNESSETH:</u>

**WHEREAS,** Seller is the Receiver of the Property (as defined below); and

**WHEREAS,** Purchaser desires to purchase the Property from Seller, and Seller desires to sell the Property to Purchaser, in each case subject to and upon the terms and conditions hereinafter set forth;

**WHEREAS,** as of the date hereof, the Receiver has not committed or contracted the currently growing crop on the Property to any packing company;

**NOW, THEREFORE,** in consideration of the mutual covenants herein contained and other good and valuable consideration, the mutual receipt and legal sufficiency of which are hereby acknowledged, Purchaser and Seller, intending to be legally bound, hereby agree as follows:

## ARTICLE I

## DEFINITIONS

**Section 1.1.**    <u>Defined Terms</u>.  As used in this Agreement, the following defined terms have the meanings indicated below:

"<u>Agreement</u>" means this Purchase and Sale Agreement and the exhibits and schedules attached hereto, as amended from time to time.

"<u>Closing</u>" has the meaning set forth in <u>Section 5.1</u> of this Agreement.

"<u>Closing Date</u>" has the meaning set forth in <u>Section 5.1</u> of this Agreement.

"<u>Cultural Cost Reimbursement</u>" has the meaning set forth in Section 5.4(a) of this Agreement.

"<u>Deed</u>" has the meaning set forth in <u>Section 5.2(a)</u> of this Agreement.

"<u>Deposit</u>" has the meaning set forth in <u>Section 2.6</u> of this Agreement.

"<u>District Court</u>" means the United States District Court for the Eastern District of California (Fresno), the Honorable Kirk E. Sherriff, presiding, before which the Seller has been appointed as Receiver in Case No. **1:24-CV-01261**  (and related cases).

"<u>Effective Date</u>" has the meaning set forth in the introductory paragraph of this Agreement.

"<u>Escrow Agent</u>" has the meaning set forth in <u>Section 2.6</u> of this Agreement.

"<u>Improvements</u>" has the meaning set forth in <u>Section 2.1(b)</u> of this Agreement.

"<u>Inspection Period</u>" has the meaning set forth in <u>Section 4.1(a)</u> of this Agreement.

"<u>Land</u>" has the meaning set forth in <u>Section 2.1(a)</u> of this Agreement.

"<u>Permitted Exceptions</u>" has the meaning set forth in <u>Section 3.1</u> of this Agreement.

"<u>Property</u>" has the meaning set forth in <u>Section 2.3</u> of this Agreement.

"<u>Purchase Price</u>" has the meaning set forth in <u>Section 2.4</u> of this Agreement.

"<u>Purchaser</u>" has the meaning set forth in the introductory paragraph of this Agreement.

"<u>Real Property</u>" has the meaning set forth in <u>Section 2.3</u> of this Agreement.

"<u>Receiver</u>" means the receiver appointed by the District Court in Case No. 1:24-CV-01261 (and related cases).

"<u>Seller</u>" has the meaning set forth in the introductory paragraph of this Agreement.

"<u>Survey</u>" has the meaning set forth in <u>Section 3.1</u> of this Agreement.

"<u>Title Company</u>" has the meaning set forth in <u>Section 3.1</u> of this Agreement.

"<u>Title Policy</u>" has the meaning set forth in <u>Section 3.2</u> of this Agreement.

"<u>Title Report</u>" has the meaning set forth in <u>Section 3.1</u> of this Agreement.

Terms not defined in this Section 1.1 herein shall be entitled to their plain meaning in the context of this Agreement.

## ARTICLE II

## PURCHASE AND SALE

**Section 2.1.**    <u>Agreement of Purchase and Sale</u>.    Subject to the terms and conditions hereinafter set forth, Seller agrees to sell and convey to Purchaser, and Purchaser agrees to purchase, the following:

(a)    those certain tracts or parcels of agricultural land (the "<u>Land</u>") located in Kern County, California (Kern County Assessor's Parcel Numbers 220-130-05-00-7, 220-130-17-00-2, 220-130-24-00-2, 220-130-30-00-9, and 220-130-35-00-4), as more particularly described in

55193539.2
392865-00009

2

Exhibit 2
22

**Exhibit A** attached hereto and made a part hereof, together with Seller's right, title and interest in all rights and appurtenances pertaining to such property, including the benefit of any development rights or appurtenant easements, and together with all rights, privileges, and appurtenances pertaining thereto, including but not limited to Seller's right, title and interest in water rights, claims, permits, strips and gores, and easements, and

           (b)     all of Seller's right, title and interest in and to all improvements, including all irrigation equipment, permanent plantings and fixtures situated on the Land, and any growing crops thereon (the "Improvements").

    **Section 2.2.**    Intentionally Omitted.

    **Section 2.3.**    Property Defined.  The Land and Improvements are hereinafter sometimes referred to as the "Real Property" or the "Property."

    **Section 2.4.**    Purchase Price.  The purchase price to be paid by Purchaser to Seller for the Real Property shall be the sum of Six Million and No/100 Dollars ($6,000,000.00) (the "Purchase Price").

    **Section 2.5.**    Payment of Purchase Price.  The Purchase Price shall be payable in full at the Closing in cash by federal wire transfer of immediately available funds.

    **Section 2.6.**    Deposit; Transaction Fee.  Within two (2) business days after the Effective Date, Purchaser shall deposit with Chicago Title Company, with an address of 7330 N Palm Ave, Suite 101, Fresno, CA 93711 (the "Escrow Agent"), Attention: Sue Meyer, the sum of Three Hundred Thousand and No/100 Dollars ($300,000.00) (the "Deposit").

The Escrow Agent shall hold the Deposit in accordance with the terms and conditions of this Agreement.  Purchaser shall be responsible for the payment of all costs and fees imposed on the Deposit account.  The Deposit shall be distributed in accordance with the terms of this Agreement.

    **Section 2.7.**    Escrow Agent.

Escrow Agent shall execute this Agreement solely for the purpose of being bound by the provisions of Sections 2.6 and 2.7 hereof.

Escrow Agent shall hold and dispose of the Deposit in accordance with the terms of this Agreement.  Seller and Purchaser agree that the duties of the Escrow Agent hereunder are purely ministerial in nature and shall be expressly limited to the safekeeping and disposition of the Deposit in accordance with this Agreement.  Escrow Agent shall incur no liability in connection with the safekeeping or disposition of the Deposit for any reason other than Escrow Agent's fraud, willful misconduct or gross negligence.  In the event that Escrow Agent shall be in doubt as to its duties or obligations with regard to the Deposit, or in the event that Escrow Agent receives conflicting instructions from Purchaser and Seller with respect to the Deposit (but in each case subject to the last sentence of this Section 2.7 pertaining to the circumstances in which the unilateral instructions of Purchaser shall govern), Escrow Agent shall not disburse the Deposit and

shall, at its option, continue to hold the Deposit until both Purchaser and Seller agree as to its disposition or until a final judgment is entered by a court of competent jurisdiction directing its disposition, or Escrow Agent shall interplead the Deposit in accordance with the laws of the state in which the Property is located.

Escrow Agent shall not be responsible for any interest on the Deposit except as is actually earned, or for the loss of any interest resulting from the withdrawal of the Deposit prior to the date interest is posted thereon or for any loss caused by the failure, suspension, bankruptcy or dissolution of the institution in which the Deposit is deposited. Notwithstanding anything to the contrary in this Agreement, Escrow Agent agrees to comply with the unilateral instructions of Purchaser with respect to the return of the Deposit to Purchaser prior to expiration of the Inspection Period.

<div align="center">

**ARTICLE III**

**TITLE AND SURVEY**

</div>

**Section 3.1.**     Title Inspection Period.   Seller will order and provide Purchaser with a preliminary title report for the Property  (the "Title Report") issued by Chicago Title Insurance Company ("Title Company").  During the period beginning upon the date of Purchaser's receipt of the Title Report and ending at 5:00 p.m. (local time at the Property) on the later of (a) the last day of the Inspection Period (as defined below) and (b) ten (10) business days after receipt of the Title Report, Purchaser shall have the right to review the Title Report.  Title to the Property shall be conveyed subject to all exceptions to title identified in the Title Report other than the deed of trust in favor of Metropolitan Life Insurance Company identified in the Title Report and any delinquent real estate taxes and assessments (the "Permitted Exceptions"). If Purchaser desires, Purchaser may order a new survey or an update of any existing survey of the Real Property during the Inspection Period (collectively, the "Survey"), at Purchaser's sole cost.

**Section 3.2.**     Conveyance of Title.   At the Closing, Seller shall convey and transfer to Purchaser fee simple title to the Land and the Improvements, free and clear of any and all liens and encumbrances other than the Permitted Exceptions, by execution and delivery of the Deed (as defined in Section 5.2(a) hereof).  Evidence of delivery of such title shall be the issuance by the Title Company of an ALTA Standard Owner's Policy of Title Insurance (the "Title Policy") covering the Real Property, in the full amount of the Purchase Price, subject only to the Permitted Exceptions.

<div align="center">

**ARTICLE IV**

**REVIEW OF PROPERTY**

</div>

**Section 4.1.**     Right of Inspection.

(a)     Inspection Period.  During the period that begins on the Effective Date and ends at 5:00 p.m. (local time at the Property) on March 24, 2025 (hereinafter referred to as the "Inspection Period"), Purchaser shall have the right to make a physical inspection of the Real Property, including a Phase I inspection of the environmental condition thereof, testing of existing wells and pumps and related irrigation equipment, pursuant to the terms and conditions of this

55193539.2
392865-00009

<div align="center">

4

**Exhibit 2**
**24**

</div>

Agreement. Purchaser shall also have the right to have a Survey made of the Property (at Purchaser's sole cost), all subject to the procedures set forth in Section 4.1(b) below.

        (b)    <u>On-Site Property Inspections</u>.  Purchaser understands and agrees that any on-site inspections of the Property shall occur at reasonable times upon reasonable prior written notice to Seller.  Seller reserves the right to have a representative present during any such inspections. Purchaser shall have the right to test any existing wells on the Real Property at Purchaser's own cost and expense.  Purchaser shall have no right to conduct any invasive testing at the Property, absent Seller's prior written consent.  In no event shall Purchaser provide any governmental entity or agency with information concerning the environmental condition of the Property without obtaining Seller's prior written consent thereto, which consent may be withheld in Seller's sole and absolute discretion; <u>provided</u> that no such consent shall be required in the event that Purchaser is required by applicable law to provide such information to a governmental entity or agency or in the event that such disclosure is necessary to enforce Purchaser's rights under this Agreement or in connection with any legal proceeding arising in connection with this Agreement.

        As a condition to Purchaser's (or its agents') access on the Property, Purchaser (and its agents, as applicable) shall provide Seller with evidence of liability insurance in an amount per occurrence not less than $1,000,000. Purchaser shall keep the Property free from any liens arising out of any work performed, materials furnished, or obligations incurred by or on behalf of Purchaser or Purchaser's agents with respect to any inspection or testing of the Property.  If any such lien is filed, Purchaser shall cause the same to be discharged of record within thirty (30) days after knowledge by Purchaser thereof by satisfying the same.  Failure by Purchaser to discharge such lien within said thirty (30) day period shall entitle Seller, at its option, to declare this Agreement to be terminated.

        Purchaser agrees to protect, indemnify, defend and hold Seller harmless from and against any claim for liabilities, losses, costs, expenses (including reasonable attorneys' fees), damages or injuries ("<u>Claims</u>") arising out of or resulting from the inspection of the Property by Purchaser or its agents or consultants; provided, however, that in no event shall Purchaser be liable to or indemnify Seller for any Claims arising out of or resulting from the mere discovery of a pre-existing condition on the Property, but shall be liable for any exacerbation of such condition caused by Purchaser's activities on the Property.  Notwithstanding anything to the contrary in this Agreement, Purchaser's obligation to indemnify and hold harmless Seller pursuant to this paragraph shall survive the Closing or any termination of this Agreement.  The provisions of this <u>Section 4.1</u> shall survive any termination of this Agreement.

        In addition, in the event of termination of this Agreement, and provided that such termination is not due to Seller's default, Seller shall have the option of requiring Purchaser to deliver to Seller copies of any studies, reports, analysis and investigations of any kind with respect to the Property which have been prepared by or at the request of Purchaser including, without limitation, well testing, test wells, soil engineering reports, maps, surveys, site plans and plans and specifications of any kind relating to the Property which have been prepared by or at the request of Purchaser, and permits, approvals, and authorizations pertaining to the Property, but excluding any internally generated marketing reports or studies, architectural plans and attorney-client privileged or proprietary materials ("<u>Work Product</u>"), "AS-IS," without recourse to Purchaser and without representation or warranty as to accuracy or completeness, and subject to the rights of the

applicable third-parties who prepared the Work Product, including any limitations or prohibitions on use or reliance; provided, Seller reimburses Purchaser for one hundred percent (100%) of the third-party costs incurred by Purchaser in connection with the preparation of any Work Product so requested by Seller.

      **Section 4.2.**   <u>Right of Termination</u>.  If for any reason or no reason, Purchaser determines that the Property or any aspect thereof is unsuitable for Purchaser's acquisition during the Inspection Period, Purchaser shall have the right to terminate this Agreement by giving written notice thereof to Seller at any time prior to the expiration of the Inspection Period, and if Purchaser gives such notice of termination prior to the expiration of the Inspection Period, this Agreement shall terminate.  If this Agreement is terminated pursuant to the foregoing provisions of this paragraph, then neither party shall have any further rights or obligations hereunder (except for any indemnity obligations of either party that expressly survive the termination of this Agreement pursuant to the other provisions of this Agreement), all Deposits shall be returned to Purchaser, and each party shall bear its own costs incurred hereunder.  If Purchaser fails to give Seller a notice of termination prior to the expiration of the Inspection Period, Purchaser shall be deemed to have elected to proceed with the purchase of the Property pursuant to the terms hereof and the Deposit shall become non-refundable.

## ARTICLE V

## CLOSING

      **Section 5.1.**   <u>Time and Place</u>.  The purchase and sale of the Property shall be consummated pursuant to a mutually satisfactory and customary escrow arrangement established with the Escrow Agent (the "<u>Closing</u>") on a date mutually agreed to by Seller and Purchaser (the "<u>Closing Date</u>"); provided, under no circumstances shall the Closing occur later than twenty-one (21) days after the entry of the order approving the sale by the District Court, unless the District Court or the Court of Appeals has entered an order staying the effect of such order approving the sale.  At the Closing, Seller and Purchaser shall perform the obligations set forth in, respectively, <u>Section 5.2</u> and <u>Section 5.3</u> hereof, the performance of which obligations shall be concurrent conditions.

      **Section 5.2.**   <u>Seller's Obligations at the Closing</u>.  At the Closing, subject to District Court approval, Seller shall

      (a)    deliver to Purchaser a duly executed deed or deeds (the "<u>Deed</u>") conveying the Land and Improvements, subject only to the Permitted Exceptions;

      (b)    deliver to Purchaser such evidence as may be reasonably required by the Title Company as to the authority of the person or persons executing documents on behalf of Seller, subject to District Court approval;

      (c)    deliver to Purchaser possession and occupancy of the Property, subject to the Permitted Exceptions and District Court approval;

      (d)    execute a closing statement providing for adjustments and prorations required or contemplated by this Agreement and otherwise reasonably acceptable to Purchaser (the "<u>Closing Statement</u>"); and

(e)     deliver such additional documents as shall be reasonably required by Purchaser or the Escrow Agent to consummate the transactions contemplated by this Agreement.

**Section 5.3.**    <u>Purchaser's Obligations at the Closing</u>.  At the Closing, Purchaser shall:

(a)     pay to Seller the full amount of the Purchase Price (less the Deposit), as increased or decreased by prorations and adjustments as herein provided, in immediately available wire transferred funds pursuant to <u>Section 2.5</u> hereof;

(b)     join Seller in execution of the Closing Statement; and

(c)     deliver such additional documents as shall be reasonably required by Seller or Escrow Agent to consummate the transactions contemplated by this Agreement.

**Section 5.4.**    <u>Credits and Prorations</u>.

(a)     <u>Cultural Cost Reimbursements.</u> At the Closing, through the Escrow, Purchaser shall reimburse Seller for all cultural costs, including, without limitation, water costs and water district assessments, actually incurred by Seller in connection with the 2025 crops from November 1, 2024, through the Closing (the "<u>Cultural Cost Reimbursements</u>").  Prior to the Closing Date, Seller shall provide Purchaser and Escrow Agent with a written statement showing the amount of the Cultural Costs Reimbursement. Purchaser shall deposit the Cultural Costs Reimbursement with Escrow Agent, in cash, prior to the Closing Date.

(b)     <u>Property Taxes</u>. The Title Company shall prorate real and personal property taxes and assessments ("<u>Property Taxes</u>") as of the Closing Date, and such prorations shall be set forth on the Closing Statement.  Seller shall be liable for the proportionate amount of such taxes and expenses attributable to the period through and including the Closing Date, and Purchaser shall be liable for the proportionate amount of such taxes and expenses attributable to the period after the Closing Date. If the amount of any proration cannot be determined at the Closing, adjustments will be made between the parties as soon after the Closing as possible.

(c)     <u>Utilities</u>.  Fuel, electricity, and other utility costs other than Cultural Cost Reimbursements shall be apportioned as of 12:01 a.m. on the Closing Date.

(d)     <u>Tax Refunds</u>.  If any refunds of real property taxes or assessments, water rates and charges or sewer taxes and rents shall be made after the Closing, the same shall be held in trust by Seller or Purchaser, as the case may be, and shall first be applied to the unreimbursed costs incurred in obtaining the same, then the balance, if any, shall be paid to Seller (to the extent such refunds relate to periods prior to the Closing Date) and to Purchaser (to the extent such refunds relate to periods commencing after the Closing Date).

(e)     <u>Insurance Premiums</u>.  No insurance policies of Seller are to be assigned or otherwise transferred to Purchaser, and no apportionment of the premiums therefore shall be made.

(f)     <u>Estimates</u>.  If any of the foregoing items of income or expense cannot be apportioned at the Closing because of the unavailability of the amounts which are to be apportioned, such items shall be apportioned on the basis of a good faith estimate by the parties and adjusted and

reconciled as soon as practicable after the Closing Date; provided, however, all such adjustments and reconciliations shall occur no later than three (3) months after the Closing Date.

(g)     Errors.  If either party discovers any errors on the Closing Statement within thirty (30) days after the Closing Date, the parties shall make such adjustments and reconciliations as are necessary to correct such errors.

(h)     Adjustment to Purchase Price.  If a net amount is owed by Seller to Purchaser pursuant to Section 5.4, such amount shall be credited against the Purchase Price.  If a net amount is owed by Purchaser to Seller pursuant to Section 5.4, such amount shall be paid together with the Purchase Price.

(i)     The provisions of this Section 5.4 shall survive the Closing.

**Section 5.5.**    Transaction Taxes and Closing Costs.

(a)     Seller shall pay the fees of any counsel representing Seller in connection with this transaction.  Seller shall also pay the following costs and expenses:

(a)     one-half of the escrow fee, if any, which may be charged by the Escrow Agent;

(b)     any fee for title search and examination charged by the Title Company in connection with the issuance of the Title Report;

(c)     the base policy premium for a CLTA Standard Owner's Title Policy on the Real Property;

(d)     one-half of the costs for the recording of the Deed;

(e)     any state or local real estate transfer tax or documentary transfer tax payable due to the sale or transfer of the Property, if any;

(f)     the fee for the real estate commission payable to Pearson Realty ("PR");

(b)     Purchaser shall pay the fees of any counsel or other advisors or real estate brokers representing Purchaser in connection with this transaction.  Purchaser shall also pay the following costs and expenses:

(a)     one-half of the escrow fee, if any, which may be charged by the Escrow Agent;

(b)     one-half of the costs for the recording of the Deed;

(c)     all of the base policy premium for the Owner's Title Policy to be issued to Purchaser by the Title Company at the Closing above the cost of a CLTA Standard Owner's Title Policy, all of the costs of all endorsements thereto, all of the costs of the premium for any lender's

title insurance policy to be issued by the Title Company, and the cost of any endorsements thereto; and

        (d)     all of the cost of any updates to the Survey, or any new surveys obtained by Purchaser and any environmental testing performed or commissioned by Purchaser.

     (c)     All costs and expenses incident to this transaction and the Closing thereof, and not specifically described above, shall be paid by the party incurring same.

     (d)     The provisions of this <u>Section 5.5</u> shall survive the Closing.

    **Section 5.6.**   <u>Conditions Precedent to Obligations of Purchaser</u>.  The obligation of Purchaser to consummate the transactions hereunder shall be subject to the fulfillment on or before the Closing Date of all of the following conditions, any or all of which may be waived by Purchaser in its sole discretion:

     (a)     Seller shall have delivered to Purchaser all of the items required to be delivered to Purchaser pursuant to the terms of this Agreement, including, but not limited to, those provided for in <u>Section 5.2</u> hereof;

     (b)     All of the representations and warranties of Seller contained in this Agreement shall be true and correct in all material respects as of the date of the Closing;

     (c)     Seller shall have performed and observed all covenants and agreements of this Agreement to be performed and observed by Seller;

and

     (d)     The Title Company shall be irrevocably committed to issue the Title Policy as set forth in <u>Section 3.2</u> hereof.

    **Section 5.7.**   <u>Conditions Precedent to Obligations of Seller.</u>  The obligation of Seller to consummate the transactions hereunder shall be subject to the fulfillment on or before the Closing Date of all of the following conditions, any or all of which may be waived by Seller in its sole discretion:

     (a)     Seller shall have received the Purchase Price pursuant to and payable in the manner provided for in this Agreement;

     (b)     Purchaser shall have delivered to Seller all of the items required to be delivered to Seller pursuant to <u>Section 5.3</u> hereof;

     (c)     All of the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects as of the date of the Closing; and

     (d)     Purchaser shall have performed and observed, in all material respects, all covenants and agreements of this Agreement to be performed and observed by Purchaser.

**ARTICLE VI**

**REPRESENTATIONS, WARRANTIES AND COVENANTS**

**Section 6.1.**  <u>Representations and Warranties of Seller</u>.  As of the Effective Date, based upon its actual knowledge, Seller, solely in Seller's capacity as Receiver, and not in any personal, individual, corporate, or other capacity, hereby makes the following representations and warranties to Purchaser without any duty of independent investigation and inquiry, which representations and warranties shall be deemed to have been made again as of the Closing:

(a)    **Authority; No Conflict**.  Seller, as Receiver, has, or will as of the Closing Date have, full authority, including the approval of the District Court which appointed the Receiver, to enter into and perform this Agreement and the person or persons signing this Agreement and any documents executed pursuant hereto on Seller's behalf have full power and authority to bind Seller.

**Section 6.2.**  <u>Representations and Warranties of Purchaser</u>.  Purchaser hereby makes the following representations and warranties to Seller as of the Effective Date, which representations and warranties shall be deemed to have been made again as of the Closing:

(a)    <u>Authority</u>.  Purchaser is an individual.  Purchaser has the full right and authority to enter into this Agreement and to consummate or cause to be consummated the transactions contemplated by this Agreement.

(b)    <u>Pending Actions</u>.  There is no action, suit, arbitration, unsatisfied order or judgment, government investigation or proceeding pending against Purchaser which, if adversely determined, could individually or in the aggregate materially interfere with the consummation of the transactions contemplated by this Agreement.

(c)    <u>No Conflict</u>.  Neither the execution and delivery of this Agreement nor the fulfillment of or compliance with its terms and provisions will violate, conflict with or result in a breach of the terms, conditions or provisions of, or constitute a default under, (a) Purchaser's organizational documents or (b) any contract to which Purchaser is a party or by which it is bound.

**ARTICLE VII**

**DEFAULT, COURT, AND AS-IS CONDITION, LIQUIDATED DAMAGES**

**Section 7.1.**  <u>DEFAULT BY PURCHASER.</u>  **IN THE EVENT THE SALE OF THE PROPERTY AS CONTEMPLATED HEREUNDER IS NOT CONSUMMATED DUE TO PURCHASER'S DEFAULT HEREUNDER, AND PURCHASER HAS NOT OTHERWISE ELECTED TO TERMINATE THIS AGREEMENT PRIOR TO THE EXPIRATION OF THE INSPECTION PERIOD, SELLER SHALL BE ENTITLED, AS ITS SOLE AND EXCLUSIVE REMEDY, TO TERMINATE THIS AGREEMENT AND RECEIVE THE DEPOSIT AS LIQUIDATED DAMAGES FOR PURCHASER'S BREACH OF THIS AGREEMENT, IT BEING AGREED BETWEEN THE PARTIES HERETO THAT THE ACTUAL DAMAGES TO SELLER IN THE EVENT OF SUCH BREACH ARE**

55193539.2
392865-00009

10

**Exhibit 2**
**30**

**IMPRACTICAL TO ASCERTAIN AND THE AMOUNT OF THE DEPOSIT IS A REASONABLE ESTIMATE THEREOF.**

_____      _____

PURCHASER'S INITIALS    SELLER'S INITIALS

Section 7.2.    DEFAULT BY SELLER.  **IF SELLER SHALL FAIL TO PERFORM ANY OF THE MATERIAL COVENANTS AND AGREEMENTS CONTAINED HEREIN TO BE PERFORMED BY SELLER AT OR PRIOR TO THE CLOSING, PURCHASER MAY, AS ITS SOLE AND EXCLUSIVE REMEDY, AS LIQUIDATED DAMAGES, OBTAIN A RETURN OF THE DEPOSIT, WHICH THE SELLER MAY ONLY CONTEST BEFORE THE DISTRICT COURT.**

_____      _____

PURCHASER'S INITIALS    SELLER'S INITIALS

Section 7.3.    No Default.  In the event the sale of the Property as contemplated hereunder is not consummated and such failure is not the result of a Purchaser default under Section 7.1 or a Seller default under Section 7.2, Purchaser shall be entitled to receive a return of the Deposit.

Section 7.4.    DISTRICT COURT.    **NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, OR ANY OTHER DOCUMENT RELATING TO THIS AGREEMENT, THE DISTRICT COURT HAS EXCLUSIVE JURISDICTION OVER ANY DISPUTE WITH THE SELLER REGARDING THIS AGREEMENT.**

_____      _____

PURCHASER'S INITIALS    SELLER'S INITIALS

Section 7.5    AS-IS; RELEASE.  AS AN ESSENTIAL INDUCEMENT TO SELLER TO ENTER INTO THIS AGREEMENT, AND AS PART OF THE DETERMINATION OF THE PURCHASE PRICE, PURCHASER ACKNOWLEDGES, UNDERSTANDS AND AGREES AS OF THE EFFECTIVE DATE AND AS OF THE CLOSING TO THE PROVISIONS SET FORTH BELOW.

A.    AS-IS; WHERE-IS.    EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTION 6.1 ABOVE, PURCHASER ACKNOWLEDGES AND AGREES THAT (I) THE SALE OF THE PROPERTY HEREUNDER IS AND WILL BE MADE ON AN "AS IS, WHERE IS, WITH ALL FAULTS" BASIS, WITH PURCHASER ASSUMING THE PROPERTY IN SUCH CONDITION AND AGREEING THAT SELLER SHALL NOT HAVE ANY RESPONSIBILITY FOR THE CONDITION OF THE PROPERTY (OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, THE REPAIR OF ANY PORTION OF THE PROPERTY, THE CONSTRUCTION OF ANY IMPROVEMENTS AND/OR THE ENVIRONMENTAL CONDITION OF THE PROPERTY), (II) SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES OR GUARANTIES OF ANY KIND OR CHARACTER

**IMPRACTICAL TO ASCERTAIN AND THE AMOUNT OF THE DEPOSIT IS A REASONABLE ESTIMATE THEREOF.**

_____          _____

PURCHASER'S INITIALS    SELLER'S INITIALS

**Section 7.2.** <u>DEFAULT BY SELLER</u>. **IF SELLER SHALL FAIL TO PERFORM ANY OF THE MATERIAL COVENANTS AND AGREEMENTS CONTAINED HEREIN TO BE PERFORMED BY SELLER AT OR PRIOR TO THE CLOSING, PURCHASER MAY, AS ITS SOLE AND EXCLUSIVE REMEDY, AS LIQUIDATED DAMAGES, OBTAIN A RETURN OF THE DEPOSIT, WHICH THE SELLER MAY ONLY CONTEST BEFORE THE DISTRICT COURT.**

_____          _____

PURCHASER'S INITIALS    SELLER'S INITIALS

**Section 7.3.** <u>No Default</u>. In the event the sale of the Property as contemplated hereunder is not consummated and such failure is not the result of a Purchaser default under <u>Section 7.1</u> or a Seller default under <u>Section 7.2</u>, Purchaser shall be entitled to receive a return of the Deposit.

**Section 7.4.** <u>DISTRICT COURT</u>. **NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, OR ANY OTHER DOCUMENT RELATING TO THIS AGREEMENT, THE DISTRICT COURT HAS EXCLUSIVE JURISDICTION OVER ANY DISPUTE WITH THE SELLER REGARDING THIS AGREEMENT.**

_____          _____

PURCHASER'S INITIALS    SELLER'S INITIALS

**Section 7.5** <u>AS-IS; RELEASE</u>. AS AN ESSENTIAL INDUCEMENT TO SELLER TO ENTER INTO THIS AGREEMENT, AND AS PART OF THE DETERMINATION OF THE PURCHASE PRICE, PURCHASER ACKNOWLEDGES, UNDERSTANDS AND AGREES AS OF THE EFFECTIVE DATE AND AS OF THE CLOSING TO THE PROVISIONS SET FORTH BELOW.

A.    <u>AS-IS; WHERE-IS</u>. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN SECTION 6.1 ABOVE, PURCHASER ACKNOWLEDGES AND AGREES THAT (I) THE SALE OF THE PROPERTY HEREUNDER IS AND WILL BE MADE ON AN "AS IS, WHERE IS, WITH ALL FAULTS" BASIS, WITH PURCHASER ASSUMING THE PROPERTY IN SUCH CONDITION AND AGREEING THAT SELLER SHALL NOT HAVE ANY RESPONSIBILITY FOR THE CONDITION OF THE PROPERTY (OR OTHERWISE, INCLUDING, WITHOUT LIMITATION, THE REPAIR OF ANY PORTION OF THE PROPERTY, THE CONSTRUCTION OF ANY IMPROVEMENTS AND/OR THE ENVIRONMENTAL CONDITION OF THE PROPERTY), (II) SELLER HAS NOT MADE, DOES NOT MAKE AND SPECIFICALLY NEGATES AND DISCLAIMS ANY REPRESENTATIONS, WARRANTIES OR GUARANTIES OF ANY KIND OR CHARACTER

55193539.2
392865-00009

11

**Exhibit 2**
**32**

WHATSOEVER, WHETHER EXPRESS OR IMPLIED, ORAL OR WRITTEN, PAST, PRESENT OR FUTURE OF, AS TO, CONCERNING OR WITH RESPECT TO THE PROPERTY OR ANY OTHER MATTER WHATSOEVER (INCLUDING, WITHOUT LIMITATION ANY REPRESENTATIONS OR WARRANTIES REGARDING THE ENVIRONMENTAL CONDITION OR ANY HAZARDOUS SUBSTANCES IN, ON, UNDER OR ABOUT THE PROPERTY OR THE CONSTRUCTION OF ANY IMPROVEMENTS), (III) PRIOR TO THE EXPIRATION OF THE INSPECTION PERIOD, PURCHASER SHALL HAVE CONFIRMED INDEPENDENTLY ALL INFORMATION THAT IT CONSIDERS MATERIAL TO ITS PURCHASE OF THE PROPERTY OR THE TRANSACTION CONTEMPLATED HEREBY (INCLUDING, WITHOUT LIMITATION, THE CONDITION OF THE PROJECT AND TITLE TO THE PROPERTY), (IV) PURCHASER IS A SOPHISTICATED PURCHASER AND ACKNOWLEDGES THAT TO THE FULLEST EXTENT AT LAW, SELLER SHALL NOT BE RESPONSIBLE FOR ANY MATTERS AFFECTING THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE ENVIRONMENTAL CONDITION THEREOF OR CONSTRUCTION OF ANY IMPROVEMENTS OR OTHERWISE WITH RESPECT TO THE PROPERTY, AND (V) ANY INFORMATION PROVIDED WITH RESPECT TO THE PROPERTY (INCLUDING, WITHOUT LIMITATION, ANY DILIGENCE MATERIALS) IS SOLELY FOR PURCHASER'S CONVENIENCE AND SELLER HAS NOT MADE ANY INDEPENDENT INVESTIGATION OR VERIFICATION OF SUCH INFORMATION AND EXPRESSLY DISCLAIMS ALL REPRESENTATIONS AS TO THE ACCURACY OR COMPLETENESS OF THE SAME.

       B.    <u>RELEASE</u>.  AS A MATERIAL PART OF THE CONSIDERATION TO SELLER FOR THE SALE OF THE PROPERTY, PURCHASER WAIVES, RELEASES, ACQUITS AND DISCHARGES SELLER AND SELLER PARTIES FROM ANY AND ALL LOSSES, COSTS, CLAIMS, LIABILITIES, EXPENSES, CAUSES OF ACTION, DEMANDS, FEES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES) AND OBLIGATIONS, WHETHER OR NOT LATENT, KNOWN AND UNKNOWN, FORESEEN AND UNFORESEEN AND WHETHER OR NOT NOW ACCRUED, INCLUDING, WITHOUT LIMITATION, ANY RIGHTS TO, OR CLAIM FOR, CONTRIBUTIONS OR INDEMNITY THAT ARE BASED DIRECTLY OR INDIRECTLY ON, ARISE FROM OR IN CONNECTION WITH, OR ARE RELATED TO (IN ANY WAY) (I) ANY PAST, PRESENT OR FUTURE CONDITION OF THE PROPERTY (INCLUDING, WITHOUT LIMITATION, THE PRESENCE OF ANY HAZARDOUS SUBSTANCES IN, ON, UNDER OR ABOUT THE PROPERTY OR THE CONSTRUCTION OF ANY IMPROVEMENTS), (II) ANY AND ALL STATEMENTS, REPRESENTATIONS, WARRANTIES, DETERMINATIONS, CONCLUSIONS, ASSESSMENTS, ASSERTIONS OR ANY OTHER INFORMATION CONTAINED IN ANY OF THE DILIGENCE MATERIALS, (III) ANY DEFECT, INACCURACY OR INADEQUACY IN TITLE OF THE PROPERTY OR THE CONSTRUCTION OF ANY IMPROVEMENTS, AND (IV) THE PROPERTY OR THE USE, TENANCY, OCCUPANCY OR OPERATION THEREOF.  PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT (A) PURCHASER MAY HEREAFTER DISCOVER FACTS DIFFERENT FROM, OR IN ADDITION TO, THOSE NOW OR AS OF THE CLOSING KNOWN OR BELIEVED TO BE TRUE REGARDING THE PROPERTY AND/OR DILIGENCE MATERIALS, AND SELLER SHALL HAVE NO LIABILITY IN

CONNECTION THEREWITH (PURCHASER HEREBY BEING SOLELY RESPONSIBLE FOR THE SAME), AND (B) PURCHASER'S AGREEMENT TO WAIVE, RELEASE, ACQUIT AND DISCHARGE SELLER AND SELLER PARTIES AS SET FORTH HEREIN SHALL REMAIN IN FULL FORCE AND EFFECT, NOTWITHSTANDING THE EXISTENCE OR DISCOVERY OF ANY SUCH DIFFERENT OR ADDITIONAL FACTS.

WITH RESPECT TO THE RELEASES AND WAIVERS SET FORTH IN THIS SECTION, PURCHASER EXPRESSLY WAIVES THE BENEFITS OF SECTION 1542 OF THE CALIFORNIA CIVIL CODE, WHICH PROVIDES AS FOLLOWS:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

PURCHASER HAS BEEN ADVISED BY ITS LEGAL COUNSEL AND UNDERSTANDS THE SIGNIFICANCE OF THIS WAIVER OF SECTION 1542 RELATING TO UNKNOWN, UNSUSPECTED AND CONCEALED CLAIMS. BY ITS INITIALS BELOW, PURCHASER ACKNOWLEDGES THAT IT FULLY UNDERSTANDS, APPRECIATES AND ACCEPTS ALL OF THE TERMS OF THIS SECTION 7.5.

_____
PURCHASER'S INITIALS

        C.    <u>Survival</u>.  This Section 7.5 shall survive the termination of this Agreement and the Closing.

## ARTICLE VIII

## RISK OF LOSS

**Section 8.1.**   <u>Casualty</u>.  If, prior to the Closing, all or any part of the Property shall be destroyed or materially damaged by fire or other casualty, Seller shall promptly notify Purchaser of such fact.  If such notice is given subsequent to the expiration of the Inspection Period, Purchaser shall have the right to terminate this Agreement by giving notice thereof to Seller not later than ten (10) business days after the date on which Purchaser received Seller's notice of such casualty (and, if necessary, the Closing Date shall be extended until the day that is two (2) business days after the expiration of such period in order to permit Purchaser the full period to consider whether or not to exercise its termination right), and all Deposits shall be returned to Purchaser.  For purposes of this Section 8.1, a "material" part of the Property means a casualty loss (i) which would exceed five percent (5%) of the Purchase Price to repair, or (ii) which is not insured for the full replacement cost (except for deductible amounts).

55193539.2
392865-00009

**Exhibit 2**
**34**

Failure of Purchaser to deliver any such notice of termination to Seller within such ten (10) business day period shall be a deemed election by Purchaser to proceed with the purchase of the Property. If Purchaser shall elect (or be deemed to have elected) to terminate this Agreement as aforesaid, the Deposit shall be paid to Purchaser, whereupon this Agreement shall terminate and be of no further force and effect and neither party shall have any liabilities or obligations to the other hereunder, except for those obligations and liabilities which expressly survive the Closing or the earlier termination of this Agreement. If Purchaser shall not elect (or is not deemed to have elected) to terminate this Agreement as aforesaid, then at Closing, Seller shall pay to Purchaser or provide a credit against the Purchase Price in an amount equal to all insurance proceeds (including loss of rent or business interruption proceeds applicable to any period on and after the Closing Date) and all condemnation awards and other payments in connection with such damage, destruction or taking theretofore actually paid to Seller as of the Closing Date, net of any costs of repairs made by Seller prior to Closing and net of reasonable collection costs. In addition, if such insurance proceeds and/or condemnation awards have not yet been paid to Seller as of the Closing Date, Seller shall assign, transfer, and set over to Purchaser all of Seller's right, title, and interest in and to such insurance proceeds and/or condemnation awards, together with any insurance claims or any awards, payments, or insurance proceeds that may thereafter be made for any such taking or sale in lieu thereof, or for any such damage or destruction, net of any such costs of repairs or collection costs referred to above if not previously recovered by Seller, and except that any loss of rent or business interruption awards shall be prorated as of the date of Closing.

Section 8.2.    <u>Condemnation</u>. If, prior to the Closing, all or any part of the Property is taken by eminent domain (or becomes the subject of a pending taking which has not yet been consummated), Seller shall notify Purchaser of such fact. If such notice is given subsequent to the expiration of the Inspection Period, Purchaser shall have the right to terminate this Agreement by giving notice thereof to Seller not later than ten (10) business days after the date on which Purchaser received Seller's notice of such condemnation (and, if necessary, the Closing Date shall be extended until two (2) business days after the expiration of such period in order to permit Purchaser the full period to consider whether or not to exercise its termination right), and all Deposits shall be returned to Purchaser.

Failure of Purchaser to deliver any such notice of termination to Seller within such ten (10) business day period shall be a deemed election by Purchaser to terminate this Agreement. If Purchaser shall elect (or be deemed to have elected) to terminate this Agreement as aforesaid, the Deposit shall be paid to Purchaser, whereupon this Agreement shall terminate and be of no further force and effect and neither party shall have any liabilities or obligations to the other hereunder, except for those obligations and liabilities which expressly survive the Closing or the earlier termination of this Agreement. If Purchaser shall not elect to terminate this Agreement as aforesaid, then the sale of the Property shall be consummated as herein provided without any adjustment to the Purchase Price (except that Purchaser shall be entitled to a credit for any condemnation award received by Seller prior to the Closing) and Seller shall assign to Purchaser at the Closing all of Seller's right, title and interest in and to all awards, if any, for the taking, and Purchaser shall be entitled to receive and keep all awards for the taking of the Property or any portion thereof.

**ARTICLE IX**

**COMMISSIONS**

Brokerage Commissions.  Seller shall pay the real estate commission of Pearson Realty("PR") if the sale closes to Purchaser pursuant to the terms hereof in accordance with the terms of a separate listing agreement between Seller and PR. PR also represents Purchaser in connection with the sale, and Purchaser represents that Purchaser has not used any broker, finder or like agent who would have any rights as a result of this transaction, other than PR.  Seller acknowledges that all commissions payable to PR in connection with the transaction are subject to District Court approval and will only be paid from the Purchase Price and only if the sale closes to Purchaser pursuant to the listing agreement and the procedures required in Exhibit C.

**ARTICLE X**

**MISCELLANEOUS**

**Section 10.1.**   Intentionally Omitted.

**Section 10.2.**   Notices.  Any notice pursuant to this Agreement shall be given in writing by (a) personal delivery, (b) reputable overnight delivery service with proof of delivery, (c) United States Mail, postage prepaid, registered or certified mail, return receipt requested or (d) email transmission, sent to the intended addressee at the address set forth below, or to such other address or to the attention of such other person as the addressee shall have designated by written notice sent in accordance herewith, and shall be deemed to have been given upon receipt or refusal to accept delivery, or, in the case of email transmission, as of the date of the email transmission provided that an original of such email is also sent to the intended addressee by means described in clauses (a), (b) or (c) above.  Unless changed in accordance with the above, the addresses for notices given pursuant to this Agreement shall be as follows:

| | |
|---|---|
| To Seller: | Phillip Christensen, as Receiver |
| | 2787 W Bullard Ave |
| | Fresno, Ca 93711 |
| | Email: p.christensen@agriglobe.com |
| | |
| With a required copy to: | Saul Ewing LLP |
| | 1888 Century Park East, Suite 1500 |
| | Los Angeles, Ca 90067 |
| | Email: zev.shechtman@saul.com |
| | |
| To Purchaser: | Ernie Costamagna |
| | E & C Farms, LLC |
| | 9086 Lacey Blvd |
| | Hanford, CA 93230 |
| | Email:  ebc45@comcast.net |

55193539.2
392865-00009

15

Exhibit 2
36

With a required copy to:    Pearson Realty
                        7480 N. Palm Ave Suite 101Fresno, Ca 93711Attn: Robb Stewart
                        Email: rstewart@pearsonrealty.com

To Escrow Holder:        Chicago Title – Fresno Madera
                        7330 N Palm Ave, Suite 101
                        Fresno, CA 93711
                        Attn:  Sue Meyer
                        E-mail: sue.meyer@ctt.com

**Section 10.3.**   Modifications.  This Agreement cannot be changed orally, and no executory agreement shall be effective to waive, change, modify or discharge it in whole or in part unless such executory agreement is in writing and is signed by the parties against whom enforcement of any waiver, change, modification or discharge is sought.

**Section 10.4.**   Entire Agreement.  This Agreement, including the exhibits and schedules hereto, contains the entire agreement between the parties hereto pertaining to the subject matter hereof and fully supersedes all prior written or oral agreements and understandings between the parties pertaining to such subject matter.

**Section 10.5.**   Receivership and Stalking Horse Addendum. As set forth in **Exhibit C**, this Agreement is modified by terms that are specific to the receivership, including the treatment of Purchaser as a Stalking Horse bidder.  The terms of such Addendum shall control in the event of an inconsistency with this Agreement.

**Section 10.6.**   Counterparts.  This Agreement may be executed in counterparts, all such executed counterparts shall constitute the same agreement, and the signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

**Section 10.7.**   Electronic Signatures.  In order to expedite the transactions contemplated herein, pdf or other electronic signatures may be used in place of original signatures on this Agreement and any amendments or modifications hereto.  Seller and Purchaser intend to be bound by the pdf or other electronic signatures on the document, are aware that the other party will rely on the pdf or other electronic signatures and hereby waive any defenses to the enforcement of the terms of this Agreement based on the form of signature.

**Section 10.8.**   Severability.  If any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Agreement shall nonetheless remain in full force and effect; provided that the invalidity or unenforceability of such provision does not materially adversely affect the benefits accruing to any party hereunder.

**Section 10.9.**   Applicable Law and Attorney Fees.  This Agreement shall be governed by and construed in accordance with the laws of the state in which the Property is located.  In the event of any legal or equitable action arising under this Agreement, the venue of such action shall lie exclusively within the United States District Court for the Eastern District located in Fresno, and the

55193539.2
392865-00009

16

**Exhibit 2**
**37**

parties hereto do hereby specifically waive any other jurisdiction and venue. Purchaser and Seller agree that the provisions of this <u>Section 10.9</u> shall survive the Closing or any termination of this Agreement.

Section 10.10. <u>No Third-Party Beneficiary</u>. The provisions of this Agreement and of the documents to be executed and delivered at the Closing are and will be for the benefit of Seller and Purchaser only and are not for the benefit of any third party, and accordingly, no third party shall have the right to enforce the provisions of this Agreement or of the documents to be executed and delivered at the Closing.

Section 10.11. <u>Captions</u>. The section headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent and for any purpose, to limit or define the text of any section or any subsection hereof.

Section 10.12. <u>Construction</u>. The parties acknowledge that the parties and their counsel have reviewed and revised this Agreement and that the normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Agreement or any exhibits or amendments hereto.

Section 10.13. <u>Recordation</u>. This Agreement may not be recorded by any party hereto without the prior written consent of the other party hereto. The provisions of this <u>Section 10.13</u> shall survive the Closing or any termination of this Agreement.

Section 10.14. <u>Waiver of Jury Trial</u>. EACH OF THE PARTIES HEREBY EXPRESSLY AND IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF, RELATED TO OR IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 10.15. <u>Allocation of Liability</u>. Purchaser shall be liable to third parties for any and all obligations, claims, losses, damages, liabilities and expenses arising out of events, contractual obligations, acts, or omissions of Purchaser that occur in connection with the ownership or operation of the Property after the Closing.

Section 10.16. <u>Waivers, Etc</u>. Any waiver of any term or condition of this Agreement, or of the breach of any covenant, representation or warranty contained herein, in any one instance, shall not operate as or be deemed to be or construed as a further or continuing waiver of any other breach of such term, condition, covenant, representation or warranty or any other term, condition, covenant, representation or warranty, nor shall any failure at any time or times to enforce or require performance of any provision hereof operate as a waiver of or affect in any manner such party's right at a later time to enforce or require performance of such provision or any other provision hereof. This Agreement may not be amended, nor shall any waiver, change, modification, consent or discharge be effected, except by a written instrument executed by or on behalf of the party against whom enforcement of any amendment, waiver, change, modification, consent or discharge is sought.

Section 10.17. <u>Performance on Business Days</u>. As used herein, "business day" shall mean any day other than a Saturday, Sunday or any other day on which banking institutions in the State of California, the State of Delaware, or the State of New York are authorized by law or executive action

to close.  If the date on which payment or performance of any obligation of a party hereunder is other than a business day, or the last day for the giving of any notice required or permitted hereunder is other than a business day, the time for such payment, performance or delivery shall automatically be extended to the first business day following such date.

**Section 10.18.** Attorney's Fees.  Notwithstanding anything contained herein to the contrary, if any lawsuit or arbitration or other legal proceeding arises in connection with the interpretation or enforcement of this Agreement, the prevailing party therein shall be entitled to receive from the other party the prevailing party's costs and expenses, including reasonable attorneys' fees incurred in connection therewith, in preparation therefor and on appeal therefrom, which amounts shall be included in any judgment therein.

**Section 10.19.** Time of Essence.  Time shall be of the essence with respect to the performance of each and every covenant and obligation, and the giving of all notices, under this Agreement.

**Section 10.20.** Receiver's Capacity.  Seller, Phillip Christensen, as Receiver, enters into this Agreement solely in his capacity as Receiver, and not in any personal, individual, corporate, or other capacity.

**Section 10.21.** Assignment.  This Agreement may not be assigned by Purchaser to any party absent the prior written consent of Seller provided however that Purchase shall be entitled to assign this Agreement prior to Closing to an entity wholly owned by Purchaser upon prior written notice to Seller.

**Section 10.22.** Grower/Shipper Agreement.  Upon the later of the termination of the Inspection Period and Buyer's express written waiver of all contingencies, the Seller will enter into a written agreement in the form of Exhibit D with Buyer's affiliate, Delta Packing Co. of Lodi Inc., for the Property's 2025 crop.

*[Signatures on following Page.]*

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

SELLER:

By: _____
Phillip Christensen, as Receiver

PURCHASER:

By: _____
Ernie Costamagna

*(Escrow Agent Joinder on following page)*

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the Effective Date.

SELLER:

By: _____
       Phillip Christensen, as Receiver

PURCHASER:

By: _____
       Ernie Costamagna, *member / Manager*
       *E&C Farms, LLC a California Limited Liability Co.*
       *9086 Lacey Blvd*
       *Hanford, CA 93230*

*(Escrow Agent Joinder on following page)*

**Exhibit 2**
**41**

Escrow Agent executes this Agreement below solely for the purpose of acknowledging that it agrees to be bound by the provisions of <u>Sections 2.6</u> and <u>2.7</u> hereof.

**ESCROW AGENT**

CHICAGO TITLE INSURANCE COMPANY

By: _____
Name:    Sue Meyer
Title:     Commercial Escrow Officer

55193539.2
392865-00009

20

**Exhibit 2**
**42**

**EXHIBIT A**

**LEGAL DESCRIPTION**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF KERN, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

| | |
|---|---|
| 220-130-05-00-7 | 40.00 |
| 220-130-17-00-2 | 13.33 |
| 220-130-17-00-2 | 26.67 |
| 220-130-24-00-2 | 53.33 |
| 220-130-24-00-2 | 106.67 |
| 220-130-30-00-9 | 120.00 |
| 220-130-35-00-4 | 160.00 |

(and as otherwise described in the Title Report to be provided under the terms of the Agreement)

**EXHIBIT B**

**FORM OF FIRPTA CERTIFICATE**

CERTIFICATE REGARDING FOREIGN INVESTMENT
IN REAL PROPERTY TAX ACT

(ENTITY TRANSFEROR)

Section 1445 of the Internal Revenue Code provides that a transferee (purchaser) of a U.S. real property interest must withhold tax if the transferor (seller) is a foreign person.  For U.S. tax purposes (including section 1445), the person treated as the owner of the assets of a disregarded entity, for such purposes, will be the transferor (seller) of the property and not the disregarded entity.  To inform the transferee (purchaser) that withholding of tax is not required upon the disposition of a U.S. real property interest by _____, a _____ ("Transferor"), Transferor hereby certifies:

1.    Transferor is not a foreign corporation, foreign partnership, foreign trust, foreign estate or a disregarded entity (as those terms are defined in the Internal Revenue Code and Income Tax Regulations).

2.    Transferor is not a disregarded entity for federal income tax purposes.

3.    Transferor's Federal Employer Identification Number is _____.

4.    Transferor's office address is:

_____
_____; and

5.    The address or description of the property which is the subject matter of the disposition is _____.

Transferor understands that this certification may be disclosed to the Internal Revenue Service by transferee and that any false statement contained herein could be punished by fine, imprisonment, or both.

Transferor declares that it has examined this certification and to the best of its knowledge and belief, it is true, correct and complete, and further declares that the individual executing this certification on behalf of Transferor has full authority to do so.

**TRANSFEROR:**

**EXHIBIT C**
**RECEIVERSHIP AND STALKING HORSE ADDENDUM**

Notwithstanding any other provisions of the Agreement, Purchaser expressly acknowledges and agrees as follows:

1. Seller, Phillip Christensen, as Receiver, enters into this Agreement solely in his capacity as Receiver, and not in any personal, individual, corporate, or other capacity.

2. The sale is subject to approval of the District Court after notice and a hearing, including the opportunity for higher and better bids as required by applicable law. Seller is required to list and market the properties for sale in order to call for higher and better bids at a public sale before the District Court pursuant to 28 U.S.C. § 2001.

3. The sale is "AS-IS" and "WHERE-IS" "WITH ALL FAULTS" and "WITHOUT REPRESENTATIONS OR WARRANTIES" except to the extent expressly and unambiguously stated in the Agreement.

4. No court or tribunal shall have jurisdiction over any dispute with Seller except the District Court which shall have exclusive jurisdiction.

5. Purchaser's only remedy if the sale to Purchaser is not consummated through no fault of Purchaser is a return of the Deposit. If the sale is not consummated due to an act or omission by Purchaser, then Purchaser shall forfeit the Deposit.

6. After execution of the Agreement, payment of the Deposit, compliance with all requirements of the Agreement, and waiver of all contingencies other than District Court approval, Seller shall be deemed the "Stalking Horse Bidder" which shall give it the following rights:

   a. Seller will seek to have the sale approved by the District Court, including any auction, within 60 days of execution hereof.

   b. Seller will inform Purchaser of dates and deadlines relating to the sale.

   c. Seller will deem Purchaser qualified to participate in the auction conditioned on Purchaser's waiver of contingencies and Purchaser's compliance with all other terms hereof.

   d. Subject to the Court's approval of sale procedures, upon closing of the sale, Seller will pay Purchaser a break-up fee of 2% of the Purchase Price, in addition to a return of the Deposit, if Purchaser participates in an auction and there is a successful overbidder other than the Purchaser.

   e. The Closing Date will be within 21 days after entry of the District Court's order approving the sale.

7. The Seller has sole discretion regarding the qualification of overbidders to participate in the auction, the timing of any auction, hearings and continuances thereof, determination of higher and better bids, and any other procedural aspects relating to the sale approval process, subject only to District Court approval. Seller's mere inability to obtain Court approvals on the schedule described above will not be a basis for Purchaser to terminate the sale.

8. In the event of any inconsistency between this Addendum and the above Agreement, this Addendum shall control.

ACKNOWLEDGED AND AGREED BY PURCHASER:

By: Ernie Costamagna, *Member / Manager*
*E & C Farms, LLC a California Limited Liability C.*

55193539.2
392865-00009

**Exhibit 2**
**45**



**EXHIBIT D**



## 2025 GROWER/SHIPPER AGREEMENT A1

THIS AGREEMENT, made this _____ day of _____, _____, between Delta Packing Co of Lodi, Inc., hereinafter referred to as "SHIPPER", and _____, hereinafter referred to as "GROWER".

      WHEREAS, GROWER is the GROWER and owner or lessee of _____ acres of farm land planted to **Cherries** in _____County, State of California.

NOW THEREFORE, in consideration of the mutual covenants and conditions, the parties hereto agree as follows:

      1.  GROWER hereby designates and hires SHIPPER as its agent for the year **2025**, for purposes of selling all of its crop of **Cherries** grown on the aforementioned real property.

      2.  GROWER shall harvest said crop at such time or times as the SHIPPER in its discretion shall deem proper.  The preparation for market and selling of said crop shall be done by SHIPPER, or its nominee.  SHIPPER, or its nominee, shall charge for such services as follows;

      A.   In Charge - $0.24 per pound
      B.   Packing Charge - $6.50 per box, $4.50 per 5k
      C.   Packing Charge for bags – additional $1.75 per 16 lb box, $3.80 per 24 lb box
      D.   Packing Charge for pouch bags – additional $2.75 per 16 lb box, $4.15 per 24 lb box
      E.   Packing Charge for clamshells – additional $3.25 per 16 lb box, $5.25 per 24 lb box
      F.   Packing Charge for export clamshells – additional $4.00 per 150g, 250g or 350g
      G.   Packing Charge for Rainier's – additional $3.00 per box
      H.   Packing Charge for Doubles & Spurs & Pick Outs - $3.00 per box
      I.   Commission – 8%
      J.   Picking, Hauling and Equipment – at cost
      K.   Fumigation Charge - $4.00 per 18 lb box, $2.50 per 11 lb box
      L.   Japan System Approach charge - $2.50 per 18 lb box, $1.50 per 11lb box
      M.   Modified Atmosphere bag charge – additional $0.35 per box
      N.   CCAB Assessment – $0.01 per lb. (if applicable, subject to change per CCAB)

         *If the packout is less than 60%, charges will be set during the season.  GROWER will be notified within three (3) days of these charges.

      3.  SHIPPER shall properly and promptly account to GROWER of all sales and charges.  Account of Sales will be made to GROWER within ninety (90) days of final shipment.  Payment schedule above is based on total net proceeds for a given sale and is applicable only if SHIPPER has received the full amount owed to the GROWER for that sale.  In the event SHIPPER has not received the total amount due, SHIPPER will pay the GROWER based on the amount that has been received from the buyer and the remaining balance due the GROWER when the full amount has been receipted.

      4.  SHIPPER will insure all **Cherries** in storage for loss due to fire or extended casualty but IT IS AGREED AND UNDERSTOOD THAT SHIPPER IS NOT LIABLE OR RESPONSIBLE FOR **CHERRIES** WHICH DETERIORATE IN STORAGE OR ARE LOST DUE TO UNINSURED CAUSES.  IT BEING EXPRESSLY AGREED THAT THIS IS A RISK OF LOSS WHICH IS BORNE BY THE GROWER.

      5.  This agreement shall be binding on and insure to the benefit of the heirs, executors, administrators, successors, and assigns of the parties hereto.

**GROWER**:

Will provide a current copy of <u>Food Safety Certification</u> by GFS standard. The following schemes are accepted Global GAP, SQF, Primus GFS and BRC. If you do not have certification Delta Packing will provide assistance to obtain Food Safety certification. All fruit sent to Delta Packing Company of Lodi, Inc. must be certified. If you are sending organic cherries to Delta Packing Company, they must be certified by USDA National Organic Program standards and a current certificate must be provided. If you need to recertify Delta Packing Company will assist in recertification.

GROWER _____ Date _____     SHIPPER _____ Date _____

**EXHIBIT D**

**All transactions shall be subject to trade rules issued by the United States Department of Agriculture, under the Perishable Agriculture Commodities Act and to standard rules and definitions of trade terms.**

IN WITNESS WHEREOF, the parties have executed this agreement as of the day and year first above written.

a) It is understood that all crops delivered for sale are guaranteed to be not adulterated within the meaning of the Federal Food, Drug and Cosmetic Act, or any other applicable law or regulation.

b) It is the understanding of the parties that each are independent contractors, and that they are not joint venturers or partners.

c) GROWER hereby gives permission to SHIPPER to comply with any governmental regulation or order that would in any way affect said crop and to act with full authority with reference to any matter or proration under any federal or state law or order pertaining to said crop.

d) SHIPPER shall attempt to obtain the best market prices and effect quick sales, but in no event is this instrument to be deemed or construed as a guaranty of any specific price, nor shall SHIPPER be liable for losses arising from the financial failure or default of purchaser of said crop or any part thereof. SHIPPER shall not be liable for error in judgement in exercising any of its duties or obligations under or carrying out the terms of this agreement.

e) SHIPPER will make every reasonable effort to sell said crop F.O.B. shipping point, provided, however, SHIPPER shall not be liable for error in judgement if in the opinion of SHIPPER crop should be sold at auction, thru local or destination brokers or jobbers, or by shipping said crop on a delivered or consignment basis, SHIPPER shall have the right to make sale of said crop or any part thereof, on such basis, and in that event all freight, refrigeration, terminal inspection, demurrage, commissions, brokerages, drayage, marketing and other charges or expenses incurred in connection with the shipping and marketing of said crop shall be deducted from the proceeds received from the sale of said crop.

f) SHIPPER is authorized to make whatever adjustments or to grant any allowances that in SHIPPER's opinion are justifiable or necessary in order that sales be consummated at destination and cars or truck lots be accepted by buyers. SHIPPER is also hereby authorized to file and prosecute all proper claims for produce loss or damage in transit, and SHIPPER shall be allowed, in addition to all other charges mentioned herein, a reasonable compensation for the collection of such claims, together with the necessary legal expense incurred.

g) Neither party hereto shall be required to perform or be liable for failure to perform if such non-performance is occasioned by strikes, labor or car shortages, acts of God, action of the elements, or other causes beyond the control of the party so unable to perform; and it is specifically agreed that neither party hereto shall be obligated to meet or conform to any labor demands in order to avoid or terminate any labor dispute in effect or threatened.

h) No liens or encumbrances shall be created on said crop except on the written approval of both parties hereto.  GROWER shall not transfer or assign his or its interest in this agreement to any person or persons whomsoever without first obtaining the written consent of the SHIPPER.  The agreement shall be binding upon the heirs and personal representatives of any natural party to this contract.

i) If either party shall bring any action under this agreement, the prevailing party in such action shall be entitled to judgement for reasonable attorney's fees to be fixed by the Court.

j) SHIPPER agrees that all books of account and records relating to the preparation for market and sale of said crop under this agreement shall during business hours and for a period of not exceeding two years following any transaction be open to the inspection of GROWER.  SHIPPER shall not be obligated to keep or retain any of its records more than two years following the consummation of any given transaction hereunder and shall not be liable for any adjustment in accounting more than nine (9) months following the consummation of any given transaction hereunder.

k) SHIPPER agrees that the grading and packing of said crop will be in accordance with the standard required by state and federal authorities, if any exists, and when deemed advisable by SHIPPER, state or federal inspection will be obtained, in which case the cost of such inspection shall be deducted as a cost of preparation of said crop for market.

l) SHIPPER, in its discretion, may handle said crop on a pool basis with other crops of the same kind being handled by SHIPPER from the same general area.  If said crop is handled on a pool basis, SHIPPER will create pools and each GROWER will be credited with the average return of the pool, prorated on the number of containers of each size and grade shipped by SHIPPER.

m) SHIPPER is hereby authorized to market said crop or any part thereof to any customer, including any company or person having an interest in SHIPPER.

n) I (Do) (Do not) request notice of any price adjustment which is 50 % or less of market news quote or if there is a reduction in the quantity of farm products delivered.

o) I (Do) (Do  not) waive the right to inspection on any lot alleged to be of substandard condition.

p) I (Do) (Do not) request that lot numbers be affixed on each individual farm product container as provided in subdivision (h) of Section 56271.

GROWER _____ Date _____    SHIPPER _____ Date _____

**Exhibit 2**

**47**

## EXHIBIT D

### PAYMENT AND PENALTY REQUIREMENTS

Sections 55601.3 and 56302.2 of the Food Agricultural Code require that under certain conditions you, as a supplier of farm products, must be notified of the following: a) Sections 55601, 55872 and 56603 require that you be paid within the time set by the contract and if no time is specified in the contract, you must be paid within 30 days, and b) Sections 55881 and 56620 require that any delinquent payment of money shall also include a late charge of 5% per month of the unpaid balance, calculated on a daily basis for the delinquency for the first month, and an additional 1% per month of the unpaid balance calculated on a daily basis for the remaining period of the delinquency, unless waived in writing.

## Contact Information

**Grower:**  _____

**Address:**  _____

  _____

**Voice:**  _____

**Fax:**  _____

**Email:**  _____

**Other:**  _____

  _____

  _____

## Orchard Information

| Block ID | Variety | Acres | Tree Spacing | Root Stock | Yr Planted |
|----------|---------|-------|--------------|------------|------------|
|          |         |       |              |            |            |
|          |         |       |              |            |            |
|          |         |       |              |            |            |
|          |         |       |              |            |            |
|          |         |       |              |            |            |
|          |         |       |              |            |            |

GROWER _____ Date _____     SHIPPER _____ Date _____

# EXHIBIT 3

Docusign Envelope ID: 91AD3E29-A0FB-4E72-A687-927977F8F1F5

| | |
|---|---|
| **Lender:** | MLIC |
| **Loan #:** | 198935 |
| **Loan Name:** | Andrews-Corotto |
| **Case #:** | 1261 |

**EXCLUSIVE LISTING AGREEMENT**
*(01261)*

**THIS EXCLUSIVE LISTING AGREEMENT** (this "Agreement") is made as of February ___21___, 2025, by and between **PHILLIP CHRISTENSEN**, in his capacity as receiver pursuant to Court Order ("Receiver"), having an address for notice purposes of AGRIGLOBE, LLC, ATTN: PHILLIP CHRISTENSEN, P.O. BOX 5379, FRESNO, CALIFORNIA 93755, and **PEARSON REALTY**, a California corporation, having an address for notice purposes of c/o 7480 N. PALM AVENUE, SUITE 101, FRESNO, CALIFORNIA 93711, ATTN: PETER J. ORLANDO ("Broker"), and subject to approval by the United States District Court, Eastern District of California.  Broker and Receiver shall be referred to herein each as a "party" and collectively as the "parties".

**WITNESSETH:**

WHEREAS, the "Property" is described in accordance with attached **Exhibit "A"** attached hereto and incorporated herein by reference;

WHEREAS, for purposes this Agreement, the term "Property" used herein shall refer to any combination of the real property parcels individually or collectively listed on **Exhibit "A"**, and Receiver agrees that any combination of such parcels as part of this Agreement shall constitute Property;

WHEREAS, the Owner and Property are subject to various orders in the United States District Court, Eastern District of California, Case No. 1:24-CV-01261 (the "Receivership" and the court overseeing the Receivership, the "Receivership Court");

WHEREAS, the Receivership Court has approved Phillip Christensen  to act as the duly appointed Receiver with authority to sell the Property , subject to Receivership Court approval;

WHEREAS, acquisition by buyers of the Property is subject to final approval and confirmation of the Receivership Court;

WHEREAS, during the Administration Period (as defined below), any sale, lease, option, or other transfer of the Property (each a "Transfer") is subject to the approval of the Receiver and the  Receivership Court; and

WHEREAS, Receiver desires to engage Broker to facilitate sales and Broker desires to accept such engagement, upon and subject to the terms and conditions set forth herein.

NOW, THEREFORE, for and in consideration of the mutual agreements set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Receiver and Broker hereby agree as follows:

Docusign Envelope ID: 91AD3E29-A0FB-4E72-A687-927977F8F1F5

## AGREEMENT

1.    **Authorization**

Receiver hereby grants to Broker the exclusive right to market the Property via sale, option, lease, or otherwise that is agreeable by Receiver, for the term of this Agreement. Notwithstanding anything to the contrary herein or elsewhere, all terms and conditions of an agreement with any prospective purchaser, tenant, option holder, or otherwise shall be subject to Receiver's sole and absolute discretion. Receiver has the absolute right in all events to approve or to disapprove any and all proposals regarding pricing, marketing and terms of transfer of the Property. Broker shall have no authority to extend any offer or make any agreement on behalf of or binding on Receiver, and Broker shall have no authority to accept security or other deposits in connection with any offer to purchase the Property; accordingly, an agreement to Transfer shall become effective only when: (i) during the Administration Period, it is (A) signed by the Receiver and the prospective transferee, (B) delivered by Receiver to such prospective transferee, and (C) approved by the Receivership Court.  Receiver agrees that Broker and its representatives shall have the right to enter upon and inspect the Property with prospective purchasers at all reasonable times.

2.    **Term**

The "term" of this Agreement shall end, and this Agreement shall terminate and be of no further force and effect, on September 1, 2025; provided, however, that Receiver shall have the right to terminate this Agreement and end the term without cause at any time by providing thirty (30) day's prior written notice to Broker,  (b) Receiver and Broker shall each have the right to terminate this Agreement and end the term for cause immediately upon giving written notice of such cause and such termination to the other party and (c) this Agreement shall terminate upon the completion of a foreclosure of the Property. The period of the term prior to the consummation of the Acquisition shall be referred to herein as the "Administration Period"; the period of the term from and after the consummation of the Acquisition shall be referred to herein as the "Post Administration Period".

3.    **Duties of Broker**

Broker agrees to take all actions reasonably required or helpful in transferring part or all of the Property as promptly as possible, including, but not limited to, promoting and marketing the Property, using its diligent and best efforts, skill, judgment, and abilities to show the Property, offering the Property for sale, procuring prospective purchasers for Property, cooperating with outside brokers representing such prospective transferees, obtaining financial and reference information on prospectives, promptly submitting all offers to Receiver, taking photographs of the Property, making monthly inspections of the Property, and other actions as may be directed by Receiver from time to time including, but not limited to, as and when requested by Receiver, using best efforts to assist Receiver with obtaining tenant estoppel certificates and subordinations. Inquiries regarding the Property shall be referred to Broker and related negotiations shall be handled by or under direction of Broker, subject to the approval and review of Receiver.

Broker shall be responsible for coordinating and supervising all services provided by any other cooperating brokers as necessary to facilitate the timely and proper performance of the services and activities required by this Agreement. The costs of any services performed by any of the cooperating brokers, are included in the compensation for the Broker's services established by this Agreement.

Docusign Envelope ID: 91AD3E29-A0FB-4E72-A687-927977F8F1F5

4.      **Commission on Sale**

Upon any Transfer pursuant to a written agreement executed during the term of this Agreement, Receiver agrees, subject to the conditions contained herein, to pay to Broker a commission in accordance with attached **Exhibit "B"** attached hereto and incorporated herein by reference. Any transfer of the Property pursuant to or following the completion of the foreclosure of the Property is excluded from the scope of this Agreement. The commission shall be calculated solely with respect to such Transfer and deemed earned, due and payable in full when, and only if, a Transfer is consummated, and Receiver shall pay such commission (or cause such commission to be paid) concurrent with such Transfer. Broker shall be responsible for paying any and all commissions to any other cooperating broker after Broker is paid by Receiver, and Broker shall indemnify and hold Receiver harmless from and against the claims of any other cooperating broker with claims arising from a cooperating broker relationship initiated by or through Broker, including, but not limited to, attorneys' fees and expenses in connection with Receiver's defense against such claims. All commissions due and payable to Broker shall be paid from the proceeds of the relevant Transfer. Nothing in this Agreement shall require the Receiver to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties or in the exercise of any of its rights or powers hereunder.

5.      **Post-Termination Commissions**

Within ten (10) business days following the termination of this Agreement, Broker shall submit to Receiver a written list (the "Prospective Transferee List") of any person or entity proposed by Broker to the Receiver in writing during the term of this Agreement as a prospective purchaser of the Property. The Prospective Transferee List shall include the names and addresses of such prospective Transferees and the date of the Broker's communication with the prospective Transferees. If within six (6) months after the date of termination of this Agreement, a Transfer is consummated between Receiver and any person or entity included on the Prospective Transferee List submitted to Receiver, Receiver shall pay Broker the commission in accordance with **Exhibit "B"**. The agreements of this Section 5 shall survive the termination of this Agreement and shall be deemed to bind any cooperating broker engaged by Broker.

6.      **Listing**

Broker shall initially list the Property for the prices set forth on **Exhibit "C"** attached hereto and incorporated herein by reference.

7.      **Nondiscrimination**

The Property shall be offered without regard to race, color, creed, religion, national origin, sex, handicap, gender, orientation, age, pregnancy, disability and/or familial status.

8.      **Broker Representations**

Broker represents and warrants to Receiver that Broker and all of its agents performing services under it shall be duly licensed in the State of California to the extent required by applicable law, and agrees to comply with all applicable laws in the performance of the services hereunder including, but not limited to, the real estate broker licensure requirements. Broker covenants to keep its license and those of its agents performing services under this Agreement in good standing at all times during the term of this Agreement to the extent required by applicable law.

Docusign Envelope ID: 91AD3E29-A0FB-4E72-A687-927977F8F1F5

9.    **Standards**

Broker shall further the interests of Receiver  in accordance with Receiver's applicable requirements, procedures and directions, in each case accordance with the highest professional standards. Broker shall comply with all national, federal, state, and municipal laws, regulations, codes, ordinances, and orders applicable to Broker and the activities of Broker and its agents or employees under and in connection with this Agreement.

10.   **Assignment**

Broker shall not be entitled to assign any rights or to delegate any duties or obligations under this Agreement, and any assignment in violation of this prohibition shall be void.

11.   **Governing Law**

This Agreement shall be construed according to and governed by the laws of the State of California. THE PARTIES HERETO SPECIFICALLY WAIVE ANY RIGHT OR CLAIM TO A JURY TRIAL IN THE EVENT OF A DISPUTE HEREUNDER, OR ARISING OUT OF OR INVOLVING THE SUBJECT MATTER HEREUNDER WHETHER ARISING IN CONTRACT OR TORT. The provisions of this paragraph shall survive the termination or expiration of this Agreement.

12.   **Receiver's Capacity and Court Process**

The Receiver enters into this Agreement solely in his capacity as receiver, and not in any corporate, personal or other capacity.

The terms hereof and all sales are subject to Receivership Court approval.

Further, the Receiver will seek approval of sale procedures and this Agreement shall be subject to the terms of any Receivership Court order thereon.

If there are any discrepancies between this Agreement and any order of the Receivership Court, the order of the Receivership Court shall control.

13.   **Modifications**

This Agreement may not be amended, modified or changed, nor shall any waiver of any provisions hereof be effective, except only by an instrument in writing and signed by the party against whom enforcement of any waiver, amendment, change, modification or discharge is sought.

14.   **Notices**

All notices or other communications required or desired to be given hereunder shall be in writing and shall be effective for all purposes if (a) emailed and (b) hand delivered to the parties at the respective addresses set forth above (or such other addresses as the parties may hereafter designate in writing) or sent to the respective parties at such addresses by (i) certified or registered United States mail, postage prepaid, (ii) expedited prepaid delivery service, either commercial or United States Postal Service, with proof of attempted delivery, or (iii) by telecopier (with answer back acknowledged and so long as the original of said telecopy is mailed the next day). A notice shall be deemed to have been given by the following: in the case of hand delivery or email, at the time of delivery; or in the case of mail delivery three (3) days after

Docusign Envelope ID: 91AD3E29-A0FB-4E72-A687-927977F8F1F5

having been deposited in the United States mail postage prepaid and properly addressed; or in the case of notice sent via overnight delivery service or telecopy, upon receipt.

15.     **Independent Contractor**

It is expressly understood and agreed that Broker, as an agent of Receiver, will act as an independent contractor in the performance of this Agreement. The parties hereby agree that nothing in the Agreement shall be intended or construed to create an employer-employee relationship, a partnership, or a joint venture with respect to the Property or otherwise.

16.     **Binding Effect; Counterpart Signatures/Electronic Signatures**

This Agreement shall be binding upon, and shall inure to the benefit of, the successors and assigns of the parties hereto, subject to the restrictions and limitations of Section 10 of this Agreement. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original and all such counterparts, taken together, shall constitute but one and the same instrument. Facsimile signatures or any other electronic signature or DocuSign on any counterpart shall be effective as an original signature, but the parties hereto agree to deliver to the other original signatures within thirty (30) days after the date of this Agreement.

17.     **Entire Agreement**

This Agreement constitutes the entire agreement between Broker and Receiver and supersedes all other agreements.

**[The remainder of this page is intentionally left blank.]**

Docusign Envelope ID: 91AD3E29-A0FB-4E72-A687-927977F8F1F5

**IN WITNESS WHEREOF**, the parties have duly entered into this Agreement as of the day and year first written above.

**RECEIVER:**

*Phillip Christensen*

PHILLIP CHRISTENSEN, as Receiver

**BROKER:**

**PEARSON REALTY**

By: *Sullivan Grosz*

Name: Sullivan Grosz

Title: President Ag Division CA DRE# 02019422

Docusign Envelope ID: 91AD3E29-A0FB-4E72-A687-927977F8F1F5

**EXHIBIT "A"**

**DESCRIPTION OF PROPERTY**

| County | APN | Assessed Acres |
|--------|-----|----------------|
| Kern | 220-130-05-00-7 | 40.00 |
| Kern | 220-130-17-00-2 | 13.33 |
| Kern | 220-130-17-00-2 | 26.67 |
| Kern | 220-130-24-00-2 | 53.33 |
| Kern | 220-130-24-00-2 | 106.67 |
| Kern | 220-130-30-00-9 | 120.00 |
| Kern | 220-130-35-00-4 | 160.00 |
| | **Total Assessed Acres** | **520.00** |

**Exhibit 3**
**55**

Docusign Envelope ID: 91AD3E29-A0FB-4E72-A687-927977F8F1F5

## EXHIBIT "B"

## COMMISSIONS

**Sales**

| Total Commission Based on Transfer Sales Price | Transfer of Assets Listed by Pearson Realty where Buyer is Represented by Agent OTHER THAN Dan Kevorkian, Sullivan Grosz, Robb Stewart, AJ Ferdinandi, or Kameron Stewart | Transfer of Assets Listed by Pearson Realty where Buyer is Represented by Dan Kevorkian, Sullivan Grosz, Robb Stewart, AJ Ferdinandi, Or Kameron Stewart |
|---|---|---|
| ≥$500,000,000 | 1.00% | 1.00% |
| ≥ $250,000,000 and < $500,000,000 | 1.50% | 1.25% |
| ≥ $100,000,000 and < $250,000,000 | 2.00% | 1.75% |
| ≥ $50,000,000 and < $100,000,000 | 2.50% | 2.25% |
| ≥ $25,000,000 and < $50,000,000 | 3.00% | 2.75% |
| ≥ $10,000,000 and < $25,000,000 | 3.50% | 3.25% |
| < $10,000,000 | 4.00% | 3.75% |

**Leases**

Commissions based upon 5% of the rent to be paid under the Lease for any lessee.

**Options to Purchase**

Commissions at the rate for a sale set forth above to be paid upon exercise of option and close of the purchase.

**Pre-Existing Buyers.**

The Receiver has two (2) existing pre-qualified bidders. In the event that one of those pre-qualified bidders purchases the Property, Broker agrees that the commission percentage is reduced by 1%. If Broker procures a "Stalking Horse Bidder," or an offer from a Buyer who is not a pre-existing bidder, then the commission is as set forth in the above table of commissions.

**Exhibit 3**

56

Docusign Envelope ID: 91AD3E29-A0FB-4E72-A687-927977F8F1F5

# EXHIBIT "C"

## LISTING PRICE PER RANCH

| | Ranch Name | Acres | Water Info | Listing Price | Per Acre |
|---|---|---|---|---|---|
| 1. | Copus (15123, 15223, 16023, & 15223) | 520.00 | Wheeler Ridge-Maricopa Water SD | $6,250,000 | $12,019 |

**Exhibit 3**
57

# EXHIBIT 4



**PRELIMINARY REPORT**

*In response to the application for a policy of title insurance referenced herein, **Chicago Title Company** hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a policy or policies of title insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referred to as an exception herein or not excluded from coverage pursuant to the printed Schedules, Conditions and Stipulations or Conditions of said policy forms.*

*The printed Exceptions and Exclusions from the coverage and Limitations on Covered Risks of said policy or policies are set forth in Attachment One.  The policy to be issued may contain an arbitration clause.  When the Amount of Insurance is less than that set forth in the arbitration clause, all arbitrable matters shall be arbitrated at the option of either the Company or the Insured as the exclusive remedy of the parties.  Limitations on Covered Risks applicable to the CLTA and ALTA Homeowner's Policies of Title Insurance which establish a Deductible Amount and a Maximum Dollar Limit of Liability for certain coverages are also set forth in Attachment One.  Copies of the policy forms should be read.  They are available from the office which issued this report.*

*This report (and any supplements or amendments hereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby.  If it is desired that liability be assumed prior to the issuance of a policy of title insurance, a Binder or Commitment should be requested.*

*The policy(ies) of title insurance to be issued hereunder will be policy(ies) of Chicago Title Insurance Company, a Florida corporation.*

***Please read the exceptions shown or referred to herein and the exceptions and exclusions set forth in Attachment One of this report carefully.  The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.***

***It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects and encumbrances affecting title to the land.***

**Chicago Title Insurance Company**

By:

_____
Michael J. Nolan, President

Countersigned By:                                                    Attest:

_____                    _____
Tasha Thompson                                                      Marjorie Nemzura, Secretary
Authorized Officer or Agent

CLTA Preliminary Report Form - Modified (11.17.06)                                    Printed:  03.04.25 @ 01:34 PM by AM
SCA0002402.doc / Updated:  07.30.24                            1            CA-CT-FWKN-02180.054541-SPS-1-25-FWKN-TO25000400

**Exhibit 4**
**58**

*Visit Us on our Website:* *www.ctic.com*



**CHICAGO TITLE COMPANY**

***ISSUING OFFICE:*** 7475 N. Palm Avenue, Ste 107, Fresno, CA 93711

***FOR SETTLEMENT INQUIRIES, CONTACT:***
Chicago Title Company
7330 N. Palm Avenue, Suite 101 • Fresno, CA 93711
(559)451-3700 • FAX (559)431-8936

***Another Prompt Delivery From Chicago Title Company Title Department***
***Where Local Experience And Expertise Make A Difference***

## PRELIMINARY REPORT

| | |
|---|---|
| Title Officer: Marc Wisneski | Escrow Officer: Sue Meyer |
| Email: marc.wisneski@titlegroup.fntg.com | Email: meyers@ctt.com |
| Title No.: FWKN-TO25000400-MW | Escrow No.: 45006085 |

TO: Pearson Realty
7480 North Palm
Fresno, CA 93711
Attn: Sullivan Grosz

**PROPERTY ADDRESS(ES):** Ptn S34, T32, R25E, MDB&M, Taft, CA

**EFFECTIVE DATE: February 26, 2025 at 07:30 AM**

The form of policy or policies of title insurance contemplated by this report is:

1. THE ESTATE OR INTEREST IN THE LAND HEREINAFTER DESCRIBED OR REFERRED TO COVERED BY THIS REPORT IS:

    A Fee

2. TITLE TO SAID ESTATE OR INTEREST AT THE DATE HEREOF IS <u>VESTED IN:</u>

    Grantor Fresno Clovis Investments, LLC, a California Limited Liability Company, subject to proceedings in the Eastern District of California, Case No. 24-cv-01261-KES-SAB, whereas Phillip Christensen was appointed as Receiver, as to Parcels 1, 2, 3 and 4; and

    Willow Avenue Investments, LLC, a California Limited Liability Company, subject to proceedings in the Eastern District of California, Case No. 24-cv-01261-KES-SAB, whereas Phillip Christensen was appointed as Receiver, as to Parcel 5

3. THE LAND REFERRED TO IN THIS REPORT IS DESCRIBED AS FOLLOWS:

    SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

CLTA Preliminary Report Form - Modified (11.17.06)      Printed: 03.04.25 @ 01:34 PM by AM
SCA0002402.doc / Updated: 07.30.24      2      CA-CT-FWKN-02180.054541-SPS-1-25-FWKN-TO25000400

**Exhibit 4**
**59**

## EXHIBIT "A"
Legal Description

**For APN/Parcel ID(s):  220-130-17, 220-130-24, 220-130-05, 220-130-30 and 220-130-35**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE UNINCORPORATED AREA IN COUNTY OF KERN, STATE OF CALIFORNIA AND IS DESCRIBED AS FOLLOWS:

**PARCEL 1: APN 220-130-30**

THE SOUTH HALF OF THE NORTHWEST QUARTER AND THE SOUTHWEST QUARTER OF THE NORTHEAST QUARTER OF SECTION 26, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER THE OFFICIAL PLAT THEREOF.

**PARCEL 2: APN 220-130-05**

THE SOUTHEAST QUARTER OF THE NORTHEAST QUARTER OF SECTION 26, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, AS PER THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM AN UNDIVIDED 10% INTEREST OF ALL OIL, GAS, OTHER HYDROCARBON SUBSTANCES AND MINERALS WITHIN OR UNDERLYING SAID LAND AS BY B.P. OIL CORPORATION, A CORPORATION BY DEED RECORDED NOVEMBER 21, 1973, IN BOOK 4813, PAGE 1567, AS DOCUMENT NO. 36460 OF OFFICIAL RECORDS.

**PARCEL 3: APN 220-130-24**

THE NORTHEAST QUARTER OF SECTION 34, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND APPROVED BY THE SURVEYOR GENERAL ON JUNE 1, 1855.

EXCEPTING THEREFROM AN UNDIVIDED 1/4 INTEREST OF ALL OIL, GAS AND MINERAL RIGHTS AS RESERVED IN DEED FROM PAULINE F. CRANE ADMINISTRATIX OF THE ESTATE OF ABIGAIL BRIGGS FOWLER, DECEASED, RECORDED JULY 3, 1952, IN BOOK 1959, PAGE 228, AS DOCUMENT NO. 30914 OF OFFICIAL RECORDS.

**PARCEL 4: APN 220-130-17**

THE NORTHEAST QUARTER OF THE SOUTHEAST QUARTER OF SECTION 34, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT OF SAID LAND APPROVED BY THE SURVEYOR GENERAL ON JUNE 1, 1855.

**PARCEL 5: APN 220-130-35**

THE EAST HALF OF THE SOUTH HALF OF SECTION 26, TOWNSHIP 32 SOUTH, RANGE 25 EAST, MOUNT DIABLO BASE AND MERIDIAN, IN THE UNINCORPORATED AREA OF THE COUNTY OF KERN, STATE OF CALIFORNIA, ACCORDING TO THE OFFICIAL PLAT THEREOF.

EXCEPTING THEREFROM ALL OIL, GAS, OTHER HYDROCARBONS SUBSTANCES AND MINERALS OF ANY KIND OR CHARACTER, IN, ON OR THEREUNDER, AS RESERVED IN PREVIOUS DEEDS OF RECORD.

CLTA Preliminary Report Form - Modified (11.17.06)                                    Printed: 03.04.25 @ 01:34 PM by AM
SCA0002402.doc / Updated:  07.30.24                          3                CA-CT-FWKN-02180.054541-SPS-1-25-FWKN-TO25000400

**Exhibit 4**
**60**

Title No.:  FWKN-TO25000400-MW

**AT THE DATE HEREOF, EXCEPTIONS TO COVERAGE IN ADDITION TO THE PRINTED EXCEPTIONS AND EXCLUSIONS IN SAID POLICY FORM WOULD BE AS FOLLOWS:**

**THE FOLLOWING MATTERS AFFECT PARCELS 1 AND 2**

1.      Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes to be levied for the fiscal year 2025-2026.

2.      Property taxes, including any personal property taxes and any assessments collected with taxes are as follows:

        Code Area:                135-005
        Tax Identification No.:   220-130-05
        Fiscal Year:              2024-2025
        1st Installment:          $1,270.82 Paid
        2nd Installment:          $1,270.80 Open
        Exemption:                $0.00
        Land:                     $160,096.00
        Improvements:             $0.00
        Personal Property:        $0.00

        The lien of the assessment shown below, which assessment is or will be collected with, and included in, the property taxes shown above.

        Assessment:               Wheeler-Maricopa WSD
        Amount:                   $487.80

        The lien of the assessment shown below, which assessment is or will be collected with, and included in, the property taxes shown above.

        Assessment:               Wheeler GSA Admin Chg
        Amount:                   $255.85

3.      Property taxes, including any personal property taxes and any assessments collected with taxes are as follows:

        Code Area:                135-005
        Tax Identification No.:   220-130-30
        Fiscal Year:              2024-2025
        1st Installment:          $3,080.58 Paid
        2nd Installment:          $3,080.57 Open
        Exemption:                $0.00
        Land:                     $480,288.00
        Improvements:             $0.00
        Personal Property:        $0.00

        The lien of the assessment shown below, which assessment is or will be collected with, and included in, the property taxes shown above.

        Assessment:               Wheeler GSA Admin Chg
        Amount:                   $767.22

CLTA Preliminary Report Form - Modified (11.17.06)                                          Printed:  03.04.25 @ 01:34 PM by AM
SCA0002402.doc / Updated:  07.30.24                    4              CA-CT-FWKN-02180.054541-SPS-1-25-FWKN-TO25000400

**Exhibit 4**
**61**

Title No.:  FWKN-TO25000400-MW

**EXCEPTIONS**
(continued)

4.    Prior to close of escrow, please contact the Tax Collector's Office to confirm all amounts owing, including current fiscal year taxes, supplemental taxes, escaped assessments and any delinquencies.

5.    The lien of supplemental or escaped assessments of property taxes, if any, made pursuant to the provisions of Chapter 3.5 (commencing with Section 75) or Part 2, Chapter 3, Articles 3 and 4, respectively, of the Revenue and Taxation Code of the State of California as a result of the transfer of title to the vestee named in Schedule A or as a result of changes in ownership or new construction occurring prior to Date of Policy.

6.    Taxes and assessments levied by the Wheeler Ridge-Maricopa Water Storage District.

Assessments levied by said District are payable with and in like manner as the County Taxes of the County of Kern.

7.    Reservations contained in the Patent

| | |
|---|---|
| From: | The United States of America |
| To: | The heirs of James H. McNew |
| Recording Date: | March 7, 1924 |
| Recording No.: | Book 12, Page 427 of Official Records |

Which among other things recites as follows:

Subject to any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes and rights to ditches and reservoirs used in connection with such water rights, as may be recognized and acknowledged by the local customs, laws and decisions of the courts, and the reservation from the lands hereby granted, a right of way thereon for ditches or canals constructed by the authority of the United States.

8.    Any policy of title insurance issued under this application will not insure a legal right of access to and from said Land.  Insuring Provision 4 will be deleted.

9.    Easement(s) for the purpose(s) shown below and rights incidental thereto as reserved in a document;

| | |
|---|---|
| Reserved by: | Southern Fuel Company, a corporation |
| Purpose: | pipeline |
| Recording Date: | September 1, 1931 |
| Recording No.: | 14313, Book 59, Page 372 of Official Records |
| Affects: | as more fully described in said document |

10.    Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document:

| | |
|---|---|
| Granted to: | Pacific Lighting Corporation, a corporation |
| Purpose: | Oil Pipeline |
| Recording Date: | February 10, 1943 |
| Recording No.: | 2823, Book 1090, Page 393 of Official Records |
| Affects: | as more fully described in said document |

CLTA Preliminary Report Form - Modified (11.17.06)                     Printed:  03.04.25 @ 01:34 PM by AM
SCA0002402.doc / Updated:  07.30.24                     5                     CA-CT-FWKN-02180.054541-SPS-1-25-FWKN-TO25000400

**Exhibit 4**
**62**

## EXCEPTIONS
### (continued)

11.    Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document:

Granted to:          County of Kern
Purpose:             Public highway
Recording Date:      April 30, 1948
Recording No.:       17106, Book 1523, Page 58 of Official Records
Affects:             as more fully described in said document

12.    Matters contained in that certain document

Entitled:            License Agreement
Dated:               June 16, 1950
Executed by:         Kern Oil Company Limited, a British corporation and Richfield Oil Corporation, a Delaware corporation
Recording Date       July 3, 1950
Recording No.:       27558, Book 1733, Page 51 of Official Records

Reference is hereby made to said document for full particulars.

13.    Matters contained in that certain document

Entitled:            Contract
Dated:               January 12, 1970
Executed by:         Wheeler Ridge-Maricopa Water Storage District and Evarist A. Turco, Et Al, Trustees
Recording Date:      January 20, 1970
Recording No.:       3171, Book 4359, Page 203 of Official Records

Reference is hereby made to said document for full particulars.

Matters contained in that certain document

Entitled:            Wheeler Ridge-Maricopa Water Storage Assumption Agreement and Consent to Transfer Interest of Water User Resulting from Transfer of Real Property Subject to a Contract for Agricultural Water Service (Contract No. 126)
Dated:               February 12, 1992
Executed by:         Wheeler Ridge-Maricopa Water Storage District and The Corotto Company, Inc., a California Corporation
Recording Date:      February 13, 1992
Recording No.:       20351, Book 6631, Page 1301 of Official Records

Reference is hereby made to said document for full particulars.

Exhibit 4
63

Title No.:  FWKN-TO25000400-MW

**EXCEPTIONS**
(continued)

Matters contained in that certain document

| | |
|---|---|
| Entitled: | Wheeler Ridge-Maricopa Water Storage Assumption Agreement and Consent to Transfer Interest of Water User Resulting from Transfer of Real Property Subject to a Contract for Agricultural Water Service (Contract No. 126) |
| Dated: | February 14, 2017 |
| Executed by: | Wheeler Ridge-Maricopa Water Storage District and Grantor Fresno Clovis Investments, LLC, a California Limited Liability Company |
| Recording Date: | March 14, 2017 |
| Recording No.: | 217032570 of Official Records |

Reference is hereby made to said document for full particulars.

14.    Covenants and restrictions imposed by a Land Conservation Contract executed pursuant to Section 51200 et seq. California Government Code (Williamson Act) authorizing the establishment of agricultural preserves.  The use of the land within the preserve may be restricted by the contract to agricultural, recreational, open-space, and other approved compatible uses.

| | |
|---|---|
| Dated: | February 28, 1972 |
| Executed by: | Buena Vista Farms, Inc., a corporation and the County of Kern |
| Recording Date: | February 3, 1972 |
| Recording No.: | 15807, Book 4640, Page 797 of Official Records |

15.    Matters contained in that certain document

| | |
|---|---|
| Entitled: | Agreement Establishing Eligibility for Water Service to Non-Contract Lands and Covenant running with Land |
| Dated: | June 15, 1990 |
| Executed by: | Wheeler Ridge-Maricopa Water Storage District and Donald S. Andrews |
| Recording Date: | August 23, 1990 |
| Recording No.: | 27033, Book 6422, Page 2106 of Official Records |

Reference is hereby made to said document for full particulars.

16.    An unrecorded oil and gas lease for the term therein provided, with certain covenants, conditions and provisions, together with easements, if any, as set forth therein, disclosed by document

| | |
|---|---|
| Entitled: | Oil and Gas Lease (Short Form) |
| Dated: | May 10, 2012 |
| Lessor: | The Corotto Co., Inc. |
| Lessee: | Black Hawk Oil Co., LLC, a California Limited Liability Company |
| Recording Date: | May 30, 2012 |
| Recording No.: | 212073026 of Official Records |

No insurance is made as to the present ownership of the leasehold created by said lease, nor as to other matters affecting the rights or interests of the lessor or lessee in said lease.

CLTA Preliminary Report Form - Modified (11.17.06)                                7                                Printed:  03.04.25 @ 01:34 PM by AM
SCA0002402.doc / Updated:  07.30.24                                                                CA-CT-FWKN-02180.054541-SPS-1-25-FWKN-TO25000400

**Exhibit 4**
64

Title No.:  FWKN-TO25000400-MW

**EXCEPTIONS**
(continued)

17.     Matters contained in that certain document

Entitled:               Wheeler Ridge-Maricopa Water Storage District Assumption Agreement and Consent to Transfer of Interest of Water User  Resulting From Transfer of Real Property Subject to a Contract for Agricultural Water Service (Contract No. 20H)
Dated:                  February 14, 2017
Executed by:            Wheeler Ridge-Maricopa Water Storage District and Grantor Fresno Clovis Investments, LLC, a California Limited Liability Company
Recording Date:     March 14, 2017
Recording No.:      217032568 of Official Records

Reference is hereby made to said document for full particulars.

Matters contained in that certain document

Entitled:               Amendment No. 20H-19-.01 Amendment to Contract Between Wheeler Ridge-Maricopa Water Storage District Grantor Fresno Clovis Investments, LLC, (Contract No. 20H)
Dated:                  January 31, 2020
Executed by:            Wheeler Ridge-Maricopa Water Storage District and Grantor Fresno Clovis Investments, LLC, a California Limited Liability Company
Recording Date:     February 20, 2020
Recording No.:      220022864 of Official Records

Reference is hereby made to said document for full particulars.

18.     Matters contained in that certain document

Entitled:               Easement Agreement (Copus Road Ranch)
Dated:                  April 2, 2021
Executed by:            Copus Road Almonds, LLC, a Delaware limited liability company, Maricopa Orchards, LLC, a California Limited Liability Company, Grantor Fresno Clovis Investments, LLC, a California Limited Liability Company, Ashlan & Hayes Investment, LLC, a California Limited Liability Company and C & A Farms, LLC, a California Limited Liability Company
Recording Date:     April 2, 2021
Recording No.:      221061366 of Official Records

Reference is hereby made to said document for full particulars.

19.     **ALSO SEE MATTERS AFFECTING ALL PARCELS**

        **THE FOLLOWING MATTERS AFFECT PARCELS 3 AND 4**

20.     Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes to be levied for the fiscal year 2025-2026.

CLTA Preliminary Report Form - Modified (11.17.06)                                                                    Printed:  03.04.25 @ 01:34 PM by AM
SCA0002402.doc / Updated:  07.30.24                          8                  CA-CT-FWKN-02180.054541-SPS-1-25-FWKN-TO25000400

**Exhibit 4**
**65**

Title No.:  FWKN-TO25000400-MW

**EXCEPTIONS**
(continued)

21.     Property taxes, including any personal property taxes and any assessments collected with taxes are as follows:

        Code Area:                  135-005
        Tax Identification No.:      220-130-17
        Fiscal Year:                2024-2025
        1st Installment:            $1,276.87 Paid
        2nd Installment:            $1,276.86 Open
        Exemption:                  $0.00
        Land:                       $160,096.00
        Improvements:               $44,737.00
        Personal Property:          $0.00

        The lien of the assessment shown below, which assessment is or will be collected with, and included in, the property taxes shown above.

        Assessment:         Wheeler GSA Admin Chg
        Amount:             $255.33

22.     Property taxes, including any personal property taxes and any assessments collected with taxes are as follows:

        Code Area:                  135-005
        Tax Identification No.:      220-130-24
        Fiscal Year:                2024-2025
        1st Installment:            $5,138.23 Paid
        2nd Installment:            $5,138.21 Open
        Exemption:                  $0.00
        Land:                       $640,384.00
        Improvements:               $184,399.00
        Personal Property:          $0.00

        The lien of the assessment shown below, which assessment is or will be collected with, and included in, the property taxes shown above.

        Assessment:         Wheeler GSA Admin Chg
        Amount:             $1,013.61

23.     Prior to close of escrow, please contact the Tax Collector's Office to confirm all amounts owing, including current fiscal year taxes, supplemental taxes, escaped assessments and any delinquencies.

24.     The lien of supplemental or escaped assessments of property taxes, if any, made pursuant to the provisions of Chapter 3.5 (commencing with Section 75) or Part 2, Chapter 3, Articles 3 and 4, respectively, of the Revenue and Taxation Code of the State of California as a result of the transfer of title to the vestee named in Schedule A or as a result of changes in ownership or new construction occurring prior to Date of Policy.

25.     Taxes and assessments levied by the Wheeler Ridge-Maricopa Water Storage District.

CLTA Preliminary Report Form - Modified (11.17.06)                                    Printed:  03.04.25 @ 01:34 PM by AM
SCA0002402.doc / Updated:  07.30.24                    9            CA-CT-FWKN-02180.054541-SPS-1-25-FWKN-TO25000400

**Exhibit 4**
66

Title No.:  FWKN-TO25000400-MW

**EXCEPTIONS**
(continued)

Assessments levied by said District are payable with and in like manner as the County Taxes of the County of Kern.

26.     Any policy of title insurance issued under this application will not insure a legal right of access to and from said Land.  Insuring Provision 4 will be deleted.

27.     Reservations contained in the Patent

From:                The United States of America
To:                  Perry J. Bryan
Recording Date:      February 1, 1912
Recording No.:       Book 16, Page 154 of Patents
Affects:             Parcel 3

Which among other things recites as follows:

Subject to any vested and accrued water rights for mining, agricultural, manufacturing or other purposes and rights to ditches and reservoirs used in  connection with such water rights, as may be recognized and acknowledged by the local customs, laws and decisions of the courts; and also subject to the right of the proprietor of a vein or lode to extract and remove his ore therefrom should the same be found to penetrate or intersect the premises hereby granted, as provided by law; and the reservation from the lands hereby granted of a right of way thereon for ditches or canals constructed by the authority of the United States.

28.     Reservations contained in the Patent

From:                The United States of America
To:                  George B. Preston
Recording Date:      April 10, 1915
Recording No.:       Book 18, Page 159 of Patents
Affects:             Parcel 4

Which among other things recites as follows:

Subject to any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes and rights to ditches and reservoirs used in connection with such water rights, as may be recognized and acknowledged by the local customs, laws and decisions of the courts, and the reservation from the lands hereby granted, a right of way thereon for ditches or canals constructed by the authority of the United States.

29.     Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document:

Granted to:          Richfield Oil Corporation, a corporation
Purpose:             Pipelines
Recording Date:      June 27, 1950
Recording No.:       26498, Book 1690, Page 421 of Official Records
Affects:             as more fully described in said document

**Exhibit 4**
**67**

Title No.:  FWKN-TO25000400-MW

**EXCEPTIONS**
(continued)

30.    Matters contained in that certain document

Entitled:              Contract for Agricultural Water Service
Dated:                 February 16 1970
Executed by:           Wheeler Ridge-Maricopa Water Storage District, Title Insurance and Trust Company,
a California Corporation, as Truste under the Declaration of Trust of Cad M. Newberry (Trust No.
PP-15465, Asset No. 76198.7)
Recording Date:        February 25, 1970
Recording No.:         10100, Book 4369, Page 987 of Official Records

Reference is hereby made to said document for full particulars.

Matters contained in that certain document

Entitled:              Wheeler Ridge-Maricopa Water Storage District Assumption Agreement and Consent
to Transfer of interest of water user resulting from transfer of real property subject to a contract for
agricultural water service (Contract No. 125)
Dated:                 February 14, 2017
Executed by:           Wheeler Ridge-Maricopa Water Storage District and Grantor Fresno Clovis
Investments, LLC, a California Limited Liability Company
Recording Date:        March 14, 2017
Recording No.:         217032569 of Official Records

Reference is hereby made to said document for full particulars.

31.    Covenants and restrictions imposed by a Land Conservation Contract executed pursuant to Section
51200 et seq. California Government Code (Williamson Act) authorizing the establishment of agricultural
preserves.  The use of the land within the preserve may be restricted by the contract to agricultural,
recreational, open-space, and other approved compatible uses.

Dated:                 February 17, 1970
Executed by:           Title Insurance and Trust Company, a corporation and the County of Kern
Recording Date:        February 27, 1970
Recording No.:         11001, Book 4373, Page 403 of Official Records

32.    An unrecorded oil and gas lease for the term therein provided, with certain covenants, conditions and
provisions, together with easements, if any, as set forth therein, disclosed by document

Entitled:              Oil, Gas and Mineral Lease (Short Form)
Dated:                 March 2, 1998
Lessor:                The Corotto Company, Inc., a California Corporation
Lessee:                James K. Guy and Helen J. Guy, Trustees of the James L. and Helen J. Guy Trust
dated May 11, 1987
Recording Date:        April 17, 1998
Recording No.:         198049344 of Official Records

No insurance is made as to the present ownership of the leasehold created by said lease, nor as to other
matters affecting the rights or interests of the lessor or lessee in said lease.

**Exhibit 4**
**68**

Title No.: FWKN-TO25000400-MW

**EXCEPTIONS**
(continued)

33.  An unrecorded oil and gas lease for the term therein provided, with certain covenants, conditions and provisions, together with easements, if any, as set forth therein, disclosed by document

   Entitled:            Oil, Gas and Mineral Lease (Short Form)
   Dated:               February 10, 2012
   Lessor:              Salome T. Crane, Trustee of the Surviving Spouse's Trust under The P. J. and S. T. Crane Family Trust, dated October 8, 1993
   Lessee:              Vintage Production California LLC
   Recording Date:      October 5, 2012
   Recording No.:       212142134 of Official Records

   No insurance is made as to the present ownership of the leasehold created by said lease, nor as to other matters affecting the rights or interests of the lessor or lessee in said lease.

34.  Matters contained in that certain document

   Entitled:            Easement Agreement (Copus Road Ranch)
   Dated:               January 23, 2020
   Executed by:         Copus Road Almonds, LLC, a Delaware limited liability company, Maricopa Orchards, LLC, a California Limited Liability Company, Grantor Fresno Clovis Investments, LLC, a California Limited Liability Company
   Recording Date:      January 23, 2020
   Recording No.:       220009363 of Official Records

   Reference is hereby made to said document for full particulars.

35.  **ALSO SEE MATTERS AFFECTING ALL PARCELS**

   **THE FOLLOWING MATTERS AFFECT PARCEL 5**

36.  Property taxes, which are a lien not yet due and payable, including any assessments collected with taxes to be levied for the fiscal year 2025-2026.

37.  Property taxes, including any personal property taxes and any assessments collected with taxes are as follows:

   Code Area:           135-005
   Tax Identification No.:  220-130-35
   Fiscal Year:         2024-2025
   1st Installment:     $2,360.19 Paid
   2nd Installment:     $2,360.18 Open
   Exemption:           $0.00
   Land:                $329,340.00
   Improvements:        $0.00
   Personal Property:   $0.00

CLTA Preliminary Report Form - Modified (11.17.06)          Printed:  03.04.25 @ 01:34 PM by AM
SCA0002402.doc / Updated:  07.30.24          12          CA-CT-FWKN-02180.054541-SPS-1-25-FWKN-TO25000400

**Exhibit 4**
69

## EXCEPTIONS
(continued)

The lien of the assessment shown below, which assessment is or will be collected with, and included in, the property taxes shown above.

Assessment:        Wheeler GSA Admin Chg
Amount:            $1,021.68

38.    Prior to close of escrow, please contact the Tax Collector's Office to confirm all amounts owing, including current fiscal year taxes, supplemental taxes, escaped assessments and any delinquencies.

39.    The lien of supplemental or escaped assessments of property taxes, if any, made pursuant to the provisions of Chapter 3.5 (commencing with Section 75) or Part 2, Chapter 3, Articles 3 and 4, respectively, of the Revenue and Taxation Code of the State of California as a result of the transfer of title to the vestee named in Schedule A or as a result of changes in ownership or new construction occurring prior to Date of Policy.

40.    Taxes and assessments levied by the Wheeler Ridge-Maricopa Water Storage District.

Assessments levied by said District are payable with and in like manner as the County Taxes of the County of Kern.

41.    Any policy of title insurance issued under this application will not insure a legal right of access to and from said Land.  Insuring Provision 4 will be deleted.

42.    Reservations contained in the Patent

From:             The United States of America
To:               Miles R. Martin Jr.
Recording Date:   August 12, 1912
Recording No.:    Book 11, Page 467 of Patents

Which among other things recites as follows:

Subject to any vested and accrued water rights for mining, agricultural, manufacturing, or other purposes and rights to ditches and reservoirs used in connection with such water rights, as may be recognized and acknowledged by the local customs, laws and decisions of the courts, and the reservation from the lands hereby granted, a right of way thereon for ditches or canals constructed by the authority of the United States.

43.    Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document:

Granted to:       Richfield Oil Corporation, a corporation
Purpose:          Pipeline, with the right of ingress and egress
Recording Date:   June 19, 1950
Recording No.:    25233, Book 1689, Page 309 of Official Records
Affects:          as more fully described in said document

**Exhibit 4**
**70**

Title No.:  FWKN-TO25000400-MW

**EXCEPTIONS**
(continued)

44.    Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document:

Granted to:          Richfield Oil Corporation, a corporation
Purpose:             Pipelines for the transportation of oil, petroleum, gas, gasoline, water or other
substances and to erect and maintain telegraph, telephone and electric lines
Recording Date:      June 22, 1950
Recording No.:       25862, Book 1689, Page 326 of Official Records
Affects:             as more fully described in said document

45.    Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document:

Granted to:          Pacific Lighting Gas Supply Company, a Nevada Corporation
Purpose:             pipelines
Recording Date:      September 8, 1950
Recording No.:       37348, Book 1511, Page 416 of Official Records
Affects:             as more fully described in said document

46.    Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document:

Granted to:          Pacific Lighting Gas Supply Company, a Nevada Corporation
Purpose:             pipelines
Recording Date:      September 18, 1950
Recording No.:       38656, Book 1732, Page 31 of Official Records
Affects:             as more fully described in said document

47.    Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document:

Granted to:          Richfield Oil Corporation, a corporation
Purpose:             Pipeline
Recording Date:      September 20, 1950
Recording No.:       39194, Book 1732, Page 58 of Official Records
Affects:             as more fully described in said document

48.    Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document:

Granted to:          Richfield Oil Corporation, a corporation
Purpose:             Pipelines
Recording Date:      February 26, 1952
Recording No.:       9460, Book 1905, Page 429 of Official Records
Affects:             as more fully described in said document

49.    Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document:

Granted to:          Pacific Gas and Electric Company, a California Corporation
Purpose:             public utilities and incidental purposes
Recording Date:      December 2, 1953
Recording No.:       53244, Book 2156, Page 377 of Official Records
Affects:             as more fully described in said document

CLTA Preliminary Report Form - Modified (11.17.06)                    Printed:  03.04.25 @ 01:34 PM by AM
SCA0002402.doc / Updated:  07.30.24                    14                    CA-CT-FWKN-02180.054541-SPS-1-25-FWKN-TO25000400

**Exhibit 4**
**71**

Title No.:  FWKN-TO25000400-MW

**EXCEPTIONS**
(continued)

50.     Matters contained in that certain document

Entitled:              Contract for Agricultural Water Service
Dated:                 January 12, 1970
Executed by:           Wheeler Ridge-Maricopa Water Storage District, Ruth E. Manley, a widow, Cecilia Stanford, a widow, James E. Sanders, a married man, and Bernie Sanders, his wife
Recording Date:        January 19, 1970
Recording No.:         2882, Book 4357, Page 168 of Official Records

Reference is hereby made to said document for full particulars.

Matters contained in that certain document

Entitled:              Wheeler Ridge-Maricopa Water Storage District Assumption Agreement and Consent to Transfer on Interest of Water user resulting from transfer of real property subject to a contract for agricultural water service (Contract No. 80A)
Dated:                 January 29, 2004
Executed by:           Wheeler Ridge-Maricopa Water Storage District and Daniel A. Andrews and Mary N. Milkie-Andrews, husband and wife
Recording Date:        February 24, 2004
Recording No.:         204040051 of Official Records

Reference is hereby made to said document for full particulars.

Matters contained in that certain document

Entitled:              Wheeler Ridge-Maricopa Water Storage District Assumption Agreement and Consent to Transfer on Interest of Water user resulting from transfer of real property subject to a contract for agricultural water service (Contract No. 80A)
Dated:                 February 11, 2006
Executed by:           Wheeler Ridge-Maricopa Water Storage District and Daniel and Mary Andrews Revocable Family Trust
Recording Date:        March 16, 2006
Recording No.:         206062892 of Official Records

Reference is hereby made to said document for full particulars.

Matters contained in that certain document

Entitled:              Wheeler Ridge-Maricopa Water Storage District Assumption Agreement and Consent to Transfer on Interest of Water user resulting from transfer of real property subject to a contract for agricultural water service (Contract No. 80A)
Dated:                 June 4, 2013
Executed by:           Wheeler Ridge-Maricopa Water Storage District and Daniel and Dan Andrews Ranch, LLC, a limited liability company
Recording Date:        July 3, 2013
Recording No.:         213093786 of Official Records

Reference is hereby made to said document for full particulars.

CLTA Preliminary Report Form - Modified (11.17.06)                                                    Printed:  03.04.25 @ 01:34 PM by AM
SCA0002402.doc / Updated:  07.30.24                     15                CA-CT-FWKN-02180.054541-SPS-1-25-FWKN-TO25000400

**Exhibit 4**
72

Title No.:  FWKN-TO25000400-MW

**EXCEPTIONS**
(continued)

Matters contained in that certain document

Entitled:           Amendment No. 80A-19.01 Amendment to Contract Between Wheeler
Ridge-Maricopa Water Storage District Ashlan & Hayes Investments, LLC (Contract No. 80A)
Dated:              January 31, 2020
Executed by:        Wheeler Ridge-Maricopa Water Storage District and Ashlan & Hayes Investments,
LLC, a California Limited Liability Company
Recording Date:     February 20, 2020
Recording No.:      220022867 of Official Records

Reference is hereby made to said document for full particulars.

Matters contained in that certain document

Entitled:           Wheeler Ridge-Maricopa Water Storage District Assumption Agreement and Consent
to Transfer on Interest of Water user resulting from transfer of real property subject to a contract for
agricultural water service (Contract No. 80A)
Dated:              April 20, 2021
Executed by:        Wheeler Ridge-Maricopa Water Storage District and C & A Farms, LLC, a California
Limited Liability Company
Recording Date:     May 19, 2021
Recording No.:      221094518 of Official Records

Reference is hereby made to said document for full particulars.

and Re-Recording Date: January 28, 2022
and Re-Recording No.:  222015055 of Official Records
Reason:                to correct the listed water user

51.    Covenants and restrictions imposed by a Land Conservation Contract executed pursuant to Section
51200 et seq. California Government Code (Williamson Act) authorizing the establishment of agricultural
preserves.  The use of the land within the preserve may be restricted by the contract to agricultural,
recreational, open-space, and other approved compatible uses.

Dated:              February 14, 1978
Executed by:        Fred S. Andrews, Elise V. Andrews, Donald S. Andrews and the County of Kern
Recording Date:     February 27, 1978
Recording No.:      18316, Book 5092, Page 403 of Official Records

CLTA Preliminary Report Form - Modified (11.17.06)                                    Printed:  03.04.25 @ 01:34 PM by AM
SCA0002402.doc / Updated:  07.30.24                    16          CA-CT-FWKN-02180.054541-SPS-1-25-FWKN-TO25000400

**Exhibit 4**
73

## EXCEPTIONS
(continued)

52.     Matters contained in that certain document

Entitled:                Wheeler Ridge-Maricopa Water Storage District Assumption Agreement and Consent to transfer of interest of water user resulting from transfer of real property subject to a contract for agricultural water service (contract no. 80A)
Dated:                   November 1, 2016
Executed by:             Wheeler Ridge-Maricopa Water Storage District and Ashlan & Hayes Investments, LLC, a California Limited Liability Company
Recording Date:          December 21, 2016
Recording No.:           216183586 of Official Records

Reference is hereby made to said document for full particulars.

53.     Matters contained in that certain document

Entitled:                Easement Agreement (Copus Road Ranch)
Dated:                   April 2, 2021
Executed by:             Copus Road Almonds, LLC, a Delaware limited liability company, Maricopa Orchards, LLC, a California Limited Liability Company, Grantor Fresno Clovis Investments, LLC, a California Limited Liability Company, Ashlan & Hayes Investment, LLC, a California Limited Liability Company and C & A Farms, LLC, a California Limited Liability Company
Recording Date:          April 2, 2021
Recording No.:           221061366 of Official Records

Reference is hereby made to said document for full particulars.

54.     **ALSO SEE MATTERS AFFECTING ALL PARCELS**

**THE FOLLOWING MATTERS AFFECT ALL PARCELS**

55.     A deed of trust to secure an indebtedness in the amount shown below,

Amount:                  $7,326,000.00
Dated:                   August 18, 2017
Trustor/Grantor          Ashlan & Hayes Investments, LLC, a California Limited Liability Company, Grantor Fresno Clovis Investments, LLC, a California Limited Liability Company and Maricopa Orchards, LLC, a California Limited Liability Company
Trustee:                 Leon A. Moreno
Beneficiary:             Metropolitan Life Insurance Company, a New York Corporation
Loan No.:                198935
Recording Date:          August 18, 2017
Recording No.:           217110039 of Official Records

**Exhibit 4**
**74**

Title No.: FWKN-TO25000400-MW

**EXCEPTIONS**
(continued)

Said deed of trust has been partially reconveyed by instrument

Recording Date:      May 23, 2019
Recording No.:       219059814 of Official Records

The land described in said partial reconveyance is as follows:

Multiple parcels, subject property not included.

Said deed of trust has been partially reconveyed by instrument

Recording Date:      August 1, 2019
Recording No.:       219093365 of Official Records

The land described in said partial reconveyance is as follows:

APN 220-130-32

Matters contained in that certain document

Entitled:            Consent to Transfer and Assumption Agreement
Dated:               December 7, 2022
Executed by:         Ashland & Hayes Investments, LLC, a California Limited Liability Company, Grantor Fresno Clovis Investments, LLC, a California Limited Liability Company, Maricopa Orchards, LLC, a California Limited Liability Company , ACDF, LLC, a California Limited Liability Company, as successor in interest to 104 Partners, LLC, a limited liability company, Willow Avenue Investments, LLC, a California Limited Liability Company and Metropolitan Life Insurance Company, a New York Corporation
Recording Date:      December 7, 2022
Recording No.:       222180923 of Official Records

Reference is hereby made to said document for full particulars.

A substitution of trustee under said deed of trust which names, as the substituted trustee, the following

Trustee:             Beacon Default Management, Inc., a California Corporation
Recording Date:      November 8, 2024
Recording No.:       224138755 of Official Records

A notice of default under the terms of said trust deed

Executed by:         Beacon Default Management, Inc., a California Corporation, as Trustee
Recording Date:      November 4, 2024
Recording No:        224138756 of Official Records

Affects:  The herein described Land and other land.

Title No.: FWKN-TO25000400-MW

**EXCEPTIONS**
(continued)

56.    Easement(s) for the purpose(s) shown below and rights incidental thereto, as granted in a document:

|  |  |
|---|---|
| Granted to: | Public in General |
| Purpose: | an easement for ingress, egress and road purposes on, over, and across |
| Recording Date: | November 24, 2019 |
| Recording No.: | 219158261 of Official Records |
| Affects: | Portions of Parcels 1, 2, 3 and 4 |

57.    Matters contained in that certain document

|  |  |
|---|---|
| Entitled: | Easement Agreement |
| Dated: | January 23, 2020 |
| Executed by: | C & A Farms, LLC, a California Limited Liability Company; Grantor Fresno Clovis Investments, LLC, a California Limited Liability Company; Ashlan & Hayes Investments, LLC, a California Limited Liability Company; and Maricopa Orchards, LLC, a California Limited Liability Company |
| Recording Date: | January 23, 2020 |
| Recording No.: | 220009365 of Official Records |

Reference is hereby made to said document for full particulars.

Affects:  Parcels 1, 2 and 5

58.    A pending court action as disclosed by a recorded notice:

|  |  |
|---|---|
| Plaintiff: | Metropolitan Life Insurance Company, a New York Corporation |
| Defendant: | ACDF, LLC, a limited liability company, as successor by merger to 104 Partners, LLC; Willow Avenue Investments, LLC, a California Limited Liability Company;  Ashlan & Hayes Investments, LLC, a California Limited Liability Company; Grantor Fresno Clovis Investments, LLC, a California Limited Liability Company; Maricopa Orchards, LLC, a California Limited Liability Company; Farid Assemi, an individual; Farshid Assemi, an individual; Darius Assemi, an individual; and Does 1 through 100, inclusive |
| Court: | Eastern District of California |
| Case No.: | 24-cv-01261-KES-SAB |
| Nature of Action: | Order granting motion for order appointing receiver and for preliminary injunction |
| Recording Date: | December 20, 2024 |
| Recording No.: | 224158302 of Official Records |

CLTA Preliminary Report Form - Modified (11.17.06)                                                                    Printed:  03.04.25 @ 01:34 PM by AM
SCA0002402.doc / Updated:  07.30.24                            19                    CA-CT-FWKN-02180.054541-SPS-1-25-FWKN-TO25000400

**Exhibit 4**
**76**

Title No.: FWKN-TO25000400-MW

## EXCEPTIONS
(continued)

59.   The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below.

Limited Liability Company:  Grantor Fresno Clovis Investments, LLC, a California Limited Liability Company; and Willow Avenue Investments, LLC, a California Limited Liability Company

a.   A copy of its operating agreement, if any, and any and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b.   If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendment thereto with the appropriate filing stamps.

c.   If the Limited Liability Company is  member-managed a full and complete current list of members certified by the appropriate manager or member.

d.   A current dated certificate of good standing from the proper governmental authority of the state in which the entity was created

e.   If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

f.   If Limited Liability Company is a Single Member Entity, a Statement of Information for the Single Member will be required.

g.   Each member and manager of the LLC without an Operating Agreement must execute in the presence of a notary public the Certificate of California LLC (Without an Operating Agreement) Status and Authority form

60.   The transaction contemplated in connection with this Report is subject to the review and approval of the Company's Corporate Underwriting Department.  The Company reserves the right to add additional items or make further requirements after such review.

**END OF EXCEPTIONS**

CLTA Preliminary Report Form - Modified (11.17.06)                                      Printed:  03.04.25 @ 01:34 PM by AM
SCA0002402.doc / Updated:  07.30.24                      20            CA-CT-FWKN-02180.054541-SPS-1-25-FWKN-TO25000400

**Exhibit 4**
**77**

Title No.:  FWKN-TO25000400-MW

## NOTES

Notice: Please be aware that due to the conflict between federal and state laws concerning the cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any transaction involving Land that is associated with these activities.

**Note 1.**  If a county recorder, title insurance company, escrow company, real estate broker, real estate agent or association provides a copy of a declaration, governing document or deed to any person, California law requires that the document provided shall include a statement regarding any unlawful restrictions.  Said statement is to be in at least 14-point bold face type and may be stamped on the first page of any document provided or included as a cover page attached to the requested document.  Should a party to this transaction request a copy of any document reported herein that fits this category, the statement is to be included in the manner described.

**Note 2.**  Any documents being executed in conjunction with this transaction must be signed in the presence of an authorized Company employee, an authorized employee of an agent, an authorized employee of the insured lender, or by using Bancserv or other approved third-party service.  If the above requirements cannot be met, please call the company at the number provided in this report.

**Note 3.**  The application for title insurance was placed by reference to only a street address or tax identification number. The proposed Insured must confirm that the legal description in this report covers the parcel(s) of Land requested to be insured. If the legal description is incorrect, the proposed Insured must notify the Company and/or the settlement company in order to prevent errors and to be certain that the legal description for the intended parcel(s) of Land will appear on any documents to be recorded in connection with this transaction and on the policy of title insurance.

**Note 4.**  Pursuant to Government Code Section 27388.1, as amended and effective as of 1-1-2018, a Documentary Transfer Tax (DTT) Affidavit may be required to be completed and submitted with each document when DTT is being paid or when an exemption is being claimed from paying the tax.  If a governmental agency is a party to the document, the form will not be required. DTT Affidavits may be available at a Tax Assessor-County Clerk-Recorder.

**Note 5.**  Due to the special requirements of SB 50 (California Public Resources Code Section 8560 et seq.), any transaction that includes the conveyance of title by an agency of the United States must be approved in advance by the Company's State Counsel, Regional Counsel, or one of their designees.

CLTA Preliminary Report Form - Modified (11.17.06)                                                          Printed:  03.04.25 @ 01:34 PM by AM
SCA0002402.doc / Updated:  07.30.24                       21                CA-CT-FWKN-02180.054541-SPS-1-25-FWKN-TO25000400

**Exhibit 4**
**78**

Title No.:  FWKN-TO25000400-MW

**NOTES**
(continued)

**Note 6.**    The following Exclusion(s) are added to preliminary reports, commitments and will be included as an endorsement in the following policies:

A.  2006 ALTA Owner's Policy (06-17-06).

   6.  Defects, liens, encumbrances, adverse claims, notices, or other matters not appearing in the Public Records but that would be disclosed by an examination of any records maintained by or on behalf of a Tribe or on behalf of its members.

B.  2006 ALTA Loan Policy (06-17-06)

   8.  Defects, liens, encumbrances, adverse claims, notices, or other matters not appearing in the Public Records but that would be disclosed by an examination of any records maintained by or on behalf of a Tribe or on behalf of its members.

   9.  Any claim of invalidity, unenforceability, or lack of priority of the lien of the Insured Mortgage based on the application of a Tribe's law resulting from the failure of the Insured Mortgage to specify State law as the governing law with respect to the lien of the Insured Mortgage.

C. ALTA Homeowner's Policy of Title Insurance (12-02-13) and CLTA Homeowner's Policy of Title Insurance (12-02-13).

   10.  Defects, liens, encumbrances, adverse claims, notices, or other matters not appearing in the Public Records but that would be disclosed by an examination of any records maintained by or on behalf of a Tribe or on behalf of its members.

D. ALTA Expanded Coverage Residential Loan Policy - Assessments Priority (04-02-15).

   12.  Defects, liens, encumbrances, adverse claims, notices, or other matters not appearing in the Public Records but that would be disclosed by an examination of any records maintained by or on behalf of a Tribe or on behalf of its members.

   13.  Any claim of invalidity, unenforceability, or lack of priority of the lien of the Insured Mortgage based on the application of a Tribe's law resulting from the failure of the Insured Mortgage to specify State law as the governing law with respect to the lien of the Insured Mortgage.

E.   CLTA Standard Coverage Policy 1990 (11-09-18).

   7.  Defects, liens, encumbrances, adverse claims, notices, or other matters not appearing in the public records but that would be disclosed by an examination of any records maintained by or on behalf of a tribe or on behalf of its members.

   8.  Any claim of invalidity, unenforceability, or lack of priority of the lien of the insured mortgage based on the application of a tribe's law resulting from the failure of the insured mortgage to specify state law as the governing law with respect to the lien of the insured mortgage.

CLTA Preliminary Report Form - Modified (11.17.06)                                                                                    Printed:  03.04.25 @ 01:34 PM by AM
SCA0002402.doc / Updated:  07.30.24                                   22                        CA-CT-FWKN-02180.054541-SPS-1-25-FWKN-TO25000400

**Exhibit 4**
**79**

Title No.:  FWKN-TO25000400-MW

**NOTES**
(continued)

**Note 7.**    Note:  The name(s) of the proposed insured(s) furnished with this application for title insurance is/are:

No names were furnished with the application.  Please provide the name(s) of the buyers as soon as possible.

**Note 8.**    Note:  There are NO conveyances affecting said Land recorded within 24 months of the date of this report.

**Note 9.**    Note:   The charge for a policy of title insurance, when issued through this application for title insurance, will be based on the Short Term Rate.

**END OF NOTES**

WIRE SAFE™ | Inquire before you wire!

# WIRE FRAUD ALERT

This Notice is not intended to provide legal or professional advice.
If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions. Parties to a transaction rarely change wire instructions in the course of a transaction.

- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you. DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify. **Obtain the number of relevant parties to the transaction as soon as an escrow account is opened.** DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols. Make your passwords greater than eight (8) characters. Also, change your password often and do NOT reuse the same password for other online accounts.

- **USE MULTI-FACTOR AUTHENTICATION** for email accounts. Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

*Federal Bureau of Investigation:*                      *Internet Crime Complaint Center:*
*http://www.fbi.gov*                                   *http://www.ic3.gov*

Wire Fraud Alert
Original Effective Date:   5/11/2017
Current Version Date:   5/11/2017

*TM and © Fidelity National Financial, Inc. and/or an affiliate.  All rights reserved*

FWKN-TO25000400

**Exhibit 4**

## FIDELITY NATIONAL FINANCIAL
## PRIVACY NOTICE

Effective January 1, 2025

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy. This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices. If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

### Collection of Personal Information
FNF may collect the following categories of Personal Information:

- contact information (*e.g.*, name, address, phone number, email address);
- demographic information (*e.g.*, date of birth, gender, marital status);
- identity information (*e.g.,* Social Security Number, driver's license, passport, or other government ID number);
- financial account information (*e.g.,* loan or bank account information);
- biometric data (e.g., fingerprints, retina or iris scans, voiceprints, or other unique biological characteristics; and
- other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:

- information we receive from you or your agent;
- information about your transactions with FNF, our affiliates, or others; and
- information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

### Collection of Browsing Information
FNF automatically collects the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:

- Internet Protocol (IP) address and operating system;
- browser version, language, and type;
- domain name system requests; and
- browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above. We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites. Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

### Other Online Specifics
Cookies. When you visit an FNF Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. Information gathered using cookies helps us improve your user experience. For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences. You can choose whether or not to accept cookies by changing your Internet browser settings. Be aware that doing so may impair or limit some functionality of the FNF Website.

Web Beacons. We use web beacons to determine when and how many times a page has been viewed. This information is used to improve our websites.

Do Not Track. Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

**Exhibit 4**
**82**

<u>Links to Other Sites</u>.  FNF Websites may contain links to unaffiliated third-party websites.  FNF is not responsible for the privacy practices or content of those websites.  We recommend that you read the privacy policy of every website you visit.

## Use of Personal Information

FNF uses Personal Information for these main purposes:

- To provide products and services to you or in connection with a transaction involving you.
- To improve our products and services.
- To prevent and detect fraud;
- To maintain the security of our systems, tools, accounts, and applications;
- To verify and authenticate identities and credentials;
- To communicate with you about our, our affiliates', and others' products and services, jointly or independently.
- To provide reviews and testimonials about our services, with your consent.

## When Information Is Disclosed

We may disclose your Personal Information and Browsing Information in the following circumstances:

- to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
- to affiliated or nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;
- to affiliated or nonaffiliated third parties with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or
- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above.  Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure.  We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors.  By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

## Security of Your Information

We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

## Choices With Your Information

Whether you submit Personal Information or Browsing Information to FNF is entirely up to you.  If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

## State-Specific Consumer Privacy Information:

For additional information about your state-specific consumer privacy rights, to make a consumer privacy request, or to appeal a previous privacy request, please follow the link Privacy Request, or email privacy@fnf.com or call (888) 714-2710.

Certain state privacy laws require that FNF disclose the categories of third parties to which FNF may disclose the Personal Information and Browsing Information listed above. Those categories are:

- FNF affiliates and subsidiaries;
- Non-affiliated third parties, with your consent;
- Business in connection with the sale or other disposition of all or part of the FNF business and/or assets;

**Exhibit 4**
83

- Service providers;
- Law endorsement or authorities in connection with an investigation, or in response to a subpoena or court order.

<u>For California Residents</u>:  We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law.  For additional information about your California privacy rights, please visit the "California Privacy" link on our website (fnf.com/california-privacy) or call (888) 413-1748.

<u>For Nevada Residents</u>:  We are providing this notice pursuant to state law.  You may be placed on our internal Do Not Call List by calling FNF Privacy at (888) 714-2710 or by contacting us via the information set forth at the end of this Privacy Notice.  For further information concerning Nevada's telephone solicitation law, you may contact:  Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number:  (702) 486-3132; email:  aginquiries@ag.state.nv.us.

<u>For Oregon Residents</u>:  We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.  For additional information about your Oregon consumer privacy rights, or to make a consumer privacy request, or appeal a previous privacy request, please email privacy@fnf.com or call (888) 714-2710

FNF is the controller of the following businesses registered with the Secretary of State in Oregon:
Chicago Title Company of Oregon, Fidelity National Title Company of Oregon, Lawyers Title of Oregon, LoanCare, Ticor, Title Company of Oregon, Western Title & Escrow Company, Chicago Title Company, Chicago Title Insurance Company, Commonwealth Land Title Insurance Company, Fidelity National Title Insurance Company, Liberty Title & Escrow, Novare National Settlement Service, Ticor Title Company of California, Exos Valuations, Fidelity & Guaranty Life, Insurance Agency, Fidelity National Home Warranty Company, Fidelity National Management Services, Fidelity Residential Solutions, FNF Insurance Services, FNTG National Record Centers, IPEX, Mission Servicing Residential, National Residential Nominee Services, National Safe Harbor Exchanges, National Title Insurance of New York, NationalLink Valuations, NexAce Corp., ServiceLink Auction, ServiceLink Management Company, ServiceLink Services, ServiceLink Title Company of Oregon, ServiceLink Valuation Solutions, Western Title & Escrow Company

<u>For Vermont Residents</u>:  We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

## Information From Children
The FNF Websites are not intended or designed to attract persons under the age of eighteen (18).  We do <u>not</u> collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

## International Users
FNF's headquarters is located within the United States.  If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence.  By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

## FNF Website Services for Mortgage Loans
Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites").  The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice.  The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and Correcting Information do not apply to the Service Websites.  The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information.   FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is

**Exhibit 4**
**84**

necessary: to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

**Your Consent To This Privacy Notice; Notice Changes**
By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice. We may change this Privacy Notice at any time. The Privacy Notice's effective date will show the last date changes were made. If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice.

**Accessing and Correcting Information; Contact Us**
If you have questions or would like to correct your Personal Information, visit FNF's Privacy Request website or contact us by phone at (888) 714-2710, by email at privacy@fnf.com, or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue,
Jacksonville, Florida 32204
Attn: Chief Privacy Officer

**Exhibit 4**
**85**

# ATTACHMENT ONE

## CALIFORNIA LAND TITLE ASSOCIATION
## STANDARD COVERAGE POLICY - 1990 (11-09-18)

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1.  (a)  Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

    (b)  Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2.  Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3.  Defects, liens, encumbrances, adverse claims or other matters:

    (a)  whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;

    (b)  not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;

    (c)  resulting in no loss or damage to the insured claimant;

    (d)  attaching or created subsequent to Date of Policy; or

    (e)  resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4.  Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.

5.  Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6.  Any claim, which arises out of the transaction vesting in the insured the estate or interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1.  Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.

    Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2.  Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3.  Easements, liens or encumbrances, or claims thereof, not shown by the public records.

4.  Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5.  (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

6.  Any lien or right to a lien for services, labor or material unless such lien is shown by the public records at Date of Policy.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART II

*(Variable exceptions such as taxes, easements, CC&R's, etc., are inserted here)*

**Exhibit 4**

# ATTACHMENT ONE
**(CONTINUED)**

**CALIFORNIA LAND TITLE ASSOCIATION
STANDARD COVERAGE OWNER'S POLICY (02-04-22)**

## EXCLUSIONS FROM COVERAGE

The following matters are excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.   a.   any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) that restricts, regulates, prohibits, or relates to:
       i.   the occupancy, use, or enjoyment of the Land;
       ii.   the character, dimensions, or location of any improvement on the Land;
       iii.   the subdivision of land; or
       iv.   environmental remediation or protection.
   b.   any governmental forfeiture, police, regulatory, or national security power.
   c.   the effect of a violation or enforcement of any matter excluded under Exclusion 1.a. or 1.b.
   Exclusion 1 does not modify or limit the coverage provided under Covered Risk 5 or 6.
2.   Any power of eminent domain. Exclusion 2 does not modify or limit the coverage provided under Covered Risk 7.
3.   Any defect, lien, encumbrance, adverse claim, or other matter:
   a.   created, suffered, assumed, or agreed to by the Insured Claimant;
   b.   not Known to the Company, not recorded in the Public Records at the Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   c.   resulting in no loss or damage to the Insured Claimant;
   d.   attaching or created subsequent to the Date of Policy (Exclusion 3.d. does not modify or limit the coverage provided under Covered Risk 9 or 10); or
   e.   resulting in loss or damage that would not have been sustained if consideration sufficient to qualify the Insured named in Schedule A as a bona fide purchaser had been given for the Title at the Date of Policy.
4.   Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights law, that the transaction vesting the Title as shown in Schedule A is a:
   a.   fraudulent conveyance or fraudulent transfer;
   b.   voidable transfer under the Uniform Voidable Transactions Act; or
   c.   preferential transfer:
       i.   to the extent the instrument of transfer vesting the Title as shown in Schedule A is not a transfer made as a contemporaneous exchange for new value; or
       ii.   for any other reason not stated in Covered Risk 9.b.
5.   Any claim of a PACA-PSA Trust. Exclusion 5 does not modify or limit the coverage provided under Covered Risk 8.
6.   Any lien on the Title for real estate taxes or assessments imposed or collected by a governmental authority that becomes due and payable after the Date of Policy.
   Exclusion 6 does not modify or limit the coverage provided under Covered Risk 2.b.
7   Any discrepancy in the quantity of the area, square footage, or acreage of the Land or of any improvement to the Land.

## EXCEPTIONS FROM COVERAGE

**Some historical land records contain Discriminatory Covenants that are illegal and unenforceable by law.  This policy treats any Discriminatory Covenant in a document referenced in Schedule B as if each Discriminatory Covenant is redacted, repudiated, removed, and not republished or recirculated. Only the remaining provisions of the document are excepted from coverage.**

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and conditions of any lease or easement identified in Schedule A, and the following matters:

### PART I

1.   (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2.   Any facts, rights, interests, or claims that are not shown by the Public Records at Date of Policy but that could be (a) ascertained by an inspection of the Land, or (b) asserted by persons or parties in possession of the Land.
3.   Easements, liens or encumbrances, or claims thereof, not shown by the Public Records at Date of Policy.
4.   Any encroachment, encumbrance, violation, variation, easement, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records at Date of Policy.
5.   (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6.   Any lien or right to a lien for services, labor, material or equipment unless such lien is shown by the Public Records at Date of Policy.
7.   Any claim to (a) ownership of or rights to minerals and similar substances, including but not limited to ores, metals, coal, lignite, oil, gas, uranium, clay, rock, sand, and gravel located in, on, or under the Land or produced from the Land, whether such ownership or rights arise by lease, grant, exception, conveyance, reservation, or otherwise; and (b) any rights, privileges, immunities, rights of way, and easements associated therewith or appurtenant thereto, whether or not the interests or rights excepted in (a) or (b) appear in the Public Records or are shown in Schedule B.

### PART II

*(Variable exceptions such as taxes, easements, CC&R's, etc., are inserted here)*

**Exhibit 4**
**87**

## ATTACHMENT ONE
### (CONTINUED)

### CLTA/ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (7-01-21)
### EXCLUSIONS FROM COVERAGE

The following matters are excluded from the coverage of this policy and We will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.  a.  any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) that restricts, regulates, prohibits, or relates to:
    i.  the occupancy, use, or enjoyment of the Land;
    ii.  the character, dimensions, or location of any improvement on the Land;
    iii.  the subdivision of land; or
    iv.  environmental remediation or protection.
    b.  any governmental forfeiture, police, or regulatory, or national security power.
    c.  the effect of a violation or enforcement of any matter excluded under Exclusion 1.a. or 1.b.
    Exclusion 1 does not modify or limit the coverage provided under Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23, or 27.

2.  Any power to take the Land by condemnation.  Exclusion 2 does not modify or limit the coverage provided under Covered Risk 17.

3.  Any defect, lien, encumbrance, adverse claim, or other matter:
    a.  created, suffered, assumed, or agreed to by You;
    b.  not Known to Us, not recorded in the Public Records at the Date of Policy, but Known to You and not disclosed in writing to Us by You prior to the date You became an Insured under this policy;
    c.  resulting in no loss or damage to You;
    d.  attaching or created subsequent to the Date of Policy (Exclusion 3.d. does not modify or limit the coverage provided under Covered Risk 5, 8.f., 25, 26, 27, 28, or 32); or
    e.  resulting in loss or damage that would not have been sustained if You paid consideration sufficient to qualify You as a bona fide purchaser of the Title at the Date of Policy.

4.  Lack of a right:
    a.  to any land outside the area specifically described and referred to in Item 3 of Schedule A; and
    b.  in any street, road, avenue, alley, lane, right-of-way, body of water, or waterway that abut the Land.
    Exclusion 4 does not modify or limit the coverage provided under Covered Risk 11 or 21.

5.  The failure of Your existing structures, or any portion of Your existing structures, to have been constructed before, on, or after the Date of Policy in accordance with applicable building codes. Exclusion 5 does not modify or limit the coverage provided under Covered Risk 14 or 15.

6.  Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights law, that the transfer of the Title to You is a:
    a.  fraudulent conveyance or fraudulent transfer;
    b.  voidable transfer under the Uniform Voidable Transactions Act; or
    c.  preferential transfer:
    i.  to the extent the instrument of transfer vesting the Title as shown in Schedule A is not a transfer made as a contemporaneous exchange for new value; or
    ii.  for any other reason not stated in Covered Risk 30.

7.  Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.

8.  Negligence by a person or an entity exercising a right to extract or develop oil, gas, minerals, groundwater, or any other subsurface substance.

9.  Any lien on Your Title for real estate taxes or assessments, imposed or collected by a governmental authority that becomes due and payable after the Date of Policy.  Exclusion 9 does not modify or limit the coverage provided under Covered Risk 8.a. or 27.

10.  Any discrepancy in the quantity of the area, square footage, or acreage of the Land or of any improvement to the Land.

### LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:

- For Covered Risk 16, 18, 19 and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 10,000.00 |
| Covered Risk 18: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 19: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 21: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $  5,000.00 |

**Exhibit 4**

## ATTACHMENT ONE
### (CONTINUED)

### CLTA/ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)
### EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:

1.  Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
    a.  building;
    b.  zoning;
    c.  land use;
    d.  improvements on the Land;
    e.  land division; and
    f.  environmental protection.
    This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.

2.  The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes.  This Exclusion does not limit the coverage described in Covered Risk 14 or 15.

3.  The right to take the Land by condemning it.  This Exclusion does not limit the coverage described in Covered Risk 17.

4.  Risks:
    a.  that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
    b.  that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;
    c.  that result in no loss to You; or
    d.  that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.

5.  Failure to pay value for Your Title.

6.  Lack of a right:
    a.  to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
    b.  in streets, alleys, or waterways that touch the Land.
    This Exclusion does not limit the coverage described in Covered Risk 11 or 21.

7.  The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.

8.  Contamination, explosion, fire, flooding, vibration, fracturing, earthquake or subsidence.

9.  Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

### LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
*   For Covered Risk 16, 18, 19 and 21, Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.

The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $ 10,000.00 |
| Covered Risk 18: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 19: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $ 25,000.00 |
| Covered Risk 21: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $  5,000.00 |

**Exhibit 4**
89

# ATTACHMENT ONE
## (CONTINUED)

### ALTA OWNER'S POLICY (07-01-2021)
### EXCLUSIONS FROM COVERAGE

The following matters are excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1.   a.   any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) that restricts, regulates, prohibits, or relates to:
   i.   the occupancy, use, or enjoyment of the Land;
   ii.   the character, dimensions, or location of any improvement on the Land;
   iii.   the subdivision of land; or
   iv.   environmental remediation or protection.
   b.   any governmental forfeiture, police, regulatory, or national security power.
   c.   the effect of a violation or enforcement of any matter excluded under Exclusion 1.a. or 1.b.
   Exclusion 1 does not modify or limit the coverage provided under Covered Risk 5 or 6.

2.   Any power of eminent domain.  Exclusion 2 does not modify or limit the coverage provided under Covered Risk 7.

3.   Any defect, lien, encumbrance, adverse claim, or other matter:
   a.   created, suffered, assumed, or agreed to by the Insured Claimant;
   b.   not Known to the Company, not recorded in the Public Records at the Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   c.   resulting in no loss or damage to the Insured Claimant;
   d.   attaching or created subsequent to the Date of Policy (Exclusion 3.d. does not modify or limit the coverage provided under Covered Risk 9 or 10); or
   e.   resulting in loss or damage that would not have been sustained if consideration sufficient to qualify the Insured named in Schedule A as a bona fide purchaser had been given for the Title at the Date of Policy.

4.   Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights law, that the transaction vesting the Title as shown in Schedule A is a:
   a.   fraudulent conveyance or fraudulent transfer;
   b.   voidable transfer under the Uniform Voidable Transactions Act; or
   c.   preferential transfer:
   i.   to the extent the instrument of transfer vesting the Title as shown in Schedule A is not a transfer made as a contemporaneous exchange for new value; or
   ii.   for any other reason not stated in Covered Risk 9.b.

5.   Any claim of a PACA-PSA Trust.  Exclusion 5 does not modify or limit the coverage provided under Covered Risk 8.

6.   Any lien on the Title for real estate taxes or assessments, imposed or collected by a governmental authority that becomes due and payable after the Date of Policy.  Exclusion 6 does not modify or limit the coverage provided under Covered Risk 2.b.

7.   Any discrepancy in the quantity of the area, square footage, or acreage of the Land or of any improvement to the Land.

### EXCEPTIONS FROM COVERAGE

**Some historical land records contain Discriminatory Covenants that are illegal and unenforceable by law.  This policy treats any Discriminatory Covenant in a document referenced in Schedule B as if each Discriminatory Covenant is redacted, repudiated, removed, and not republished or recirculated.  Only the remaining provisions of the document are excepted from coverage.**

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and conditions of any lease or easement identified in Schedule A, and the following matters:

*NOTE:  The 2021 ALTA Owner's Policy may be issued to afford either Standard Coverage or Extended Coverage.  In addition to variable exceptions such as taxes, easements, CC&R's, etc., the Exceptions from Coverage in a Standard Coverage policy will also include the Western Regional Standard Coverage Exceptions listed as 1 through 7 below:*

1.   (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2.   Any facts, rights, interests, or claims that are not shown by the Public Records at Date of Policy but that could be (a) ascertained by an inspection of the Land or (b) asserted by persons or parties in possession of the Land.

3.   Easements, liens or encumbrances, or claims thereof, not shown by the Public Records at Date of Policy.

4.   Any encroachment, encumbrance, violation, variation, easement, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records at Date of Policy.

5.   (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

6.   Any lien or right to a lien for services, labor, material or equipment unless such lien is shown by the Public Records at Date of Policy.

7.   Any claim to (a) ownership of or rights to minerals and similar substances, including but not limited to ores, metals, coal, lignite, oil, gas, uranium, clay, rock, sand, and gravel located in, on, or under the Land or produced from the Land, whether such ownership or rights arise by lease, grant, exception, conveyance, reservation, or otherwise; and (b) any rights, privileges, immunities, rights of way, and easements associated therewith or appurtenant thereto, whether or not the interests or rights excepted in (a) or (b) appear in the Public Records or are shown in Schedule B.

**Exhibit 4**
**90**

# ATTACHMENT ONE
## (CONTINUED)

### 2006 ALTA OWNER'S POLICY (06-17-06)
### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to

    (i) the occupancy, use, or enjoyment of the Land;

    (ii) the character, dimensions, or location of any improvement erected on the Land;

    (iii) the subdivision of land; or

    (iv) environmental protection;

    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.

    (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.

2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.

3. Defects, liens, encumbrances, adverse claims, or other matters

    (a) created, suffered, assumed, or agreed to by the Insured Claimant;

    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

    (c) resulting in no loss or damage to the Insured Claimant;

    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or

    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.

4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is

    (a) a fraudulent conveyance or fraudulent transfer; or

    (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.

5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

### EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees, or expenses that arise by reason of:

*NOTE: The 2006 ALTA Owner's Policy may be issued to afford either Standard Coverage or Extended Coverage. In addition to variable exceptions such as taxes, easements, CC&R's, etc., the Exceptions from Coverage in a Standard Coverage policy will also include the Western Regional Standard Coverage Exceptions listed below as 1 through 7 below:*

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2. Any facts, rights, interests, or claims that are not shown by the Public Records at Date of Policy but that could be (a) ascertained by an inspection of the Land, or (b) asserted by persons or parties in possession of the Land.

3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records at Date of Policy.

4. Any encroachment, encumbrance, violation, variation, easement, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records at Date of Policy.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

6. Any lien or right to a lien for services, labor, material or equipment unless such lien is shown by the Public Records at Date of Policy.]

7. Any claim to (a) ownership of or rights to minerals and similar substances, including but not limited to ores, metals, coal, lignite, oil, gas, uranium, clay, rock, sand, and gravel located in, on, or under the Land or produced from the Land, whether such ownership or rights arise by lease, grant, exception, conveyance, reservation, or otherwise; and (b) any rights, privileges, immunities, rights of way, and easements associated therewith or appurtenant thereto, whether or not the interests or rights excepted in (a) or (b) appear in the Public Records or are shown in Schedule B.

**Exhibit 4**
91

## Notice of Available Discounts

Pursuant to Section 2355.3 in Title 10 of the California Code of Regulations Fidelity National Financial, Inc. and its subsidiaries ("FNF") must deliver a notice of each discount available under our current rate filing along with the delivery of escrow instructions, a preliminary report or commitment.  Please be aware that the provision of this notice does not constitute a waiver of the consumer's right to be charged the filed rate.  As such, your transaction may not qualify for the below discounts.

You are encouraged to discuss the applicability of one or more of the below discounts with a Company representative.  These discounts are generally described below; consult the rate manual for a full description of the terms, conditions and requirements for such discount.  These discounts only apply to transactions involving services rendered by the FNF Family of Companies.  This notice only applies to transactions involving property improved with a one-to-four family residential dwelling.

Not all discounts are offered by every FNF Company.  The discount will only be applicable to the FNF Company as indicated by the named discount.

**FNF Underwritten Title Companies**
CTC - Chicago Title Company
CLTC - Commonwealth Land Title Company
FNTC - Fidelity National Title Company
FNTCCA – Fidelity National Title Company of California
TICOR - Ticor Title Company of California
LTC - Lawyer's Title Company
SLTC - ServiceLink Title Company

**Underwritten by FNF Underwriters**
CTIC - Chicago Title Insurance Company
CLTIC - Commonwealth Land Title Insurance Co.
FNTIC - Fidelity National Title Insurance Co.
NTINY - National Title Insurance of New York

**Available Discounts**

**CHURCHES OR CHARITABLE NON-PROFIT ORGANIZATIONS (CTIC, CLTIC, FNTIC, NTINY)**
On properties used as a church or for charitable purposes within the scope of the normal activities of such entities, provided said charge is normally the church's obligation the charge for an owner's policy shall be fifty percent (50%) to seventy percent (70%) of the appropriate title insurance rate, depending on the type of coverage selected.  The charge for a lender's policy shall be forty percent (40%) to fifty percent (50%) of the appropriate title insurance rate, depending on the type of coverage selected.

**DISASTER AREA TRANSACTIONS (CTIC, CLTIC, FNTIC, NTINY)**
This rate is available for individuals or entities that were victims of a national or state disaster.  The rate can be used for a Lender's Policy (Standard or Extended), or an Owner's Policy (Standard or Homeowners coverage).  To qualify for this rate, the applicant must, prior to the closing of the applicable transaction, make a written request, including a statement meeting the following criteria:

A.  The subject property is in a disaster area declared by the government of the United States or the State of California.

B.  The subject property was substantially or totally destroyed in the declared disaster.

C.  The subject property ownership has not changed since the time of the disaster.

The rate will be fifty percent (50%) of the applicable rate, and the transaction must be completed within sixty (60) months of the date of the declaration of the disaster.

## Notice of Available Discounts
(continued)

**DISASTER AREA ESCROWS (CTC, CLTC, FNTC, TICOR, LTC)**
This rate is available for individuals or entities that were victims of a national or state disaster.  The rate can be used for a loan or a sale escrow transaction.  To qualify for this rate, the applicant must, prior to the closing of the applicable transaction, make a written request, including a statement meeting the following criteria:

A.  The subject property is in a disaster area declared by the government of the United States or the State of California.

B.  The subject property was substantially or totally destroyed in the declared disaster.

C.  The subject property ownership has not changed since the time of the disaster.

The rate will be fifty percent (50%) of the applicable rate, and the transaction must be completed within sixty (60) months of the date of the declaration of the disaster.  Standard minimum charge applies based upon property type.  No other discounts or special rates, or combination of discounts or special rates, shall be applicable. Applies to a single transaction per property.

This rate is applicable to the following Zones/Counties:

Zone 1.A:  Orange County
Zone 1.B:  Riverside and San Bernardino Counties
Zone 2:  Los Angeles County
Zone 3:  Ventura County
Zone 10:  San Diego County
Zone 12:  Imperial County

If used for a sale transaction, the application of this rate assumes the charge for the Residential Sale Escrow Services (RSES) fee will be split evenly between buyer and seller.  As such and regardless of how the calculated applicable RSES will be split between the disaster victim and the other principal, the rate will be applied only to one half (1/2) of the calculated applicable RSES fee, regardless of whether the disaster victim is paying half (1/2) of the RSES fee (as is customary) or paying the entire fee.  The rate under this provision will be fifty percent (50%) of disaster victims' one half (1/2) portion only and shall not apply to any portion paid by non-disaster victim. Additional services will be charged at the normal rates.

**MILITARY DISCOUNT RATE (CTIC, CLTIC, FNTIC)**
Upon the Company being advised in writing and prior to the closing of the transaction that an active duty, honorably separated, or retired member of the United States Military or Military Reserves or National Guard is acquiring or selling an owner occupied one-to-four family property, the selling owner or acquiring buyer, as applicable, will be entitled to a discount equal to fifteen percent (15%) of the otherwise applicable rates such party would be charged for title insurance policies.  Minimum charge:  Four Hundred Twenty-Five And No/100 Dollars ($425.00)

The Company may require proof of eligibility from the parties to the transaction verifying they are entitled to the discount as described.  No other discounts or special rates, or combination of discounts or special rates, shall be applicable.

**MILITARY RATE (SLTC)**
A discount of twenty percent (20%) off the purchase transaction closing and settlement fee or a discount of One Hundred And No/100 Dollars ($100.00) off the refinance closing and settlement fee, will be applied when the loan is guaranteed by the United States Veterans Administration and the escrow fee is being paid by the consumer and is listed as paid by borrower on the Closing Disclosure and final Settlement Statement.

**PROOF OF SERVICE OF DOCUMENT**

I am over the age of 18 and not a party to this case.  My business address is: **Saul Ewing 1888 Century Park East, Suite 1500, Los Angeles, CA 90067.**

A true and correct copy of the document entitled: **Receiver's Notice of Motion and Motion for Entry of Order Approving Sale of Real Property and for Related Relief; Memorandum of Points and Authorities and Declarations of Phillip Christensen and Sullivan Grosz in Support Thereof** will be served or was served on the judge in chambers in the manner stated below:

**1.     TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**: The foregoing document will be served by the court via NEF and hyperlink to the document.  On **March 17, 2025,** I checked the CM/ECF docket for this case and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒ Service information continued on attached page

**2.     SERVED BY UNITED STATES MAIL:**

On **March 17, 2025,** I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows.  Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed

☒ Service information continued on attached page

**3.     SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 on **March 17, 2025,** I served the following persons and/or entities by personal delivery, overnight  mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

**VIA PERSONAL DELIVERY:**
Honorable Kirk E. Sherriff
United States District Court, Eastern District of California
Robert E. Coyle Federal Courthouse
2500 Tulare Street, First Floor Clerk's Office
Fresno, CA 93721

☒ Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| March 17, 2025 | Hannah Richmond | /s/ *Hannah Richmond* |
|---|---|---|
| *Date* | *Printed Name* | *Signature* |

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

**1.**    **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- **Mark Anishchenko**
  markanishchenko@dwt.com,rosalindcook@dwt.com
- **Robert Cullen Barton**
  rbarton@mwe.com,acorona@mwe.com,mnadel@mwe.com
- **Michael Barrett Brown**
  michael.brown@stoel.com,docketclerk@stoel.com,rebecca.lerma@stoel.com,jill.keehnen@stoel.com,ha.nguyen@stoel.com
- **Dumar LLC**
  reisslaw@reisslaw.net
- **John D. Freed**
  jakefreed@dwt.com,kimberlysimmonsgreene@dwt.com
- **Jane Kim**
  jkim@kbkllp.com
- **Michael S. Nadel , PHV**
  mnadel@mwe.com
- **Saul Reiss**
  reisslaw@reisslaw.net,fay.pugh@outlook.com
- **Zev M. Shechtman**
  Zev.Shechtman@saul.com,Zev.Shechtman@ecf.courtdrive.com,Shelly.Guise@saul.com,hannah.richmond@saul.com,LitigationDocketing@saul.com
- **Brodie Austin Surfus**
  bsurfus@wtjlaw.com,borozco@wtjlaw.com
- **Marshall Craig Whitney**
  mwhitney@wtjlaw.com,sgomez@wtjlaw.com,abroome@wtjlaw.com
- **Thomas Andrew Woods**
  thomas.woods@stoel.com,docketclerk@stoel.com,dalila.tobin@stoel.com,1261239420@filings.docketbird.com,rebecca.lerma@stoel.com

**2.**    **SERVED BY UNITED STATES MAIL (continued)**:

| | |
|---|---|
| John A. Bezmalinovic, General Counsel | Fay Pugh |
| Katrina Ingrao | Law Offices of Saul Reiss, P.C. |
| The Assemi Group | 11835 W. Olympic Blvd., Suite 415E |
| 5260 N. Palm Ave., Suite 421 | Los Angeles, Ca 90064 |
| Fresno, CA 93704 | |
| | |
| Ashlan & Hayes Investments, LLC | Grantor Fresno Clovis Investments, LLC |
| c/o Agent for Service of Process | c/o Agent for Service of Process |
| John A. Bezmalinovic, General Counsel | John A. Bezmalinovic, General Counsel |
| The Assemi Group | The Assemi Group |
| 5260 N. Palm Ave., Suite 421 | 5260 N. Palm Ave., Suite 421 |
| Fresno, CA 93704 | Fresno, CA 93704 |
| | |
| Dirk B. Paloutzian | Ernie Costamagna – Proposed Buyer |
| Natalya M. Ferdinandi | E & C Farms, LLC |
| Baker Manock & Jensen, PC | 9086 Lacey Blvd |
| 5260 North Palm Avenue, Suite 201 | Hanford, CA 93230 |
| Fresno, California 93704 | |

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Steve Rau
9086 Lacey Blvd
Hanford, CA 93230-4729

Buena Vista Farms, Inc.
Attn.: Neil Leiman
8745 Aero Drive Suite 106
San Diego, CA  92123

**3.    SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL (continued) :**

**VIA EMAIL:**

- JBezmalinovic@assemigroup.com
- kingrao@assemigroup.com
- reisslaw@reisslaw.net
- fay.pugh@outlook.com
- dpaloutzian@bakermanock.com
- nferdinandi@bakermanock.com
- lalves@bakermanock.com
- joevanleuven@DWT.COM
- SRau@farmenterprises.net

SAUL EWING LLP
1888 CENTURY PARK EAST, SUITE 1500
LOS ANGELES, CALIFORNIA 90067
(310) 255-6100

Metlife v. ACDF, LLC, et al
1:24-cv-01261

Robinson Family Farms, L.P., a
California limited partnership, et al.,
10835 FURLONG DR,
HANFORD, CA 93230

104 Pistachios, a California general
partnership, et al
c/o Richard H. Cochran, Esq. Kloster,
Ruddell, Hornburg, et al
1102 North Chinowth Street
Visalia, CA 93291-4113

The Corotto Company, Inc
111 N. MARKET ST 3RD FLOOR
ROOM 28
SAN JOSE, CA 95113

Ashlan & Hayes Investments, LLC,
Grantor Fresno Clovis Investments,
LLC, a California limited liability
company, Maricopa Orchards, LLC, a
California limited liability company
1306 West Herndon Avenue, Suite 101
Fresno, CA 93711

Ashlan & Hayes Investments, LLC,
Grantor Fresno Clovis Investments,
LLC, a California limited liability
company, Maricopa Orchards, LLC, a
California limited liability company
1306 West Herndon Avenue, Suite 101
Fresno, CA 93711

Maricopa Orchards, LLC, a California
limited liability company, Grantor,
Fresno Clovis Investments, LLC, a
California limited liability company,
Ashlan & Hayes Investments, LLC., a
California limited liability company, C &
A Farms LLC, a California limit
1306 West Herndon Avenue, Suite 101
Fresno, CA 93711

Kern County
Kern County Administrative Office
1115 Truxtun Avenue, Fifth Floor
Bakersfield, CA 93301

Rachael Marie White
c/o 104 Partners, LLC
1306 West Herndon, Suite 101
Fresno, CA 93711

104 Partners, LLC
1306 West Herndon, Suite 101
Fresno, CA 93711

Horst Simmross
1505 North Clark
Fresno, CA 93703

Peter E. Hirschfeld and Helga
Hirschfeld, husband and wife
1505 North Clark
Fresno, CA 93703

Wheeler Ridge-Maricopa Water Storage
District
c/o Young Woolridge, Paulden, et al
1600 "M" Street
Bakersfield, CA 93301

AG West Farm Credit
19628 Industry Parkway Drive
Bakersfield, CA 93308

Corpus Road Almonds, LLC, a
Delaware limited liability company
2055 Woodside Road, Suite 195
Redwood City, CA 94061

PGIM Real Estate Finance
c/o Prudential Asset Resources
2100 Ross Avenue, Suite 2500
Dallas, TX 75201

The Prudential Insurance Company of
America, a New Jersey corporation
c/o Loan Services
2100 Ross Avenue, Suite 2500
Dallas, TX 75201

Fresno Water Agency
Water & Natural Resources Division
2220 Tulare Street, 6th Floor
Fresno, California 93721

Fresno Treasurer-Tax Collector, Attn:
Oscar J. Garcia, CPA
County of Fresno Hall of Records,
Room 105
2281 Tulare Street
Fresno, CA 93721

County of Fresno
2281 Tulare Street, Room 304
Fresno, CA 93721

James L. Guy and Helen J. Guy,
Trustees of the James L. and Helen L.
Guy Trust dated May 11, 1987
c/o James Guy
2516 Silver Drive
Bakersfield, CA 93306

Fresno Clovis Investments, LLC, a
California limited liability company
2519 W SHAW AVE, Suite 106
FRESNO, CA 93711

Westlands Water District
286 W Cromwell Ave
Fresno, CA 93711

Kern County Water Agency
3200 Rio Mirada Drive
Bakersfield, CA 93308

West Valley  AG Finance LLC
339 West "D" #G
LeMoore, CA 93245

Black Hawk Oil Co., LLC, a California
limited liability company
420 D Bryant Circle
Ojai, CA 93023

Title Insurance and Trust Company, a
corporation
433 South Spring Street
Los Angeles, CA 90054

Buena Vista Farms, Inc
44 Montgomery Street Room 3363
San Francisco, CA 94104

Pacific Gas and Electric Company, a
California corporation
Land Services Office Fresno
650 O Street, Bag 23
Fresno, CA 93760

Pacific Gas and Electric Company, a
California corporation
Land Services Office Fresno
650 O Street, Bag 23
Fresno, CA 93760

MUFG Union Bank, NA
7108 North Fresno Street, Suite 200
Fresno, CA 93720

Wells Fargo Bank
Attn: Vahagn Bznouni, Sr. VP
8405 North Fresno Street, Suite 200
Fresno, CA 93720

Vintage Production California LLC
9600 Ming Avenue, Suite 300
Bakersfield, CA 93311

Kern County Tax Collector Attn:  Jordan
Kaufman, Treasurer/Tax Collector:
KCTTC Taxpayer Service Center
P.O. Box 579
Bakersfield, CA 93302-0580

Todd Henry, Trustee, et al.
c/o Westside Farming
PO Box 590
Friant, CA 93626

**Not Being Served –
No Address Available**

Salome T. Crane, Trustee of the
Surviving Spouse's Trust under the P.J.
and S.T. Crane Family Trust, dated
October 8, 1993
No address available

Fred S. Andrews, et al
No address available

William Heim and Lee Wallace Heim,
his wife, and Frank M. Heim
No address available
recorded 11/10/1958

W. J. Deal and Company, Inc.
No address available

Heinz H. Molsen, et al
No address available

R. Todd Henry and Linda J. Henry,
husband and wife, and Gary G.
Robinson and Karen Robinson,
husband and wife
No address available

R. Todd Henry and Linda J. Trustees of
the Todd and Linda Revocable Trust,
and Gary G. Robinson and Karen
Robinson, as Trustees of the Gary G.
Robinson and Karen Robinson 2004
Trust
No address available

Brad N. Coburn and Kandy S. Coburn,
husband and wife, et al
No address available

Southern Fuel Company, a corporation
No address available

Pacific Lighting Corporation
No address available

Pacific Lighting Gas Supply Company
No address available

Kern Oil Company Limited, a British
corporation
No address available

Richfield Oil Corporation, a Delaware
corporation
No address available

Wheeler Ridge-Maricopa Water Storage
District
P.O. Box 9429
Bakersfield, CA 93389-9429

Donald S. Andrews
No address available

Southern Fuel Company, a corporation
No address available

Donald S. Andrews
No address available

Salome T. Crane, Trustee of the
Surviving Spouse's Trust under the P.J.
and S.T. Crane Family Trust, dated
October 8, 1993
No address available